**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR *ex rel*. ANDY BESHEAR, in His Official Capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; GOVERNOR JOSH SHAPIRO, in His Capacity as Governor of the Commonwealth of Pennsylvania; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; and STATE OF WISCONSIN, | C.A. No. **COMPLAINT** |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; and ERIC SCOTT TURNER, in his official capacity as Secretary of the United States Department of Housing and Urban Development, | |
| Defendants. | |

## COMPLAINT

### I.      INTRODUCTION

1.      Housing is essential to a person's well-being and their ability to work, pursue education, or care for their children and family. But in communities all across the United States, on a given night, hundreds of thousands of people are experiencing homelessness.

2.      Each homeless person has a story of hardship and unmet needs. Addressing the crisis requires urgent action from our communities, institutions, and government. But instead of investing in programs that help people stay safe and housed, the Trump Administration has embraced policies that risk trapping people in poverty and punishing them for being poor.

3.      The Continuum of Care (CoC) Program is the federal government's flagship program for funding housing and other services for individuals at risk of and experiencing homelessness. Through the CoC Program, the Department of Housing and Urban Development (HUD) distributes billions of dollars each year to state, local, and non-profit entities to provide housing and services to families and individuals facing homelessness, including people with disabilities, seniors, families with children, veterans, LGBTQ+ Americans, and others.

4.      Congress designed the program to preserve stability so providers can reliably serve people whose lives depend on it. And for decades, the CoC Program operated with the continuity and predictability mandated by statute, with the vast majority of funding directed to renewing permanent housing, rental assistance, and supportive service projects that have been shown to work.

5.      In 2025, Defendants published Notices of Funding Opportunity (NOFOs) for the CoC Program that would have devastated the program, left tens of thousands of formerly homeless Americans without stable shelter, and severely strained states' homeless response programs.

6.      Most significantly, the Fiscal Year (FY) 2025 NOFO would have blocked renewal funding for a huge number of CoC-funded projects by unlawfully instituting a cap under which only thirty percent of CoC funds could be used for renewing permanent housing projects—down from nearly ninety percent for CoC funds set to expire in 2026.

7.      Plaintiff States sued to challenge the FY 2025 NOFO in November 2025. The Court preliminarily enjoined the FY 2025 NOFOs, including the permanent housing cap. And while that preliminary injunction was pending, Congress stepped in, passing an appropriations act that required HUD to renew existing projects. And last week, the Court granted summary judgment to the Plaintiff States, concluding Defendant HUD acted arbitrarily and capriciously in implementing the NOFOs and thus vacating them.

8.      Nonetheless, on June 1, 2026, HUD published a new NOFO for FY 2026 that seeks to re-implement a cap on permanent housing. The FY 26 NOFO does this through a purported $1.3 billion "set aside" for transitional housing and supportive service-only grants, i.e., non-permanent housing projects. By making this $1.3 billion unavailable for permanent housing, this "set aside" has the effect of capping permanent housing at around sixty-eight percent of CoC funds (the De Facto Cap).

9.      HUD buttressed this unlawful cap with a series of funding conditions designed to punish applicants who adhere to a Housing First model of service delivery (the 2026 Service Requirement Conditions).

10.     Due to the De Facto Cap and 2026 Service Requirement Conditions, a large number of CoC-funded permanent housing projects will lose their funding or see it reduced, resulting in tens of thousands of formerly homeless individuals and families being evicted back to the streets, with states and local governments left to pick up the pieces.

11. As with the thirty percent cap under the FY 2025 NOFO, the De Facto Cap under the FY 2026 NOFO is contrary to provisions in the McKinney-Vento Act requiring HUD to make renewals under most circumstances, and is contrary to notice-and-comment provisions in both the McKinney-Vento Act and the APA.

12. On top of that, the De Facto Cap and 2026 Service Requirement Conditions are blatantly arbitrary and capricious because Defendants have failed to adequately explain their abandonment of Congressionally approved Housing First policies by setting a cap on permanent housing.

13. This Court should hold unlawful and set aside the De Facto Cap and 2026 Service Requirement Conditions and direct HUD to undertake the FY 2026 CoC competition without the unlawful conditions.

## II. JURISDICTION AND VENUE

14. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 705, and 706.

15. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Rhode Island is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Rhode Island.

## III. PARTIES

16. Plaintiff State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign state of the United States of America. The Attorney General of

Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 Wash. Rev. Code.

17.    Plaintiff State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

18.    Plaintiff State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

19.    Plaintiff State of Arizona, represented by and through its Attorney General, Kristin K. Mayes, is a sovereign state of the United States of America. The Attorney General of Arizona is the State's chief law enforcement officer and is authorized to "[r]epresent this state in any action in a federal court[.]" Ariz. Rev. Stat. § 41-193(A)(3).

20.    Plaintiff State of California is a sovereign state of the United States of America. Attorney General Rob Bonta is the chief law enforcement officer for and brings this action on behalf of California.

21.    Plaintiff State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

22.    Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

4

23.     Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State[.]" *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

24.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

25.     Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, section 15. *See* 15 Ill. Comp. Stat. 205/4.

26.     Plaintiff Office of the Governor, *ex rel.* Andy Beshear, brings this suit his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky Const. § 81. In taking office, Governor Beshear swears an oath

5

that he will support the Constitution of the United States and the Kentucky Constitution. Ky. Const. § 228.

27.     Plaintiff State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

28.     Plaintiff State of Maryland is a sovereign State of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

29.     Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

30.     Plaintiff State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

31.     Plaintiff State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

32.     Plaintiff State of New Jersey is a sovereign State of the United States of America. The State of New Jersey is represented by Attorney General Jennifer Davenport, who is the chief legal officer of New Jersey.

6

33.     Plaintiff State of New Mexico, represented by and through its Attorney General Raúl Torrez, is a sovereign state of the United States of America. As the State's chief law enforcement officer, the Attorney General is authorized to act on behalf of the State of New Mexico in this matter.

34.     Plaintiff State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

35.     Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed[.]" Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6).

36.     Plaintiff State of Vermont, represented by and through its Attorney General, Charity R. Clark, is a sovereign state of the United States of America. The Vermont Attorney General is authorized to act on behalf of the State in this matter. *See* 7 V.S.A. § 152.

37.     Plaintiff Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

38.     Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

39.     Defendant HUD is an agency and executive department of the United States government, 42 U.S.C. § 3532(a), and has responsibility for implementing the Continuum of Care Program. HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

40.     Defendant Scott Turner is the United States Secretary of Housing and Urban Development and the federal official in charge of HUD. He is sued in his official capacity.

## IV.     FACTUAL AND LEGAL BACKGROUND

**A.     Congress Created the Continuum of Care Program to Provide Stable Housing for Homeless Americans**

41.     In 1987, Congress passed the McKinney-Vento Homeless Assistance Act to address the "immediate and unprecedented crisis" of homelessness. 42 U.S.C. § 11301(a)(1). Through the Act, Congress aimed "to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S. C. § 11301(b)(3).

42.     The purpose of the CoC program is "to promote community-wide commitment to the goal of ending homelessness"; "to provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[]"; "to promote access to, and effective utilization of, mainstream programs" for individuals and families experiencing homelessness; and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

43.     Congress has directed that CoC funding "shall be used to carry out projects that serve homeless individuals or families that consist of . . . eligible activities[,]" including permanent housing, permanent supportive housing for individuals with disabilities (including mental health

8

and substance use issues), rapid rehousing, supportive services, the Homeless Management Information System, and homelessness prevention. *See* 42 U.S.C. § 11383; 24 C.F.R. § 578.37.

44. HUD issues grants to local coalitions—known as "Continuums of Care"—pursuant to a NOFO. Each Continuum represents a "geographic area," for example, a county or multi-county region within a state. 24 C.F.R. § 578.3.

45. To ensure stability of housing, the McKinney-Vento Act directs HUD to prioritize renewal of existing projects. It provides that "[t]he sums made available" under the CoC program "shall be available for the renewal of contracts in the case of tenant-based assistance, successive 1-year terms, and in the case of project-based assistance, successive terms of up to 15 years at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations, for rental assistance and housing operation costs[.]" 42 U.S.C. § 11386c(b). The HUD "Secretary shall determine whether to renew a contract for such a permanent housing project on the basis of certification by the collaborative applicant for the geographic area that . . . there is a demonstrated need for the project; and . . . the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary." *Id*.; *see also* § 11386b(a)(2) (requiring that "[i]n calculating the portion of" CoC funds for certain new permanent supportive housing, "the Secretary shall not count funds made available to renew contracts for existing projects under section 11386c").

46. By prioritizing renewals of existing projects, Congress wrote the statute to ensure that programs can continue to provide stable housing to formerly homeless individuals, and that millions of formerly chronically homeless individuals and families are not evicted back to homelessness.

47.     On top of this formula funding and funding earmarked for renewals, CoC funding is competitive in two respects.

48.     First, HUD awards grants competitively to applicants within a Continuum. That is, when a Continuum applies to the NOFO, it will rank projects within its geographic area, and HUD will select projects for awards within each Continuum's application up to at least the formula amount.

49.     Second, the McKinney-Vento Act specifically instructs HUD on how CoC funds shall be awarded by including lengthy "Required Criteria" for assessing grant applications such as "the previous performance of the recipient regarding homelessness" with respect to the length of time individuals remain homelessness and related factors, whether the recipient will incorporate "comprehensive strategies for reducing homelessness" such as permanent supportive housing, and many other specific factors. 42 U.S.C. § 11386a.

50.     Importantly, HUD awards "bonuses [and] other incentives to geographic areas for using funding . . . for activities that have been proven to be effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals . . . set forth in" the CoC statutes. 42 U.S.C. §11386b(d)(1).

51.     By statute, these "proven strategies" include:

   a.    "[P]ermanent supportive housing for chronically homeless individuals and families";

   b.    "[F]or homeless families, rapid rehousing services, short-term flexible subsidies to overcome barriers to rehousing, support services concentrating on improving incomes to pay rent, coupled with performance measures

emphasizing rapid and permanent rehousing and with leveraging funding from mainstream family service systems"; and

c.    "[A]ny other activity determined by the Secretary, based on research and *after notice and comment to the public*, to have been proven effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals as set forth in section 11386a(b)(1)(F) of this title."

42 U.S.C. §11386b(d)(2)(A)-(C) (emphasis added).

52.    The statute does not include temporary (i.e., transitional) housing or support service-only projects as "proven strategies."

53.    Moreover, the "independent living goals . . . set forth in section 11386a(b)(1)(F)" refer to "achieving independent living in permanent housing[.]" *Id*. § 11386a(b)(1)(F)(ii).

54.    HUD is also required to proceed by notice-and-comment rulemaking for "matters that relate to . . . grants," "even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. §§ 10.1, 10.2, 10.7-10.10. Although certain exceptions are listed, none apply here. *Id.* § 10.1.

**B.    The CoC Program Is Designed to Create Stable, Permanent Housing**

55.    For at least two decades, HUD has implemented the CoC Program to further its stated policy of "implement[ing] a Housing First approach to reducing homelessness, and driv[ing] equitable community development."[1]

56.    According to HUD—defining the term in its FY 2024 NOFO—Housing First is "[a] model of housing assistance that prioritizes rapid placement and stability in permanent

---

[1] HUD, *Fiscal Year 2022-2026 HUD Strategic Plan* 18 (2022), https://archives.hud.gov/reports/FY2022-2026HUDStrategicPlan.pdf.

housing in which admission does not have preconditions (such as sobriety or a minimum income threshold) and in which housing assistance is not conditioned upon participation in services."[2]

57.    HUD adopted its Housing First approach in recognition of the fact that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success."[3]

58.    According to HUD's most recent strategic plan, a "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services."[4]

59.    Similarly, the United States Interagency Council on Homelessness has recognized that Housing First policy "is based on overwhelming evidence that people experiencing homelessness can achieve stability in permanent housing if provided with the appropriate level of services. Study after study has shown that Housing First yields higher housing retention rates, drives significant reductions in the use of costly crisis services and institutions, and helps people achieve better health and social outcomes."[5]

60.    The core Housing First intervention is "permanent housing"—including "permanent supportive housing" and "rapid rehousing"—in which individuals are provided stable housing "without a designated length of stay." 24 C.F.R. § 578.37(a)(1).

61.    With respect to permanent housing, CoC "funds may be used for acquisition, rehabilitation, new construction, leasing, rental assistance, operating costs, and supportive services." *Id.*

---

[2] HUD, *Community Planning and Development* 17 (2025), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf.

[3] *See supra*, note 1 at 25.

[4] *See supra*, note 1 at 26.

[5] United States Interagency Council on Homelessness, *Housing First Checklist: Assessing Projects and Systems for a Housing First Orientation* 3 n.1 (2016), https://www.usich.gov/sites/default/files/document/Housing_First_Checklist_FINAL.pdf.

62. Permanent supportive housing is available for "individuals with disabilities and families in which one adult or child has a disability[]" and couples housing with "[s]upportive services designed to meet the needs of the program participants[.]" 24 C.F.R. § 578.37(a)(1)(i).

63. The McKinney-Vento Act defines "supportive services" to include, for example, a "child care services program for families experiencing homelessness;" "the establishment and operation of an employment assistance program, including providing job training;" "the provision of mental health services, trauma counseling, and victim services;" "the provision of . . . transportation services that facilitate an individual's ability to obtain and maintain employment;" and more. 42 U.S.C. § 11360(29).

64. For rapid rehousing, CoC "funds may provide supportive services[]" and/or "tenant-based rental assistance . . . as necessary to help a homeless individual or family, with or without disabilities, move as quickly as possible into permanent housing and achieve stability in that housing." 24 C.F.R. § 578.37(a)(1)(ii).

65. The McKinney-Vento Act specifically incorporates a Housing First approach. In 2009, the statute was amended via the HEARTH Act to "entrench federal support for Housing First and expand the availability of permanent housing" and "authorize[] funds for rapid re-housing assistance to help people move into permanent housing."[6]

66. For example, as noted above, the law specifically directs that "[t]he Secretary shall provide bonuses or other incentives . . . for activities that have been proven to be effective at reducing homelessness[,]" including "permanent supportive housing," and "rapid rehousing services[.]" 42 U.S.C. § 11386b(d).

---

[6] Josh Leopold, *Five Ways HEARTH Act Changed Homelessness*, Urban Institute (May 9, 2019), https://www.urban.org/urban-wire/five-ways-hearth-act-changed-homelessness-assistance.

13

67.     With respect to the statute's reference to "achieving homeless prevention and independent living goals as set forth in section 11386a(b)(1)(F) of this title," § 11386a(b)(1)(F) specifically states that this involves "independent living in permanent housing" which "includ[es] assistance to address" issues like "mental health conditions, substance addiction . . . or multiple barriers to employment[.]"

68.     Therefore, under the statute, the Secretary is required to provide bonuses and incentives for permanent supportive housing, rapid rehousing, and assistance to homeless families and individuals who are struggling to obtain employment or are experiencing substance addiction or mental health conditions. This directly reflects a Housing First approach that is centered on permanent housing, including permanent supportive housing, without preconditions regarding employment, sobriety, or the like.

69.     And to the extent HUD wishes to "provide . . . incentives" for "other activit[ies]," it may only do so "based on research and after notice and comment to the public[.]" 42 U.S.C. § 11386b(d)(2)(C).

70.     Similarly, with respect to the Continuum of Care Program, "*[t]o the extent practicable*, each project shall provide supportive services for residents of the project and homeless persons using the project[.]" 42 U.S.C. § 11385(a) (emphasis added). Given that these services include, for example, "operating an employment assistance program," and "providing assistance in obtaining . . . mental health benefits, employment counseling, and medical assistance[]" (42 U.S.C. § 11385(c)), the statute again reflects a Housing First approach given that assistance will be offered to residents of the project rather than first requiring homeless individuals to meet certain criteria to obtain the housing.

14

71.    Consistent with these provisions of the McKinney-Vento Homeless Assistance Act and its amendments, HUD has employed a Housing First and permanent supportive housing approach since at least 2004.[7] As one recent HUD document explained: "For 20 years, HUD has prioritized permanent supportive housing, which serves people with the highest levels of housing and service needs, especially people experiencing chronic homelessness."[8]

72.    Specifically, prior NOFOs and Funding Opportunity Descriptions from 2004 to the present reflect HUD's longstanding commitment to "permanent supportive housing" to "meet the long-term needs of homeless individuals and families" and "Housing First" as one of HUD's "Policy Priorities."[9]

73.    HUD's most recent strategic plan (for Fiscal Years 2022-2026) explicitly provides that HUD will "implement a Housing First approach to reducing homelessness[.]"[10] This policy is explicitly incorporated throughout HUD's most recent, lawful NOFO, for FY 2024-2025.

---

[7] Alap Davé, *How one state almost solved America's homelessness problem*, Catalyst (2023), https://www.bushcenter.org/catalyst/the-fix/homes-for-the-unhoused-solving-homelessness-problem (George W. Bush Administration adopted Housing First program in 2004 as part of its goal to end homelessness); Josh Leopold & Mary K. Cunningham, *To end homelessness, Carson should continue Housing First approach*, Urban Institute (Jan. 7, 2017), https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-housing-first-approach (As a result of the Bush administration's adoption of Housing First, there was a thirty percent reduction in chronic homelessness from 2005 to 2007, and the Obama Administration then continued this support for Housing First).

[8] HUD, *Office of Community Planning and Development Homeless Assistance Grants*, (https://archives.hud.gov/budget/fy25/2025_CJ_Program_-_HAG.pdf (last visited July 6, 2025).

[9] *See, e.g.*, Continuum of Care Homelessness Assistance Programs, 69 Fed. Reg. 27495, 27497-98 (May 14, 2004), https://archives.hud.gov/funding/2004/cocpsec.pdf (Fiscal Year 2004 Continuum of Care Homeless Assistance Programs Funding Opportunity Description states that one of the "basic components" of the "CoC system" is "Permanent housing, or permanent supportive housing, to help meet the long-term needs of homeless individuals and families"); *see also, e.g.*, Grants.gov, Related Documents, *FY 2014 Notice of Funding Opportunity of Continuum of Care*, https://grants.gov/search-results-detail/265408 (last visited July 6, 2026) (Fiscal Year 2014 Notice of Funding Availability for Continuum of Care Program awards applications "up to 10 points" for following a "Housing First" model and defines "Housing First" as one of HUD's "Policy Priorities"); *see also, e.g.*, HUD, *Community Planning and Development Notice of Funding Availability(NOFA) for the Fiscal Year (FY) 2018 Continuum of Care Program Competition* (2018), https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf (Fiscal Year 2018 NOFO includes the same provisions); *see also, e.g.*, Grants.gov, Related Documents, *2021 Continuum of Care* (2021), https://grants.gov/search-results-detail/335322 (last visited July 6, 2026) (Fiscal Year 2021 NOFO includes the same provisions).

[10] *See supra*, note 1 at 18.

15

**C.      HUD Issues Fiscal Year 2025 NOFOs that Include Unlawful Conditions, and Plaintiff States File a Prior Lawsuit**

74.      Yet this Administration has recently sought to cast aside HUD's longstanding commitment to Housing First and fundamentally and unlawfully undermine the CoC program.

75.      Most significantly, over two NOFOs published in November and December 2025, HUD purported to implement a 30% cap on CoC funding going to permanent housing renewals, as well as a 30% cap on "Tier 1" funding—essentially, funding that guaranteed renewals for existing projects, and stability for the people living in those projects.

76.      The FY 2025 NOFOs also included a host of unlawful conditions, including conditions that discriminated against certain disabilities and conditions that discriminated against certain localities based on the policy choices made by local voters and legislatures.

77.      Plaintiff States sued in November 2025, and this Court preliminarily enjoined HUD's FY 2025 NOFO, as well as the challenged conditions therein.

78.      In February 2026, while the parties were briefing summary judgment, the President signed into law the 2026 THUD Appropriations Act (the THUD Act). Transp., Hous. and Urb. Dev. Consol. Appropriations Act of 2026, Pub. L. No. 119-75, 140 Stat. 173. The THUD Act does several things relevant to this dispute.

79.      First, because HUD never developed a lawful NOFO for FY 2025, the THUD Act ultimately required HUD to non-competitively renew all CoC projects expiring in calendar year 2026. The process for renewing CoC projects remains ongoing as of the date this Complaint is filed.

80.      Second, the THUD Act appropriated $4,010,000,000 for the CoC program for FY 2026. *Id.*, 140 Stat. 173, 399.

16

81.    In appropriating that money, Congress explicitly directed that the HUD "Secretary shall select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 et seq." *Id.* In other words, the THUD Act explicitly repudiated HUD's prior thirty percent Tier 1 Cap and instead required that HUD set Tier 1 at sixty percent of annual renewal demand at a minimum.

82.    While the THUD Act's authorization of a sixty percent Tier 1 cap affects local continuums' ability to prioritize projects for funding, it does not affect HUD's statutory obligation to make funds available for renewals.

83.    Moreover, the THUD Act included various set-asides among the broader $4.01 billion appropriation. For example, the Act specifically allocates $52,000,000 "for grants for new rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking[.]" *Id.*, 140 Stat. 173, 399-400. Similarly, the Act specifically allocates $107,000,000 "to implement projects to demonstrate how a comprehensive approach to serving homeless youth, age 24 and under, . . . can dramatically reduce youth homelessness[.]" *Id.*, 140 Stat. 173, 400.

84.    The THUD Act does not, however, include any set-aside for transitional housing, supportive service-only grants, or other policies called for by the FY 2025 NOFOs. Nor does the THUD Act include any sort of cap, explicit or implicit, on permanent housing. Nor does it authorize HUD to ignore the McKinney-Vento Act's explicit prioritization of permanent housing projects over temporary and transitional housing projects.

17

85.     On June 29, 2026, this Court granted Plaintiff States' motion for summary judgment and set aside HUD's issuance of the FY 2025 NOFOs.

**D.     HUD Issues a Fiscal Year 2026 NOFO that Includes Unlawful Conditions Concerning Permanent Housing**

86.     On June 1, 2026, HUD issued a "FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO" with an application due date of August 26, 2026 (the "FY 2026 NOFO"). The FY 2026 NOFO is attached hereto as an Appendix.

87.     Like its predecessor, the FY 2026 NOFO again unlawfully attempts to reverse HUD's decades-long Housing First policy.

88.     Whereas the FY 2025 NOFOs attempted to do so by placing an unauthorized and arbitrary cap on renewal funding for permanent housing projects, the FY 2026 NOFO does so by purporting to create a $1.3 billion "set-aside . . . for new projects with a priority for Transitional Housing and Supportive Service Only projects." App. at 35-36. By making $1.3 billion of the $4.04 billion in CoC appropriations unavailable for permanent housing, this set-aside caps the amount of funds that can go to permanent housing at approximately sixty-eight percent of total available CoC funds.[11]

89.     The De Facto Cap, if allowed to go into effect, will drastically cut funding for permanent housing projects. Well over eighty percent of CoC program funds currently go to support permanent housing. By capping permanent housing at sixty-eight percent, the De Facto Cap will cause programs to lose funding, which means residents losing housing.

90.     According to estimates from the National Alliance to End Homelessness, this shift to funding temporary programs will result in "**at least 97,000 residents** of CoC-funded permanent

---

[11] While Congress appropriated $4.01 billion for CoC funding for FY 2026, HUD has total CoC funding of approximately $4.04 billion for FY 2026. App. at 6.

housing [being] at risk of losing their housing," which it states is a low-end estimate. Nat'l All. to End Homelessness, *Changes to HUD Policy Threaten Efforts to End Homelessness: At Least 97,000 People Could Lose Housing* (June 2, 2026), https://endhomelessness.org/resources/hud-policy-changes-threaten-efforts-to-end-homelessness/ (emphasis in original). In New York, for example, where approximately ninety-two percent of CoC funding goes to permanent housing, the De Facto Cap is estimated to strip CoCs within the state of over $129 million, causing over 8,700 people to lose their housing. *Id.* In Washington, some 2,900 people are at risk of losing stable housing due to the De Facto Cap. *Id.* And in California, it is a staggering 14,937 people. *Id.*

91.    Estimates from Plaintiff States' own agencies further support NAEH's projection. For example, Maryland's Department of Housing and Community Development estimates that changes in the 2026 NOFO, including the De Facto Cap, would result in a $20 to $25 million cut in permanent housing and 1,500 disabled and elderly households losing assistance in calendar year 2027 in the State of Maryland alone. As another example, New York's Office of Temporary and Disability Assistance, which manages New York's Balance of State CoC, estimates that the De Facto Cap puts approximately 71 households at risk.

92.    Congress, however, has directed HUD to fund Housing First policies through various statutory provisions. And it has directed HUD to prioritize renewals to ensure that individuals and families who have successfully exited homelessness are not evicted back into the streets. 42 U.S.C. § 11386c(b). The De Facto Cap ensures that much-needed projects will not be renewed.

93.    In addition to imposing the De Facto Cap, the FY 2026 NOFO reverses HUD's longstanding Housing First policy via new scoring criteria that effectively force applicants to require participants to enroll in services to receive housing (the "2026 Service Requirement

19

Conditions"). For example, the FY 2026 NOFO awards up to twenty points (out of a maximum of 200) for availability of "Treatment and Recovery Services," of which up to six points specifically reward conditioning continued program participation on mandatory substance-abuse treatment engagement, including requirements that applicants "[d]escribe how the[y] . . . partner[] with, or ha[ve] projects that provide, outpatient treatment for mental health and substance use disorders," "[d]emonstrate that for every 2 persons reporting chronic substance use in the CoC's most recent [point-in-time] count, there is at least 1 CoC-funded unit that requires program participant engagement in substance abuse treatment services as a condition of continued participation," and "[i]dentify at least one new or existing CoC project that operates sober housing."[12]

94.    Similarly, the FY 2026 NOFO awards up to eight points if a CoC can "demonstrate" that it "is investing adequately in supportive services by showing" it is either "providing supportive services with a value of 50% of the CoC's Annual Renewal Demand" or that "30% of their proposed CoC funding is used for supportive services relative to their Annual Renewal Demand."[13]

95.    Likewise, the FY 2026 NOFO awards up to eight points if a CoC can "demonstrate that housing projects . . . require program participants to take part in supportive services . . . in line with 24 C.F.R. 578.75(h)."[14] Yet, 24 C.F.R. 578.75(h) only says that programs "may" require program participants to participate in services, not that they are required or incentivized to do so. Instead, the statute requires incentives for permanent supportive housing, as described above. And as recently as 2024, HUD was explicitly encouraging applicants not to require services as a condition for stable housing. *See* HUD, *Community Planning and Development* 87 (2025), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_N

---

[12] App. at 76-78.
[13] *Id.* at 77-79.
[14] *Id.* at 79.

20

OFO_FR-6800-N-25.pdf (to receive full points, applicants "must [d]emonstrate at least 75 percent of all project applications that include housing . . . are using the Housing First approach by providing low barrier projects that do not require preconditions to accessing housing nor participation in supportive services . . . and prioritize rapid placement and stabilization in permanent housing.").

96.     Moreover, the new scoring system makes it extremely difficult for applicants proposing rapid rehousing without supportive services to compete. It does this through a "project quality threshold" in which new Rapid Rehousing projects "must receive at least 4 out of the 6 points available" to be considered for funding, but awarding two points for offering "supportive services and assistance . . . to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance)."[15] Thus, an applicant who does not provide supportive services is heavily disfavored in meeting the minimum threshold for funding.

97.     As a result of the De Facto Cap and 2026 Service Requirement Conditions (collectively, the "2026 Challenged Conditions"), services will be cut off and tens of thousands of Americans will soon face risk of eviction back to homelessness.

**E.      The 2026 Challenged Conditions Violate the APA**

98.     The 2026 Challenged Conditions violate the APA because they are in excess of HUD's statutory authority, contrary to law, and arbitrary and capricious.

99.     Whether considered as a sixty-eight percent cap on permanent housing or as a dedicated pot of money for service-only projects and transitional (i.e., temporary) housing, the De Facto Cap violates the McKinney-Vento Act's provisions mandating that CoC funds "shall be

---

[15] *Id.* at 62, 67-68.

available" for renewals "at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations[.]" 42 U.S.C. § 11386c(b). Moreover, the same statute provides that HUD "shall determine whether to renew a contract for . . . a permanent housing project on the basis of certification" by the applicant of two and only two factors: "(1) there is a demonstrated need for the project; and (2) the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary." *Id.* But by capping permanent housing at sixty-eight percent, the FY 2026 NOFO adds factors that Congress did not permit it to consider, namely, whether renewal would exceed HUD's unlawful and arbitrary cap.

100.    The De Facto Cap, and accompanying 2026 Service Requirement Conditions, are also unlawful because they repeal and replace HUD's longstanding Housing First policy without notice and comment. The APA requires agencies to follow their own binding regulations. HUD's regulations require it to proceed by notice-and-comment rulemaking for "matters that relate to . . . grants[.]" 24 C.F.R. § 10.1. Moreover, the McKinney-Vento Act explicitly requires that HUD may only provide "incentives" for "activities that have been proven to be effective at reducing homelessness," which are limited to those "proven strategies" explicitly laid out in the statute or other activities "based on research and after notice and comment to the public[.]" 42 U.S.C. § 11386b(d). Neither transitional housing nor supportive service-only programs are "proven strategies" within the meaning of the McKinney-Vento Act, and HUD did not undertake a notice-and-comment procedure before implementing its $1.3 billion incentive program or adopting a scoring system that favored transitional housing or supportive service-only programs. The 2026 Challenged Conditions are thus unlawful.

101.    The 2026 Challenged Conditions are also arbitrary and capricious. The APA requires that agencies' decisions be supported by a rational connection between the choice made and the facts underlying that choice, and that agencies consider the disadvantages of their policies. It also requires that a deviation from agency policy be acknowledged and supported by a reasoned explanation or justification. *See* 5 U.S.C. § 706(2)(C). HUD's imposition of the conditions is supported by neither. Although the NOFO offers a policy narrative asserting that a "Housing First" approach "has been a profound failure by any measure," App. at 28, that narrative does not satisfy the APA's reasoned decision-making requirement because the data on which HUD relies does not actually support their conclusion, nor does HUD explain why a $1.3 billion set-aside, or the resulting sixty-eight percent cap, is an appropriately calibrated response to the trends HUD identifies, nor does it reconcile its account with contrary data—including from HUD's own strategic plan—describing Housing First as reducing costs and improving housing stability. *See* supra ¶ 73. Defendants also failed to consider important aspects of their decision including the disadvantages of the decision, namely, what would happen when states and housing providers suddenly lost federal funding. As detailed above, the 2026 Challenged Conditions mean that contracts will be cancelled and formerly homeless individuals left, again, without stable housing. But HUD has failed to consider this problem whatsoever. On top of that, the 2026 Challenged Conditions weigh factors Congress has not authorized HUD to consider and failed to consider factors that Congress explicitly directed it to, like that Housing First strategies have proven successful. When HUD similarly failed to consider these issues with respect to its FY 2025 NOFO, the Court granted the Plaintiff States' motion for summary judgment because HUD's similar failures were arbitrary and capricious. *See* Order, *State of Washington v. Dep't of Hous. and Urban*

*Dev.*, 25-cv-626-MSM-AEM, ECF No. 113 (D.R.I. June 29, 2026). For the same reasons, HUD's imposition of the 2026 Challenged Conditions was also arbitrary and capricious.

**F.    The Challenged Conditions Harm the Plaintiff States and their Residents**

102.    The Plaintiff States rely on the CoC program as a principal source of federal funding and coordination for assistance with addressing homelessness. The 2026 Challenged Conditions threaten to upend this intertwined system of federal, state, and local funding, programming, and collaboration and seriously harm the Plaintiff States, their homelessness response systems, and their most vulnerable residents.

103.    Within each State, CoC regions are locally defined geographies created by community stakeholders and recognized by HUD, reflecting historical collaboration patterns. Each CoC is organized around the specific housing and service needs of the population it serves, structuring its governance, priorities, and project portfolio in response to local factors such as homelessness patterns, provider capacity, geography, and demographic characteristics.

104.    Washington, for example, is organized into several HUD-designated CoCs, including Seattle/King County (WA-500), Spokane City and County (WA-502), Tacoma/Lakewood/Pierce County (WA-503), and the Balance of State CoC (WA-501), which covers the thirty-four smaller counties in Washington. New York has 24 CoCs across the state, including the New York Balance of State CoC (NY-525) and the New York City CoC (NY-600). And Rhode Island is coterminous with the Rhode Island Statewide Continuum of Care Program (RI-500), which serves homeless individuals across the State. Each CoC has a designated Collaborative Applicant under 24 C.F.R. Part 578, responsible for communitywide planning, project ranking, and application for competitive HUD funding. Through their respective CoCs, service organizations, agencies and local governments in the Plaintiff States receive funding to

24

support permanent supportive housing, rapid rehousing, transitional housing, and coordinated entry systems across the state.

105.    CoC funds not only supply direct federal aid, but also leverage hundreds of millions in additional public and philanthropic funds essential for operations at publicly funded housing sites. 24 C.F.R. § 578.73 requires that every CoC-funded project must provide a twenty-five percent match for all eligible costs other than leasing, and CoC grants provide the backbone of funding that is supplemented by other public and private sources. Projects with guaranteed annual CoC renewals are able to attract other sources of funding, including state Housing Trust Fund dollars, Low-Income Housing Tax Credit (LIHTC) investment, and foundation-backed predevelopment loans. The broader impact of federal cuts is therefore much greater than the direct funding loss alone.

106.    State agencies take on various roles within their CoCs. In many Plaintiff States, state agencies operate as the Collaborative Applicant for the CoC. For example, the New York Office of Temporary and Disability Assistance serves as the Collaborative Applicant for the New York Balance of State CoC covering nine counties. The New York City Department of Social Services serves as the Collaborative Applicant for the New York City CoC. Agencies serving as the Collaborative Applicants are responsible for preparing and submitting the consolidated CoC Program application to HUD and ensuring that the application complies with all regulatory requirements under 24 C.F.R. part 578. They oversee system governance, establish required policies and procedures, and administer CoC grants on behalf of participating localities and service providers. Collaborative applicants receive direct federal funding to administer the program locally.

25

107. In addition to playing a direct role in CoCs, Plaintiff States organize their own homelessness responses around the CoC program. Many Plaintiff States make substantial investments in homelessness and supportive housing that presuppose the existence of this CoC-funded capacity, using state dollars to fund acquisition or rehabilitation of housing, supplement rental assistance, expand services, or meet match requirements that pair with federal awards. As a result, state and local expenditures rely on and are intertwined with the predictable funding, data systems, and structure of the federal CoC framework, and add up to billions of investments over time based on expectations that the CoCs would continue to operate as Congress prescribed.

108. For example, California invests millions of dollars annually through programs including the Homeless Housing, Assistance, and Prevention (HHAP) Program, Encampment Resolution Funding Program (ERF), Homekey+, the Behavioral Health Services Act (BHSA), and many other programs. As part of this system, California provides funding to local governments, public housing authorities, and non-profits for housing, emergency shelter, and supportive services to reduce and end homelessness. California provides such funding to many CoC grantees including in projects that rely on CoC funding for continual operational costs.

109. As another example, the New York City Department of Housing Preservation and Development uses CoC funding to anchor its own mixed-finance developments that leverage hundreds of millions of dollars in state and local capital subsidy, LIHCT, and private investment. The abrupt shift in stable CoC funding threatens to collapse decades of carefully structured financing, force already cash-strapped nonprofit providers facing exponential increases to their expenses to walk away from buildings they have operated for generations, and trigger widespread

layoffs of direct service staff who have kept thousands of formerly homeless New Yorkers stably housed.

110. The 2026 Challenged Conditions will have significant negative impacts on the Plaintiff States, the CoCs in the States, the organizations they comprise, and the people they serve. States' investments in the real estate that houses formerly homeless individuals are threatened by the loss of expected federal funds. California, for example, is facing an estimated loss of over $237 million in CoC funding due to changes in the FY 2026 NOFO. In New York, estimated losses exceed $129 million. In Illinois it is over $60 million.[16]

111. Smaller states are facing proportionately large losses as well. In the District of Columbia, for example, 95% of CoC funding went to permanent housing. In Maine and Delaware, it was 91%. And it's 90% in Maryland.[17]

112. Plaintiff States often make loans to operators of permanent supportive housing projects, and the Challenged Conditions threaten the repayment of those loans. For example, Oregon Housing and Community Services, the state agency that finances affordable housing, provides millions of dollars in state loans (via general obligation bond proceeds authorized by Article XI-Q of the Oregon Constitution, which requires the State to maintain an operating or ownership interest in any capital investments) to permanent supportive housing projects across the state. OHCS's decision to make these loans is based in part on whether projects leverage federal CoC funding for permanent supportive housing rental assistance and services. If the 2026 Challenged Conditions cause those funds to dry up, Oregon's investments in outreach, shelter, rehousing, and homelessness prevention will be harmed and its loans less likely to be repaid.

---

[16] Nat'l All. to End Homelessness, *Changes to HUD Policy Threaten Efforts to End Homelessness: At Least 97,000 People Could Lose Housing* (June 2, 2026), https://endhomelessness.org/resources/hud-policy-changes-threaten-efforts-to-end-homelessness/.
[17] *Id.*

113.    Many of the harms flowing from the 2026 Challenged Conditions and funding delays are particularly acute for the more rural BoS CoCs given that their resources are spread across large, mostly rural geographic areas with limited infrastructure and institutional support relative to other CoCs. Many BoS providers operate permanent supportive housing programs with long-term lease commitments and service staffing models that depend on stable annual HUD renewals. These organizations will face unfunded rental obligations, service contracts, and personnel costs. Because providers in the BoS serve rural counties with limited local revenue or philanthropic support, they typically have little capacity to replace lost federal dollars.

114.    The 2026 Challenged Conditions and funding delays also threaten to disrupt program structures that Collaborative Applicants and local partners built over years in alignment with HUD's prior emphasis on permanent supportive housing and Housing First approaches. For instance, Washington's statutory homelessness planning system (including Commerce's responsibilities under Wash. Rev. Code § 43.185C.045) relies on a predictable pipeline of federally supported permanent housing. If the 2026 Challenged Conditions take effect, existing coordinated-entry policies, performance measures, and regional housing plans that were made in reliance on previously available federal resources will be thrown into disarray.

115.    As another example, the New York Balance of State CoC has spent years developing stakeholder interest, landlord relationships, and developing real permanent housing solutions for homeless individuals in accordance with long-standing Federal priorities. Prioritizing transitional housing over permanent housing will erode housing stability for current households in the program, likely resulting in households once again experiencing homelessness.

116.    Providers that developed permanent supportive housing capacity based on prior federal guidance, through multi-year leasing arrangements, case-management teams, and

supportive-services partnerships, would face expensive operational adjustments and, in some areas, the contraction or closure of housing programs.

117.    Even where Plaintiff State agencies do not play a formal role in CoCs, the impact of the Challenged Conditions and funding delays will harm States by leading to statewide increases in homelessness. Any such increase in homelessness could in turn impact other state-run programs, leading Plaintiff States to divert funds from other state resources to fund emergency shelters and other critical services for residents who will no longer have access to permanent housing.

118.    The reduction in permanent supportive housing capacity would shift significant costs to other public services in the Plaintiff States. Individuals with complex behavioral-health needs who previously stabilized in permanent supportive housing will experience increased housing instability and higher rates of crisis service use. For example, all participants in the New York City CoC struggle with disabilities, HIV/AIDS, mental health, substance abuse issues, family trauma, and/or other challenges. This escalation places new burdens on emergency medical systems, state and federally funded behavioral-health providers, long-term inpatient facilities, local jails, and child-welfare programs serving unhoused families. Rural counties in the BoS CoC—already operating with limited behavioral-health and emergency-response infrastructure— will see disproportionate impacts and increased need for state funds. As a result, the 2026 Challenged Conditions will not only destabilize existing housing programs but will also increase expenditures and operational pressures across multiple state and local agencies within the Plaintiff States.

119.    An increase in homelessness would also have significant fiscal impacts to Plaintiff States' health systems. Individuals enrolled in permanent supportive housing programs have

significantly lower health care costs, including lower needs for inpatient and emergency department services.[18]

120.    Creating and prolonging homelessness among families with school-aged children has additional consequences for State-funded public education. Children who experience homelessness are more likely to struggle in school and to require additional supportive services, many of which are paid for in part with State funds, which will further increase the harm to the Plaintiff States.

121.    Plaintiffs face irreparable harm with the dilemma of either acceding to the unlawful 2026 Challenged Conditions or forgoing millions in critical CoC funding. Even if providers were to accede to the 2026 Challenged Conditions (which themselves slash the amount of available funding), these 2026 Challenged Conditions directly contradict other federal funding conditions that providers must follow. For example, projects that receive housing grants under VAWA or FVPSA are prohibited from requiring beneficiaries to participate in supportive services as a condition of receiving housing assistance; those services must be voluntary. 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2) (FVPSA). Therefore, these providers are now faced with the impossible choice of whether to greatly disadvantage their CoC applications under the FY 2026 NOFO—which favors applicants who require participation in supportive services— or forego critical funding under VAWA and FVPSA.

122.    In sum, the NOFO's 2026 Challenged Conditions threaten to destabilize established housing portfolios, disrupt long-term contractual and financial commitments, and force CoCs into

---

[18] *See* Blue Cross Blue Shield of Mass. Foundation, *Study: Supportive Housing Programs for Chronically Homeless Lower Health Care Costs* (Dec. 22, 2020), https://www.bluecrossmafoundation.org/about-us/news-updates/study-supportive-housing-programs-chronically-homeless-lower-health-care; Nat'l Low Income Housing Coalition, *New Research Provides Stronger Evidence that Housing First Leads to Health Care Savings* (Jan. 16, 2024), https://nlihc.org/resource/new-research-provides-stronger-evidence-housing-first-leads-health-care-savings?utm_source.

rapid restructuring that could undermine the continuity and effectiveness of their homelessness response systems, all with potentially severe and wide-ranging negative consequences for the Plaintiff States.

## V.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Violation of the Administrative Procedure Act—In Excess of Statutory Authority/Contrary to Law**

123.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

124.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[,]" 5 U.S.C. § 706(2)(C), or "otherwise not in accordance with law[,]" *id.* § 706(2)(A).

125.    In reviewing agency action, a court cannot accept "the agency's policy judgments . . . if they conflict with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994); *see Brown & Williamson Tobacco Corp. v. Food and Drug Admin.*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot "substitute their policy judgments for those of Congress[]").

126.    Defendants lack the statutory authority to impose the 2026 Challenged Conditions. No provision of HUD's authorizing statutes authorizes the agency to impose these terms, nor do the statutes specifically authorizing the CoC Program.

31

127.    In imposing the 2026 Challenged Conditions, Defendants exceeded the statutory authority granted to HUD by Congress. The 2026 Challenged Conditions therefore must be set aside under the APA.

128.    The 2026 Challenged Conditions are also contrary to statute in several respects.

129.    Congress has directed that funds made available under the CoC Program "shall be available" to renew contracts "at the discretion of the applicant or project sponsor[,]" so long as "there is a demonstrated need for the project[] and . . . the project complies with program requirements and appropriate standards of housing quality and habitability[.]" 42 U.S.C. § 11386c(b). The De Facto Cap, however, makes funds categorically unavailable for projects otherwise subject to renewal. On top of that, it adds requirements for renewals beyond the two exclusively set out in statute.

130.    Further, the McKinney-Vento Act includes "[r]equired [c]riteria" for HUD to evaluate in awarding grants, including "the extent to which the recipient will . . . incorporate comprehensive strategies for reducing homelessness," which by statute includes strategies "proven to be effective at reducing homelessness" like "permanent supportive housing" and "rapid rehousing[.]" 42 U.S.C. §§ 11386a(b)(1)(B)(iv); 11386b(d)(2). Both the De Facto Cap and the 2026 Service Requirement Conditions contradict these clear statutory commands.

131.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the 2026 Challenged Conditions violate the APA.

132.    Plaintiff States are also entitled to vacatur of the 2026 Challenged Conditions pursuant to 5 U.S.C. § 706 and a preliminary and permanent injunction preventing the 2026 Challenged Conditions' implementation.

**SECOND CAUSE OF ACTION**
**Violation of the Administrative Procedure Act—Without Observance of**
**Procedure**

133.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

134.    The APA requires courts to "hold unlawful and set aside agency action[]" found to be "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(D). This includes agency actions that are contrary to an agency's own regulations.

135.    HUD's regulations require it to proceed by notice-and-comment rulemaking for "matters that relate to . . . grants[.]" 24 C.F.R. § 10.1. Although certain exceptions are listed, there is no exception for substantive rules. *Id.*

136.    Nonetheless, HUD promulgated the 2026 Challenged Conditions without observing the notice-and-comment procedure required by its own rules.

137.    The 2026 Challenged Conditions fundamentally change eligibility requirements for federally funded programs providing services to residents of Plaintiff States by severely capping funding that has been and should be directed to permanent housing.

138.    On top of that, the McKinney-Vento Act explicitly requires that HUD may only provide "incentives" for "activities that have been proven to be effective at reducing homelessness," which are limited to those "proven strategies" explicitly laid out in the statute or other activities "based on research and after notice and comment to the public." 42 U.S.C. § 11386b(d).

139.    Both the De Facto Cap and the 2026 Service Requirement Conditions incentivize activities that are not "proven strategies" within the meaning of the McKinney-Vento Act, and HUD was thus required to undergo a notice-and-comment before implementing them.

33

140.    But HUD failed to undergo the notice-and-comment procedure before implementing any of the 2026 Challenged Conditions. They are therefore invalid.

141.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the 2026 Challenged Conditions violate the APA.

142.    Plaintiff States are also entitled to vacatur of the 2026 Challenged Conditions pursuant to 5 U.S.C. § 706 and a preliminary and permanent injunction preventing the 2026 Challenged Conditions' implementation.

### THIRD CAUSE OF ACTION
### Violation of the Administrative Procedure Act–Arbitrary and Capricious Agency Action

143.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

144.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

145.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

146.    That "reasoned explanation requirement of administrative law is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

147. An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem before" it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (citation modified); *see also id.* at 30. An agency must "pay[] attention to the advantages and the disadvantages" of its decision. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015)

148. In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the alternatives that are within the ambit of the existing policy[,]" "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33 (internal quotation marks omitted).

149. The 2026 Challenged Conditions are arbitrary and capricious because these Defendants failed to provide a reasoned basis or explanation, and their stated reasoning is conclusory, particularly in light of Defendants' changed positions.

150. For decades now, HUD has promoted a Housing First approach, urging applicants to invest in permanent housing, including permanent supportive housing and rapid rehousing. But now, without adequately explaining why, Defendants have completely reversed their position, with the apparent result that a huge number of projects will now be terminated, and program participants left without services or housing.

151. These Challenged Conditions are also arbitrary and capricious because the Defendants failed to consider the consequences of their actions, including the disadvantages of their decisions.

152. For years, Continuums, applicants, and services providers developed their programs along the lines that HUD repeatedly urged them. Now, these entities will be forced to fundamentally reshape their programs in only the two months Defendants have given to respond to the NOFO—or forego this critical funding. Many programs are likely to lose out on funding, with their clients bearing the worst of it. But the FY 2026 NOFO ignores the challenges or disadvantages of adopting these new funding conditions with little warning.

153. By the same token, these 2026 Challenged Conditions are arbitrary and capricious because they fail to take into account important reliance interests.

154. Defendants also failed to consider a factor that Congress intended for consideration, which is that permanent supportive housing and rapid rehousing are "proven to be effective at reducing homelessness." 42 U.S.C. § 11386b(d) (instructing HUD to award bonuses and incentivize these "proven strategies"). Thus, Defendants' imposition of the 2026 Challenged Conditions was arbitrary and capricious because they failed to consider Congress's determinations concerning, and prioritization of, permanent supportive housing and rapid rehousing.

155. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the 2026 Challenged Conditions violate the APA.

156. Plaintiff States are also entitled to vacatur of the 2026 Challenged Conditions pursuant to 5 U.S.C. § 706 and a preliminary and permanent injunction preventing the Challenged Conditions' implementation.

## VI.       PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.       Declare that the 2026 Challenged Conditions are contrary to the laws of the United States;

b.      Pursuant to 5 U.S.C. § 706(2), enter an order holding unlawful and setting aside the 2026 Challenged Conditions;

c.      Preliminarily and permanently enjoin Defendants from implementing or enforcing the 2026 Challenged Conditions; and order Defendants to proceed with the FY 2026 CoC competition without the 2026 Challenged Conditions;

d.      Award Plaintiffs their costs and reasonable attorney's fees; and

e.      Award such additional relief as the interests of justice may require.

DATED this 7th day of July 2026.

37

Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES*
ALIANA KNOEPFLER*
ZANE MULLER*
Assistant Attorneys General
CRISTINA SEPE*
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Zane.Muller@atg.wa.gov
Cristina.Sepe@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
STEPHEN C. THOMPSON*
Special Counsel
VICTORIA OCHOA*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov
*Attorneys for Plaintiff State of New York*

**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Special Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ William Y. Durbin*
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
WILLIAM Y. DURBIN*
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

38

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO*
Supervising Deputy Attorney General
BRIAN BILFORD*
LAUREN GREENAWALT*
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov
*Attorneys for Plaintiff State of California*

**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
NORA PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of State of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**WILLIAM TONG**
Attorney General of State of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Samantha Hall*
SAMANTHA HALL*
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
202-788-2081
Samantha.Hall@dc.gov
*Attorneys for Plaintiff District of Columbia*

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Aleeza Strubel*
ALEEZA STRUBEL*
Complex Litigation Counsel
ELENA S. METH*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
773-914-3046
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov
*Attorneys for Plaintiff State of Illinois*

39

**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Laurac.Tipton@ky.gov
*Attorneys for Plaintiff Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky*

**AARON M. FREY**
Attorney General of Maine

*/s/ Katherine W. Thompson*
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Tompson@maine.gov
*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
JLuh@oag.maryland.gov
*Attorneys for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

*/s/ Michelle Pascucci*
KATHERINE DIRKS*
Chief State Trial Counsel
MICHELLE PASCUCCI*
NITA KLUNDER*
State Trial Counsel
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

*/s/ Brian S. Carter*
BRIAN S. CARTER*
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.Carter@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

40

**JENNIFER DAVENPORT**
Attorney General of New Jersey

/s/ Daniel Resler
DANIEL RESLER*
Assistant Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@njoag.gov
*Attorney for Plaintiff State of New Jersey*


**DAN RAYFIELD**
Attorney General of Oregon

/s/ Scott P. Kennedy
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*


**CHARITY R. CLARK**
Attorney General of Vermont

/s/ Jonathan T. Rose
JONATHAN T. ROSE*
Solicitor General
SAM STRATTON*
Assistant Attorney General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov
Sam.Stratton@vermont.gov
*Attorneys for Plaintiff State of Vermont*


**RAÚL TORREZ**
Attorney General of New Mexico

/s/ Anjana Samant
ANJANA SAMANT*
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
ASamant@nmdoj.gov
*Attorneys for the State of New Mexico*


**JENNIFER C. SELBER**
General Counsel

/s/ Jacob B. Boyer
JACOB B. BOYER*
STEPHEN R. KOVATIS*
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov
717-460-6786
*Attorneys for Plaintiff Governor Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania*


**JAY JONES**
Attorney General of Virginia

/s/ Megan C. Keenan
MEGAN C. KEENAN*
Deputy Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Attorneys for Commonwealth of Virginia*

41

**JOSHUA L. KAUL**
Attorney General of Wisconsin

/s/ Faye B. Hipsman
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*