**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>               Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>               Defendants. | C.A. No. 1:26-cv-00439-MSM-AEM<br><br>**PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................ 1

II.   BACKGROUND ......................................................................................... 4

    A.   Congress Created the Continuum of Care Program to Provide Stable Housing for Homeless Americans ..................................................... 4

    B.   The CoC Program is Designed to Create Stable, Permanent Housing ......................... 7

    C.   HUD Issues Fiscal Year 2025 NOFOs that Include Unlawful Conditions, and Plaintiff States File a Prior Lawsuit ....................................... 11

    D.   HUD Issues a Fiscal Year 2026 NOFO that Includes Unlawful Conditions Concerning Permanent Housing ................................................. 13

    E.   The 2026 Challenged Conditions Will Harm the Plaintiff States ................................ 16

III.  LEGAL STANDARD ................................................................................. 18

IV.   ARGUMENT ............................................................................................. 19

    A.   Defendants' Issuance of the FY 2026 NOFO is a Final Agency Action ....................... 19

    B.   The 2026 Challenged Conditions Violate the APA ..................................................... 20

      1.   HUD lacks the authority to create the 2026 Challenged Conditions out of whole cloth ............................................................... 21

      2.   The Challenged Conditions violate the McKinney-Vento Act and are thus contrary to law ........................................................... 22

      3.   The 2026 Challenged Conditions were adopted without notice and comment ............ 26

      4.   The 2026 Challenged Conditions are arbitrary and capricious .................................... 28

        a.   Defendants failed to consider the impacts of the 2026 Challenged Conditions on individuals who are likely to lose their housing ................................ 30

        b.   Defendants relied on factors Congress did not intend them to consider ................... 32

        c.   Defendants failed to provide a reasoned explanation for their abandonment of Housing First ............................................... 32

        d.   Defendants failed to consider reliance interests........................................ 40

C.     Plaintiffs Are Entitled to the Full Suite of APA and Injunctive Relief on Summary Judgment ........................................................................................ 42

1. The Court should vacate and set aside the 2026 Challenged Conditions ..................... 42

2. The Court should permanently enjoin Defendants from implementing the 2026 Challenged Conditions ................................................................................. 43

a.     Plaintiff States succeed on the merits of their APA challenges to the 2026 Challenged Conditions ................................................................ 44

b.     The States will suffer irreparable harm absent injunctive relief ............................. 44

c.     The equities and public interest weigh strongly in the States' favor ....................... 48

D.     Alternatively, Plaintiff States Are Entitled to a Preliminary Injunction to Preserve the Status Quo Ante Pending Resolution of Their Summary Judgment Motion ..................................................................................... 49

V.   CONCLUSION ........................................................................................ 49

## TABLE OF AUTHORITIES

### Cases

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................................ 19

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016) .................................................................................... 18

*Brown v. Ent. Merch. Ass'n*,
564 U.S. 786 (2011) ................................................................................................ 34

*City of Arlington v. F.C.C.*,
569 U.S. 290 (2013) ................................................................................................ 21

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020).............................................................................. 21, 22

*City of Seattle v. Trump*,
808 F. Supp. 3d 1204 (W.D. Wash. 2025) ............................................................. 25

*Clinton v. City of New York*,
524 U.S. 417 (1998) ................................................................................................ 22

*Comm. For Fairness v. Kemp*,
791 F. Supp. 888 (D.D.C. 1992)............................................................................. 27

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ................................................................................................ 42

*Cox v. City of Bos.*,
734 F. Supp. 3d 173 (D. Mass. 2024)..................................................................... 37

*Cummings v. Premier Rehab Keller, PLLC*,
596 U.S. 212 (2022) ................................................................................................ 21

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ................................................................................................ 29

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .............................................................................................. 29, 40

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ................................................................................................ 43

*Env't Def. Fund v. Fed. Energy Regul. Comm'n*,
2 F.4th 953 (D.C. Cir. 2021)................................................................................... 42

*F.C.C. v. Fox Television Stations*,
556 U.S. 502 (2009) ................................................................................................ 22

*Fed. Commc'n Comm'n v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ...................................................................................... 28

*Gent v. CUNA Mut. Ins. Soc'y,*
  611 F.3d 79, (1st Cir. 2010) ........................................................................ 37

*Genuine Parts Co. v. E.P.A.*, 890 F.3d 304 (D.C. Cir. 2018) ......................................... 37

*Harmon v. Thornburgh,*
  878 F.2d 484 (D.C. Cir. 1989)...................................................................... 42

*Healey v. Spencer*,
  765 F.3d 65 (1st Cir. 2014)........................................................................... 43

*Hous. Auth. of the City & County of San Francisco v. Turner*,
  No. 4:25-cv-08859-JST,
  2025 WL 3187761, (N.D. Cal. Nov. 14, 2025) ........................................ 19

*Illinois v. Fed. Emergency Mgmt. Agency.*
  801 F. Supp. 3d 75 (D.R.I. 2025) ......................................................... 20, 42

*Illinois v. Noem,*
  813 F. Supp. 3d 282  (D.R.I. 2025) ...................................................... 42, 48

*Int'l Org. of Masters v. Nat'l Lab. Rels. Bd.*,
  61 F.4th 169 (D.C. Cir. 2023)....................................................................... 42

*La. Pub. Serv. Comm'n v. F.C.C.*,
  476 U.S. 355 (1986) ..................................................................................... 21

*Little Sisters of the Poor v. Pennsylvania,*
  591 U.S. 657 (2020) ..................................................................................... 32

*Littlefield v. U.S. Dep't of the Interior,*
  85 F.4th 635 (1st Cir. 2023)......................................................................... 18

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ..................................................................................... 22

*McCuin v. Sec'y of Health & Hum. Servs.*,
  817 F.2d 161 (1st Cir. 1987)........................................................................ 25

*Michigan v. E.P.A.*,
  576 U.S. 743 (2015) ............................................................................... 29, 30

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm,*
  463 U.S. 29 (1983) ............................................................... 29, 31, 32, 39

*N.H. Hosp. Ass'n v. Azar*,
  887 F.3d 62 (1st Cir. 2018).......................................................................... 27

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998).................................................................... 43

iv

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................... 19

*Penobscot Nation v. Frey*,
  3 F.4th 484 (1st Cir. 2021)......................................................................................... 26

*Planned Parenthood of Greater Wash. &*
  *N. Idaho v. U.S. Dep't of Health & Hum. Servs.*,
  946 F.3d 1100 (9th Cir. 2020) ................................................................................... 23

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
  374 F.3d 1209 (D.C. Cir. 2004)................................................................................. 32

*R.I. Coal. Against Domestic Violence v. Kennedy*,
  812 F. Supp. 3d 180 (D.R.I. 2025) ..................................................................... 19, 31

*Ramirez v. U.S. Immigr. & Customs Enf't*,
  568 F. Supp. 3d 10  (D.D.C. 2021)............................................................................ 43

*Rhode Island v. Trump*,
  781 F. Supp. 3d 25 (D.R.I. 2025) .............................................................................. 49

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985)..................................................................................... 25

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  102 F.3d 12 (1st Cir. 1996)........................................................................................ 48

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................................................... 42

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ................................................................................................... 19

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
  121 F.4th 339 (1st Cir. 2024)..................................................................................... 19

*United States v. Jacques*,
  784 F. Supp. 2d 59 (D. Mass. 2011).......................................................................... 34

*Washington v. Dep't of Hous. & Urb. Dev.*,
  C.A. No. 1:25-cv-00626-MSM-AEM,
  2026 WL 1863886, (D.R.I. June 29, 2026) ........................................................ passim

*Washington v. Dep't of Hous. and Urb. Dev.*,
  C.A. No. 1:25-cv-00626-MSM-AEM, (D.R.I., Dec. 23, 2025)................................. 11

*Washington v. U.S. Dep't of Hous. & Urban Dev.*,
  171 F.4th 473 (1st Cir. 2026)............................................................................... passim

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................................... 49

v

**Statutes**

5 U.S.C. § 553(a) ............................................................................................................... 27

5 U.S.C. § 553(b) ............................................................................................................... 27

5 U.S.C. § 553(c) ............................................................................................................... 27

5 U.S.C. § 703 .................................................................................................................... 43

5 U.S.C. § 706 ....................................................................................................... 3, 18, 22

5 U.S.C. § 706(2) ........................................................................................................ passim

42 U.S.C. § 11301 ...................................................................................................... passim

42 U.S.C. § 11301(a) ........................................................................................................... 4

42 U.S.C. § 11301(b) ........................................................................................................... 4

42 U.S.C. § 11360(29) ......................................................................................................... 8

42 U.S.C. § 11381 .......................................................................................................... 4, 31

42 U.S.C. § 11381(2) ......................................................................................................... 26

42 U.S.C. § 11383 ................................................................................................................ 4

42 U.S.C. § 11385(a) ...................................................................................................... 9, 26

42 U.S.C. § 11385(c) ........................................................................................................... 9

42 U.S.C. § 11386 .............................................................................................................. 25

42 U.S.C. § 11386(b) .................................................................................................... 21, 25

42 U.S.C. § 11386a ........................................................................................................ 6, 21

42 U.S.C. § 11386a(b) ....................................................................................... 6, 24, 25, 26

42 U.S.C. § 11386b(a) ......................................................................................................... 5

42 U.S.C. § 11386b(d) ................................................................................................. passim

42 U.S.C. § 11386c(b) ....................................................................................... 5, 23, 24, 26

Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009,
   Pub. L. No. 111-22, 123 Stat. 1632, 1663– 702 ............................................................ 9

Transp., Hous. and Urb. Dev., and
   Related Agencies Appropriations
   Act of 2026, Pub. L. No. 119-75,
   140 Stat. 173, 323–437 (Feb. 3, 2026) ........................................................ 11, 12, 21, 24

**Regulations**

24 C.F.R. § 10.1 ............................................................................................................. 6, 27

24 C.F.R. § 10.2 .................................................................................................................... 6

vi

24 C.F.R. § 10.7 ................................................................................................................. 6

24 C.F.R. § 10.8 ................................................................................................................. 6

24 C.F.R. § 10.9 ................................................................................................................. 6

24 C.F.R. § 10.10 ............................................................................................................... 6

24 C.F.R. Part 578 ........................................................................................................... 17

24 C.F.R. § 578.3 .............................................................................................................. 4

24 C.F.R. § 578.37 ............................................................................................................ 4

24 C.F.R. § 578.37(a) ..................................................................................................... 8, 9

24 C.F.R. 578.75(h) ......................................................................................................... 15

69 Fed. Reg. 27495 (May 14, 2004),
    https://archives.hud.gov/funding/2004/cocpsec.pdf ................................................ 10

81 Fed. Reg. 48366 (July 25, 2016) ............................................................................... 28

## Other Authorities

Alap Davé,
    *How one state almost solved America's homelessness problem*,
    Catalyst (2023),
    https://www.bushcenter.org/catalyst/the-fix/homes-for-
    the-unhoused-solving-homelessness-problem ......................................................... 10

Caroline Cawley, et al.,
    *Mortality Among People Experiencing Homelessness
    in San Francisco During the COVID-19 Pandemic*,
    JAMA Network Vol. 5, No. 3 (Mar. 10, 2022),
    https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789907 .............................. 36

*Changes to HUD Policy Threaten Efforts to End Homelessness:
    At Least 97,000 People Could Lose Housing*,
    Nat'l All. to End Homelessness (June 2, 2026),
    https://endhomelessness.org/resources/hud-policy-changes-
    threaten-efforts-to-end-homelessness/ ................................................................ 14, 45

Claudia Gross Shader,
    *Addressing Places in Seattle Where Overdoses
    and Crime are Concentrated: An Evidence-Based Approach*,
    Seattle Off. of the Auditor (Jul. 9, 2024),
    https://seattle.gov/documents/Departments/CityAuditor/
    auditreports/OverdoseAndCrimeConcentrationsAudit.pdf ................................... 36, 37

*Continuum of Care Program Competition*, HUD,
https://www.hud.gov/hud-partners/coc-program-competition
(last visited Jul. 17, 2026) ........................................................................................ 41

Grants.gov, Related Documents,
*2021 Continuum of Care* (2021),
https://grants.gov/search-results-detail/335322
(last visited July 16, 2026) ........................................................................................ 10

Grants.gov,
Related Documents, *FY 2014 Notice of Funding Opportunity of Continuum of Care*,
https://grants.gov/search-results-detail/265408
(last visited July 15, 2026) ........................................................................................ 10

HUD,
*Community Planning and Development Notice of Funding
Availability(NOFA) for the Fiscal Year (FY) 2018
Continuum of Care Program Competition* (2018),
https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf................................................ 10

HUD,
*Community Planning and Development* (2025),
https://www.hud.gov/sites/dfiles/CPD/documents/
FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf........................................ 7, 15

HUD,
*Fiscal Year 2022-2026 HUD Strategic Plan* (2022),
https://archives.hud.gov/reports/FY2022-2026HUDStrategicPlan.pdf ............................ passim

HUD,
*Office of Community Planning and
Development Homeless Assistance Grants*,
https://archives.hud.gov/budget/fy25/2025_CJ_Program_-_HAG.pdf
(last visited Jul. 16, 2026). ........................................................................................ 10

Josh Leopold & Mary K. Cunningham,
*To end homelessness, Carson should continue
Housing First approach*, Urban Institute (Jan. 7, 2017),
https://www.urban.org/urban-wire/end-homelessness-
carson-should-continue-housing-first-approach........................................................................ 10

Josh Leopold,
*Five Ways HEARTH Act Changed Homelessness*,
Urban Institute (May 9, 2019),
https://www.urban.org/urban-wire/five-ways-hearth-
act-changed-homelessness-assistance .......................................................................................... 9

*Provisional Drug Overdose Death Counts*,
   U.S. Ctrs. for Disease Control and Prevention, Nat'l Ctr. for Health Stat.,
   https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm
   (last visited Jul. 16, 2026) ...................................................................................... 37

*The 2024 Annual Homelessness Assessment Report*
   *(AHAR) to Congress*, The U.S. Dep't of Hous.
   and Urb. Dev. Off. of Cmty Plan. and Dev. (Dec. 2024),
   https://www.huduser.gov/portal/sites/default/files/pdf/2024-AHAR-Part-1.pdf ...................... 35

*The 2025 Annual Homelessness Assessment Report*
   *(AHAR) to Congress*, The U.S. Dep't of Hous. and Urb. Dev. (2026),
   https://www.huduser.gov/portal/sites/default/files/pdf/2025-AHAR-Part-1.pdf ............... 34, 35

Tim Murphy,
   *Long-Awaited Federal Data Shows the First*
   *Overall Reduction in Homelessness Since 2016*,
   Nat'l All. to End Homelessness (May 29, 2026),
   https://endhomelessness.org/media/news-releases/long-awaited-
   federal-data-shows-the-first-overall-reduction-in-homelessness-since-2016/ .......................... 34

*Housing First Checklist: Assessing Projects and*
   *Systems for a Housing First Orientation* (2016),
   United States Interagency Council on Homelessness
   https://www.usich.gov/sites/default/files/document/
   Housing_First_Checklist_FINAL.pdf........................................................................... 8

## I.    INTRODUCTION

Housing is essential to a person's well-being and their ability to work, pursue education, or care for their children and family. But in communities all across the United States, on a given night, hundreds of thousands of people experience homelessness. Each homeless person has a story of hardship and unmet needs. Addressing the crisis requires urgent action from our communities, institutions, and government. But instead of investing in programs that help people stay safe and housed, the Trump Administration has embraced policies that risk trapping people in poverty and punishing them for being poor.

The Continuum of Care (CoC) Program is the federal government's flagship program for funding housing and other services for individuals at risk of or experiencing homelessness. Through the CoC Program, the Department of Housing and Urban Development (HUD) distributes billions of dollars each year to state, local, and non-profit entities to provide housing and services to families and individuals facing homelessness, including people with disabilities, seniors, families with children, veterans, LGBTQ+ Americans, and others. Congress designed the program to preserve stability so providers can reliably serve people whose lives depend on it. And for decades, "consistent with Congress's intent, HUD administered the CoC program to ensure continuity and stable access to housing for the people it served," by directing the vast majority of funding to renewing permanent housing projects under a Housing First model that has been shown to work. *See Washington v. U.S. Dep't of Hous. & Urban Dev.*, 171 F.4th 473, 479 (1st Cir. 2026) (*Washington II*).

But over the past year, Defendants have thrown the CoC Program into chaos. In late 2025, Defendants published Notices of Funding Opportunity (NOFOs) for the CoC Program that would have devastated the program, left tens of thousands of formerly homeless Americans without stable

1

shelter, and severely strained states' homeless response programs. Among other things, the new NOFOs abruptly reversed HUD's statutory commitment to stability by unlawfully capping the CoC funds that could be used for renewing permanent housing projects to thirty percent—down from nearly ninety percent for CoC funds set to expire in 2026. The cap, if it had taken effect, would have blocked renewal funding for a huge number of CoC-funded projects and evicted tens of thousands of Americans back into homelessness. Plaintiff States sued to challenge the Fiscal Year (FY) 2025 NOFOs, and this Court preliminarily enjoined and stayed the FY 2025 NOFOs, including the permanent housing cap, and ultimately concluded that Defendants acted arbitrarily and capriciously in instituting the cap.

Nonetheless, on June 1, 2026, HUD published a new NOFO for FY 2026 that seeks to re-implement a cap on permanent housing. The FY 2026 NOFO does this through a purported $1.3 billion "set aside" for transitional housing and supportive service-only grants, i.e., non-permanent housing projects. By making this $1.3 billion unavailable for permanent housing, this "set aside" has the effect of capping permanent housing at around sixty-eight percent of CoC funds (the De Facto Cap). As it did with the prior cap, HUD buttressed this unlawful cap with a series of funding conditions designed to punish applicants who adhere to a Housing First model of service delivery (the 2026 Service Requirement Conditions).

This new cap violates the law, undermines the CoC program, and hurts Americans in the same ways as the prior, vacated cap. If it goes into effect, many CoC-funded permanent housing projects will lose their funding or see it reduced, resulting in tens of thousands of formerly homeless individuals and families losing their housing, with states and local governments left to pick up the pieces. As with the thirty percent cap under the FY 2025 NOFO, the De Facto Cap under the FY 2026 NOFO was never authorized by Congress, is contrary to provisions in the

McKinney-Vento Act requiring HUD to make renewals under most circumstances, and is contrary to notice and comment provisions in both the McKinney-Vento Act and the Administrative Procedure Act (APA). On top of that, the De Facto Cap and 2026 Service Requirement Conditions (collectively, the 2026 Challenged Conditions) are arbitrary and capricious because Defendants failed to adequately explain their abandonment of Congressionally approved Housing First policies and failed to consider the consequences to providers and residents in suddenly defunding permanent housing.

Like similar unlawful policies in the FY 2025 NOFO, the 2026 Challenged Conditions will have devastating effects for states, service providers, and vulnerable Americans. Plaintiff States—as well as other states, localities, and non-profits—rely on CoC funding to house their residents. They have built programs over years based on HUD's longstanding, but now abandoned, guidance. These programs are now facing the same type of upheaval caused by the FY 2025 NOFO. They have just months to radically reshape fundamental aspects of their programs to dramatically shift away from Housing First or face significant funding cuts.

To avoid this irreparable harm caused by Defendants' unlawful actions, this Court should vacate, set aside, and permanently enjoin the 2026 Challenged Conditions. Plaintiffs respectfully request that the Court grant this relief by August 10, 2026 to avoid the imminent harm that will occur if Continuums must announce their local competition results under the unlawful FY 2026 NOFO prior to the NOFO's August 26, 2026 application deadline. Alternatively, if the Court is unable to rule on Plaintiff States' motion for summary judgment by August 10, Plaintiff States respectfully request that the Court preliminarily enjoin the 2026 Challenged Conditions to preserve the status quo ante pending the outcome of the summary judgment motion and prevent irreparable harm to Plaintiff States, as described more fully below.

3

## II.    BACKGROUND

**A.    Congress Created the Continuum of Care Program to Provide Stable Housing for Homeless Americans**

In 1987, Congress passed the McKinney-Vento Homeless Assistance Act to address the "immediate and unprecedented crisis" of homelessness. 42 U.S.C. § 11301(a)(1). Through the Act, Congress aimed "to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b)(3). The purpose of the CoC program is "to promote community-wide commitment to the goal of ending homelessness"; "to provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[]"; "to promote access to, and effective utilization of, mainstream programs" for individuals and families experiencing homelessness; and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381. Congress has directed that CoC funding "shall be used to carry out projects that serve homeless individuals or families that consist of . . . eligible activities[,]" including permanent housing, permanent supportive housing for individuals with disabilities (including mental health and substance use issues), rapid rehousing, supportive services, the Homeless Management Information System, and homelessness prevention. *See* 42 U.S.C. § 11383; 24 C.F.R. § 578.37.

HUD issues grants to local coalitions—known as "Continuums of Care"—pursuant to a NOFO. Each Continuum represents a "geographic area," for example, a county or multi-county region within a state. 24 C.F.R. § 578.3.

To ensure stability of housing, the McKinney-Vento Act directs HUD to prioritize renewal of existing projects. It provides that "[t]he sums made available" under the CoC program "shall be

4

available for the renewal of contracts in the case of tenant-based assistance, successive 1-year terms, and in the case of project-based assistance, successive terms of up to 15 years at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations, for rental assistance and housing operation costs[.]" 42 U.S.C. § 11386c(b). The HUD "Secretary shall determine whether to renew a contract for such a permanent housing project on the basis of certification by the collaborative applicant for the geographic area that . . . there is a demonstrated need for the project; and . . . the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary." *Id*.; *see also* 42 U.S.C. § 11386b(a)(2) (requiring that "[i]n calculating the portion of" CoC funds for certain new permanent supportive housing, "the Secretary shall not count funds made available to renew contracts for existing projects under section 11386c"). By prioritizing renewals of existing projects, Congress wrote the statute to ensure that programs can continue to provide stable housing to formerly homeless individuals, and that millions of formerly chronically homeless individuals and families are not evicted back to homelessness.

On top of this formula funding and funding earmarked for renewals, CoC funding is competitive in two respects. First, HUD awards grants competitively to applicants within a Continuum. That is, when a Continuum applies to the NOFO, it will rank projects within its geographic area, and HUD will select projects for awards within each Continuum's application up to at least the formula amount. Second, the McKinney-Vento Act specifically instructs HUD on how CoC funds shall be awarded by including lengthy "Required Criteria" for assessing grant applications such as "the previous performance of the recipient regarding homelessness" with respect to the length of time individuals remain homeless and related factors, whether the recipient

5

will incorporate "comprehensive strategies for reducing homelessness" such as permanent supportive housing, and many other specific factors. 42 U.S.C. § 11386a.

The Act directs HUD to award "bonuses [and] other incentives to geographic areas for using funding . . . for activities that have been proven to be effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals . . . set forth in" the CoC statutes. 42 U.S.C. § 11386b(d)(1).

By statute, these "proven strategies" include:

- "[P]ermanent supportive housing for chronically homeless individuals and families";

- "[F]or homeless families, rapid rehousing services, short-term flexible subsidies to overcome barriers to rehousing, support services concentrating on improving incomes to pay rent, coupled with performance measures emphasizing rapid and permanent rehousing and with leveraging funding from mainstream family service systems"; and

- "[A]ny other activity determined by the Secretary, based on research and after notice and comment to the public, to have been proven effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals as set forth in section 11386a(b)(1)(F) of this title."

42 U.S.C. § 11386b(d)(2)(A)–(C) (emphasis added). The statute does not include temporary (i.e., transitional) housing or support service-only projects as "proven strategies." Additionally, the "independent living goals" that are referred to in the above provisions concern "achieving independent living in permanent housing." *Id.* § 11386a(b)(1)(F)(ii).

In addition to the statutory notice and comment requirement for providing incentives, HUD's policies require it to proceed by notice and comment rulemaking generally for "matters that relate to . . . grants," "even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. §§ 10.1, 10.2, 10.7–10.10. Although certain exceptions are listed, none apply here. 24 C.F.R. § 10.1.

6

**B.      The CoC Program is Designed to Create Stable, Permanent Housing**

For at least two decades and up until the unlawful FY 2025 NOFOs, HUD has implemented the CoC Program to further its stated policy of "implement[ing] a Housing First approach to reducing homelessness, and driv[ing] equitable community development."[1]

According to HUD—defining the term in its FY 2024 NOFO—Housing First is "[a] model of housing assistance that prioritizes rapid placement and stability in permanent housing in which admission does not have preconditions (such as sobriety or a minimum income threshold) and in which housing assistance is not conditioned upon participation in services."[2] HUD adopted its Housing First approach in recognition of the fact that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success."[3]

As this Court and the First Circuit has recognized, Housing First is "an evidence-based, modern" approach to "effectively combat[ing] homelessness in America." *Washington v. Dep't of Hous. & Urb. Dev.*, C.A. No. 1:25-cv-00626-MSM-AEM, 2026 WL 1863886, at *1 (D.R.I. June 29, 2026) (*Washington I*); *see also Washington II*, 171 F.4th at 480 ("This approach has proven effective: One study shows that Housing First programs decreased homelessness in a sample set of communities by 88 percent, far outpacing alternative "Treatment First" strategies[.]"). According to HUD's most recent strategic plan, a "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency

---

[1] HUD, *Fiscal Year 2022-2026 HUD Strategic Plan* 18 (2022), https://archives.hud.gov/reports/FY2022-2026HUDStrategicPlan.pdf.
[2] HUD, *Community Planning and Development* 17 (2025), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf.
[3] *See supra* note 1 at 25.

health services."[4] Similarly, the United States Interagency Council on Homelessness has recognized that Housing First policy "is based on overwhelming evidence that people experiencing homelessness can achieve stability in permanent housing if provided with the appropriate level of services. Study after study has shown that Housing First yields higher housing retention rates, drives significant reductions in the use of costly crisis services and institutions, and helps people achieve better health and social outcomes."[5]

The core Housing First intervention is "permanent housing"—including "permanent supportive housing" and "rapid rehousing"—in which individuals are provided stable housing "without a designated length of stay." 24 C.F.R. § 578.37(a)(1). HUD's regulations support permanent housing by specifying that CoC "funds may be used for acquisition, rehabilitation, new construction, leasing, rental assistance, operating costs, and supportive services." *Id.* Permanent supportive housing is available for "individuals with disabilities and families in which one adult or child has a disability[]" and couples housing with "[s]upportive services designed to meet the needs of the program participants[.]" 24 C.F.R. § 578.37(a)(1)(i). The McKinney-Vento Act defines "supportive services" to include, for example, a "child care services program for families experiencing homelessness;" "the establishment and operation of an employment assistance program, including providing job training;" "the provision of mental health services, trauma counseling, and victim services;" "the provision of . . . transportation services that facilitate an individual's ability to obtain and maintain employment;" and more. 42 U.S.C. § 11360(29).

For rapid rehousing, CoC "funds may provide supportive services[]" and/or "tenant-based- rental assistance . . . as necessary to help a homeless individual or family, with or

---

[4] *See supra* note 1 at 26.

[5] United States Interagency Council on Homelessness, *Housing First Checklist: Assessing Projects and Systems for a Housing First Orientation* 3 n.1 (2016), https://www.usich.gov/sites/default/files/document/Housing_First_Checklist_FINAL.pdf.

without disabilities, move as quickly as possible into permanent housing and achieve stability in that housing." 24 C.F.R. § 578.37(a)(1)(ii).

The McKinney-Vento Act specifically incorporates a Housing First approach. In 2009, the statute was amended via the HEARTH Act to "entrench federal support for Housing First and expand the availability of permanent housing" and "authorize[] funds for rapid re-housing assistance to help people move into permanent housing."[6] For example, as noted above, the law specifically directs that "[t]he Secretary shall provide bonuses or other incentives . . . for activities that have been proven to be effective at reducing homelessness[,]" including "permanent supportive housing," and "rapid rehousing services[.]" 42 U.S.C. § 11386b(d). And to the extent HUD wishes to "provide . . . incentives" for "other activit[ies]," it may only do so "based on research and after notice and comment to the public[.]" 42 U.S.C. § 11386b(d)(2)(C).

Similarly, with respect to the Continuum of Care Program, "*[t]o the extent practicable*, each project shall provide supportive services for residents of the project and homeless persons using the project[.]" 42 U.S.C. § 11385(a) (emphasis added). Given that these services include, for example, "operating an employment assistance program," and "providing assistance in obtaining . . . mental health benefits, employment counseling, and medical assistance[]" (42 U.S.C. § 11385(c)), the statute again reflects a Housing First approach given that assistance will be offered to residents of the project rather than first requiring homeless individuals to meet certain criteria to obtain the housing.

Consistent with these provisions of the McKinney-Vento Homeless Assistance Act and its amendments, HUD employed a Housing First and permanent supportive housing approach since

---

[6] Josh Leopold, *Five Ways HEARTH Act Changed Homelessness*, Urban Institute (May 9, 2019), https://www.urban.org/urban-wire/five-ways-hearth-act-changed-homelessness-assistance.

at least 2004—until it abruptly changed course last year.[7] As one recent HUD document explained: "For 20 years, HUD has prioritized permanent supportive housing, which serves people with the highest levels of housing and service needs, especially people experiencing chronic homelessness."[8] Specifically, prior NOFOs and Funding Opportunity Descriptions from 2004 to the present reflect HUD's longstanding commitment to "permanent supportive housing" to "meet the long-term needs of homeless individuals and families" and "Housing First" as one of HUD's "Policy Priorities."[9] HUD's most recent strategic plan (for Fiscal Years 2022–2026) explicitly provides that HUD will "implement a Housing First approach to reducing homelessness[.]"[10] This policy is explicitly incorporated throughout HUD's most recent, lawful NOFO, for FY 2024–2025. "[C]onsistent with its Housing First approach," HUD has in recent years "dedicated the vast majority of its funding to supporting permanent housing programs[.]" *Washington I*, 2026 WL 1863886, at *2.

---

[7] Alap Davé, *How one state almost solved America's homelessness problem*, Catalyst (2023), https://www.bushcenter.org/catalyst/the-fix/homes-for-the-unhoused-solving-homelessness-problem (George W. Bush Administration adopted Housing First program in 2004 as part of its goal to end homelessness); Josh Leopold & Mary K. Cunningham, *To end homelessness, Carson should continue Housing First approach*, Urban Institute (Jan. 7, 2017), https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-housing-first-approach (As a result of the Bush administration's adoption of Housing First, there was a thirty percent reduction in chronic homelessness from 2005 to 2007, and the Obama Administration then continued this support for Housing First).

[8] HUD, *Office of Community Planning and Development Homeless Assistance Grants*, https://archives.hud.gov/budget/fy25/2025_CJ_Program_-_HAG.pdf (last visited Jul. 16, 2026).

[9] *See, e.g.*, Continuum of Care Homelessness Assistance Programs, 69 Fed. Reg. 27495, 27497-98 (May 14, 2004), https://archives.hud.gov/funding/2004/cocpsec.pdf (Fiscal Year 2004 Continuum of Care Homeless Assistance Programs Funding Opportunity Description states that one of the "basic components" of the "CoC system" is "Permanent housing, or permanent supportive housing, to help meet the long-term needs of homeless individuals and families"); *see also, e.g.*, Grants.gov, Related Documents, *FY 2014 Notice of Funding Opportunity of Continuum of Care*, https://grants.gov/search-results-detail/265408 (last visited July 15, 2026) (Fiscal Year 2014 Notice of Funding Availability for Continuum of Care Program awards applications "up to 10 points" for following a "Housing First" model and defines "Housing First" as one of HUD's "Policy Priorities"); *see also, e.g.*, HUD, *Community Planning and Development Notice of Funding Availability(NOFA) for the Fiscal Year (FY) 2018 Continuum of Care Program Competition* (2018), https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf (Fiscal Year 2018 NOFO includes the same provisions); *see also, e.g.*, Grants.gov, Related Documents, *2021 Continuum of Care* (2021), https://grants.gov/search-results-detail/335322 (last visited July 16, 2026) (Fiscal Year 2021 NOFO includes the same provisions).

[10] *See supra* note 1 at 18.

**C.    HUD Issues Fiscal Year 2025 NOFOs that Include Unlawful Conditions, and Plaintiff States File a Prior Lawsuit**

As this Court is well aware, this Administration has recently tried to cast aside HUD's longstanding commitment to Housing First and fundamentally and unlawfully undermine the CoC program. Over two NOFOs published in November and December 2025, HUD purported to implement a thirty percent cap on CoC funding going to permanent housing renewals, as well as a thirty percent cap on "Tier 1" funding—essentially, funding that guaranteed renewals for existing projects, and stability for the people living in those projects. *See* Second Amended Complaint, *Washington v. Dep't of Hous. and Urb. Dev.*, C.A. No. 1:25-cv-00626-MSM-AEM, ECF No. 68 (D.R.I., Dec. 23, 2025). The FY 2025 NOFOs also included a host of other unlawful conditions, such as conditions that discriminated against certain localities based on the policy choices made by local voters and legislatures. *Id.* at 29–33. Plaintiff States sued in November 2025, and this Court preliminarily enjoined HUD's FY 2025 NOFO, as well as the challenged conditions therein. Order, *Washington v. Dep't of Hous. and Urb. Dev.*, C.A. No. 1:25-cv-00626-MSM-AEM, ECF No. 80 at 25–29 (D.R.I., Jan. 14, 2026).

In February 2026, while the parties were briefing summary judgment, the President signed into law the 2026 THUD Appropriations Act (the THUD Act). Transp., Hous. and Urb. Dev., and Related Agencies Appropriations Act of 2026, Pub. L. No. 119-75, 140 Stat. 173, 323–437 (Feb. 3, 2026). The THUD Act does at least two things relevant to this dispute.

First, because HUD never developed a lawful NOFO for FY 2025, the THUD Act ultimately required HUD to non-competitively renew all CoC projects expiring in calendar year 2026. The process for renewing CoC projects remains ongoing as of the date this Complaint was filed. *See, e.g.*, Defs.' Status Rep., *Washington v. Dep't of Hous. and Urb. Dev.*, C.A. No.1:25-cv-00626-MSM-AEM, ECF No. 114 (D.R.I. June 29, 2026).

11

Second, the THUD Act appropriated $4,010,000,000 for the CoC program for FY 2026. THUD Act § 2, 140 Stat. at 399. In appropriating that money, Congress explicitly directed that the HUD "Secretary shall select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 et seq." *Id.* In other words, the THUD Act explicitly repudiated HUD's prior thirty percent Tier 1 Cap and instead required that HUD set Tier 1 at sixty percent of annual renewal demand at a minimum. While the THUD Act's authorization of a sixty percent Tier 1 cap affects local continuums' ability to prioritize projects for funding, it does not affect HUD's statutory obligation to make funds available for renewals.

Moreover, the THUD Act included various set-asides among the broader $4.01 billion appropriation. For example, the THUD Act specifically allocates $52,000,000 "for grants for new rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking[.]" THUD Act § 2, 140 Stat. at 399–400. Similarly, the Act specifically allocates $107,000,000 "to implement projects to demonstrate how a comprehensive approach to serving homeless youth, age 24 and under, . . . can dramatically reduce youth homelessness[.]" THUD Act § 4, 140 Stat. at 400.

The THUD Act does not, however, include any set-aside for transitional housing or supportive service-only grants. Nor does the THUD Act include any sort of cap, explicit or implicit, on permanent housing. Nor does it authorize HUD to ignore the McKinney-Vento Act's explicit prioritization of permanent housing projects over temporary and transitional housing projects.

12

On June 29, 2026, this Court granted Plaintiff States' motion for summary judgment and set aside HUD's issuance of the FY 2025 NOFOs, which included the thirty percent permanent housing cap among other unlawful conditions. *See Washington I*, 2026 WL 1863886.

**D.    HUD Issues a Fiscal Year 2026 NOFO that Includes Unlawful Conditions Concerning Permanent Housing**

On June 1, 2026, HUD issued a "FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO" with an application due date of August 26, 2026 (the "FY 2026 NOFO"). Declaration of Aliana Knoepfler (Knoepfler Decl.), Ex. A.

Like its predecessor, the FY 2026 NOFO again unlawfully attempts to reverse HUD's decades-long Housing First policy. Whereas the FY 2025 NOFOs attempted to do so by placing an unauthorized and arbitrary cap on renewal funding for permanent housing projects, the FY 2026 NOFO does so by purporting to create a $1.3 billion "set-aside . . . for new projects with a priority for Transitional Housing and Supportive Service Only projects." Knoepfler Decl., Ex. A at 35–36. By making $1.3 billion of the $4.04 billion in CoC appropriations unavailable for permanent housing, this set-aside caps the amount of funds that can go to permanent housing at roughly sixty-eight percent of total available CoC funds.[11]

The De Facto Cap, if allowed to go into effect, will drastically cut funding for permanent housing projects. "As of 2025, the CoC program funded nearly 7,000 projects, with approximately 87 percent of that funding dedicated to permanent housing." *Washington II*, 171 F.4th at 480. By capping permanent housing at sixty-eight percent, the De Facto Cap will cause programs to lose funding, which means residents would lose housing. According to estimates from the National Alliance to End Homelessness, this shift to funding temporary programs will result in

---

[11] While Congress appropriated $4.01 billion for CoC funding for FY 2026, HUD has total CoC funding of approximately $4.04 billion for FY 2026. Knoepfler Decl., Ex. A at 6.

"**at least 97,000 residents** of CoC-funded permanent housing [being] at risk of losing their housing," which it states is a low-end estimate. *Changes to HUD Policy Threaten Efforts to End Homelessness: At Least 97,000 People Could Lose Housing*, Nat'l All. to End Homelessness (June 2, 2026), https://endhomelessness.org/resources/hud-policy-changes-threaten-efforts-to-end-homelessness/ (emphasis in original). In New York, for example, where approximately ninety-two percent of CoC funding goes to permanent housing, the De Facto Cap is estimated to strip CoCs within the state of over $129 million, causing over 8,700 people to lose their housing. *Id.* In Washington, some 2,900 people are at risk of losing stable housing due to the De Facto Cap. *Id.* And in California, it is a staggering 14,900 people. *Id.* Estimates from Plaintiff States' own agencies further support NAEH's projection. *Infra* Section IV.C.2.b. As just one example, Maryland's Department of Housing and Community Development estimates that the De Facto Cap would result in a $25 million cut to permanent housing programs and over 1,400 disabled and elderly households losing assistance in calendar year 2027 in the State of Maryland alone. *See* Declaration of Danielle Meister (MD) (Meister Decl.) at 16.

In addition to imposing the De Facto Cap, the FY 2026 NOFO reverses HUD's longstanding Housing First policy via new scoring criteria which effectively force applicants to require participants to enroll in services to receive housing (the "2026 Service Requirement Conditions"). For example, the FY 2026 NOFO awards up to twenty points (out of a maximum of 200) for availability of "Treatment and Recovery Services," including six points when CoCs can "[d]emonstrate that for every 2 persons reporting chronic substance use in the CoC's most recent [point-in-time] count, there is at least 1 CoC-funded unit that requires program participant engagement in substance abuse treatment services as a condition of continued participation," and an additional point when CoCs can "[i]dentify at least one new or existing CoC project that

14

operates sober housing." Knoepfler Decl., Ex. A at 77–78. The FY 2026 NOFO further awards eight points to CoCs that can demonstrate that 100% of their housing projects require residents to participate in supportive services. *Id*. at 79. Similarly, the FY 2026 NOFO rewards CoCs for dedicating their resources to supportive services. The NOFO awards up to eight points if a CoC can "demonstrate" that it "is investing adequately in supportive services by showing" it is either "providing supportive services with a value of 50% of the CoC's Annual Renewal Demand" or that "30% of their proposed CoC funding is used for supportive services relative to their Annual Renewal Demand." *Id.* at 78–79. And, the NOFO rewards CoCs that can "[d]escribe how the[y] . . . partner[] with, or ha[ve] projects that provide, outpatient treatment for mental health and substance use disorders." *Id*. at 76–77.

The 2026 Service Requirement Conditions are inconsistent with HUD's statutory obligations and past practices. For example, the FY 2026 NOFO awards up to eight points if a CoC can "demonstrate that housing projects . . . require program participants to take part in supportive services . . . in line with 24 C.F.R. 578.75(h)." *Id.* at 79. Yet, 24 C.F.R. 578.75(h) only says that programs "may" require program participants to participate in services, not that they are required or incentivized to do so. Instead, the statute requires incentives for permanent supportive housing, as described above. And as recently as 2024, HUD was explicitly encouraging applicants *not* to require services as a condition for stable housing. *See* HUD, *Community Planning and Development* 87 (2025), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf (to receive full points, applicants "must [d]emonstrate at least 75 percent of all project applications that include housing . . . are using the Housing First approach by providing low barrier projects that do not require preconditions to accessing housing

nor participation in supportive services . . . and prioritize rapid placement and stabilization in permanent housing").

Moreover, the new scoring system makes it extremely difficult for applicants proposing rapid rehousing without supportive services to compete. It does this through a "project quality threshold" in which "New Permanent Housing: Rapid Rehousing projects must receive at least 4 out of the 6 points available" to be considered for funding, but awarding two points for offering "supportive services and assistance . . . to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance)." Knoepfler Decl., Ex. A at 63, 67–68. Thus, an applicant who does not provide supportive services is heavily disfavored in meeting the minimum threshold for funding.

As a result of the De Facto Cap and 2026 Service Requirement Conditions (collectively, the "2026 Challenged Conditions"), services will be cut off and tens of thousands of Americans will soon face risk of eviction back to homelessness.

**E.     The 2026 Challenged Conditions Will Harm the Plaintiff States**

As set forth below, the 2026 Challenged Conditions will irreparably and significantly harm the Plaintiff States and their residents. *See infra* Section IV.C.2.b. The Plaintiff States rely on the CoC program as a principal source of federal funding and coordination for assistance with addressing homelessness. *E.g.*, Declaration of Christine Haley (IL) (Haley Decl.) at 4; Declaration of Tyler Jaeckel (CO) (Jaeckel Decl.) at 3; Declaration of Rachel Stucker (DE) (Stucker Decl.) at 3. Within each State, CoC regions are locally defined geographies created by community stakeholders and recognized by HUD, reflecting historical collaboration patterns. *E.g.*, Declaration of Greg Payne (ME) (Payne Decl.) at 2. Washington, for example, is organized into several HUD-designated CoCs, some of which cover particular counties, and a Balance of State CoC that covers the thirty-four smaller counties in Washington. *See* Declaration of Nicholas Mondau (WA)

16

(Mondau Decl.) at 1–2. Rhode Island is coterminous with the Rhode Island Statewide Continuum of Care Program (RI-500), which serves homeless individuals across the state. *See* Declaration of Carol Ventura (RI) (Ventura Decl.) at 1–2.

In several Plaintiff States, state agencies operate as the Collaborative Applicant for the CoC. *E.g.*, Mondau Decl. (WA) at 1–2; Declaration of Wendy Kaye Smith (KY) at 1–2, 8–9; Jaeckel Decl. (CO) at 1–2; Declaration of Richard Vilello (PA) at 2–3. Agencies serving as the Collaborative Applicants are responsible for preparing and submitting the consolidated CoC program application to HUD and ensuring that the application complies with all the regulatory requirements under 24 C.F.R. Part 578. *E.g.*, Mondau Decl. (WA) at 1–2; Declaration of Ruby Dhillon-Williams (AZ) (Dhillon-Williams Decl.) at 4–5. They oversee system governance, establish required policies and procedures, and administer CoC grants on behalf of participating localities and service providers. *E.g.*, Jaeckel Decl. (CO) at 4–7. Collaborative applicants receive direct federal funding to administer the program locally. *E.g.*, Mondau Decl. (WA) at 3; Dhillon-Williams Decl. (AZ) at 5.

In addition to playing a direct role in CoCs, Plaintiff States organize their own homelessness responses around the CoC program. *E.g.*, Declaration of Megan Kirkeby (CA) (Kirkeby Decl.) at 2; Haley Decl. (IL) at 2–4; Declaration of Jennifer Leimaile Ho (MN) (Leimaile Ho Decl.) at 2–3; Declaration of Marc Jolin (OR) (Jolin Decl.) at 4. As just one example, California makes many of its homelessness and housing grants, such as Homekey and Homekey+ grants, Homeless Housing Assistance and Prevention, and Encampment Resolution Funding Program grants available to CoCs and CoC grantees for the purpose of reducing homelessness and providing the most vulnerable populations in California with permanent supportive housing.

17

*See* Kirkeby Decl. (CA) at 4-5. Some HomeKey projects rely on CoC funding or ongoing operational costs. *See* Kirkeby Decl. (CA) at 7-8.

Many states make substantial investments in homelessness and supportive housing that presuppose the existence of this CoC-funded capacity, using state dollars to supplement rental assistance, expand services, or meet match requirements that pair with federal awards. *E.g.*, Haley Decl. (IL) at 12–14; Kirkeby Decl. (CA) at 3–5; Leimaile Ho Decl. (MN) at 2–3; Declaration of Mark Staff (WI) (Staff Decl.) at 8. As a result, state and local expenditures rely on and are intertwined with the predictable funding, data systems, and structure of the federal CoC framework, and add up to billions of dollars worth of investments over time based on expectations that the CoCs would continue to operate as Congress prescribed. *E.g.*, Haley Decl. (IL) at 2–3.

## III.    LEGAL STANDARD

In a case under the APA, a motion for summary judgment "is simply a vehicle to tee up a case for judicial review[.]" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). At summary judgment, the Court must "conduct a searching examination to ensure that the agency's decision is" lawful, including that it is "reasonably supported by the administrative record." *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023). Defendants' implementation of the 2026 Challenged Conditions is in excess of their statutory authority, contrary to law, procedurally improper, and arbitrary and capricious. Accordingly, the Court should enter summary judgment in favor of the Plaintiff States.

Alternatively, Plaintiff States satisfy each of the elements for issuance of a preliminary injunction. Under that standard, "[t]he district court must consider the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships; and the effect, if any,

18

that either a preliminary injunction or the absence of one will have on the public interest." *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (citation modified). The final two factors—the balance of hardships and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, each of these factors tips decisively in Plaintiff States' favor.

## IV.     ARGUMENT

### A.     Defendants' Issuance of the FY 2026 NOFO is a Final Agency Action

As an initial matter, Defendants' issuance of the FY 2026 NOFO with the 2026 Challenged Conditions is a "final agency action" reviewable under the APA. For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified). Courts take a "pragmatic" approach when assessing finality. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

The issuance of the FY 2026 NOFO marks the consummation of Defendants' decisionmaking process and represents a definitive legal position. *See R.I. Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180, 192 (D.R.I. 2025) (challenged grant conditions were final agency action); *Hous. Auth. of the City & County of San Francisco v. Turner*, No. 4:25-cv-08859-JST, 2025 WL 3187761, at *16 (N.D. Cal. Nov. 14, 2025) (same). Should the FY 2026 NOFO be given operative effect, its terms will be binding on Plaintiff States, and they would undoubtedly be prejudiced in the application process and lose funding Congress has appropriated if Plaintiffs decline to abide by the 2026 Challenged Conditions. Moreover, the 2026 Challenged Conditions change the lawful scope of activities permitted with the grants and may lead to the termination of awards, which are legal consequences. *See Illinois v. Fed. Emergency*

19

*Mgmt. Agency (FEMA)*, 801 F. Supp. 3d 75, 89 (D.R.I. 2025) ("Both [*Bennett*] prongs are met here: the new terms mark the consummation of DHS's rulemaking process and impose legal obligations on states by conditioning FY 2025 funding on immigration enforcement compliance.").

**B.    The 2026 Challenged Conditions Violate the APA**

The 2026 Challenged Conditions violate the Administrative Procedure Act several times over. To start, the Conditions are in excess of Defendants' authority and contrary to law because they were not authorized by Congress. On top of that, the De Facto Cap violates specific provisions of the McKinney-Vento Act mandating that CoC funds "shall be available" for renewals, subject to two and only two factors—neither of which permit HUD to refuse renewals that would exceed its unlawful and arbitrary cap.

The De Facto Cap, and accompanying 2026 Service Requirement Conditions, are also unlawful because they repeal and replace HUD's longstanding Housing First policy without notice and comment. Both the McKinney-Vento Act and HUD's own regulations require notice and comment before HUD can radically reshape its policy priorities. Because HUD did not undertake a notice and comment procedure before implementing its $1.3 billion incentive program or adopting a scoring system that favored transitional housing or supportive service-only programs, the 2026 Challenged Conditions are thus unlawful.

The 2026 Challenged Conditions are also arbitrary and capricious in at least four ways: (1) Defendants failed to consider the obvious downsides of suddenly refusing to renew funding for permanent housing projects, including what would happen when states and housing providers suddenly lost federal funding; (2) the 2026 Challenged Conditions are inconsistent with Congress' directives explicitly endorsing a Housing First approach; (3) Defendants' explanation for their new policies relies on data that does not actually support their new policy preferences and ignores data

20

that contradicts it; and (4) Defendants reversed longstanding prior policies without weighing reliance interests.

### 1. HUD lacks the authority to create the 2026 Challenged Conditions out of whole cloth

First, the 2026 Challenged Conditions violate the APA because they exceed Defendants' statutory authority. 5 U.S.C. § 706(2)(C). As an agency, HUD's "power to act and how [it is] to act is authoritatively prescribed by Congress[.]" *City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013). Accordingly, Defendants have "no power to act . . . unless and until Congress confers power upon" them. *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). This is especially true when it concerns federal funding, as the Constitution assigns Congress the power to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires . . . and violates the Administrative Procedure Act[.]" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citation modified); 5 U.S.C. § 706(2)(C).

HUD lacks the authority to add conditions to CoC funding like the ones challenged here. This is because the McKinney-Vento Act details what "required criteria" HUD must use in awarding CoC funds, 42 U.S.C. § 11386a, and which "certification[s]" are required from project sponsors, 42 U.S.C. § 11386(b)(4). But the McKinney-Vento Act does not grant HUD any authority to add additional terms, like a De Facto Cap on permanent housing or service requirement conditions. Nor does HUD have the power to implement a De Facto Cap by creating a "set-aside" for transitional housing and/or service-only projects. If Congress wanted to create such a set-aside, it could do so. Indeed, it created set-asides in the recent THUD Act for things like providing services for victims or domestic violence and programs specific to youth homelessness, *but not for transitional housing and/or service-only projects*. THUD Act, 140 Stat. at 399–400. Similarly,

21

Congress could have empowered HUD to prioritize or incentivize transitional housing or service-only projects. But not only did Congress not do that, it did the opposite; it directed HUD to incentivize permanent housing and rapid re-housing, and restricted HUD from offering similar incentives for other types of programs unless HUD could demonstrate by "research and after notice and comment to the public" that the programs "have been proven effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals[.]" 42 U.S.C. § 11386b(d)(2)(C). HUD simply does not have the authority to impose a De Facto Cap out of whole cloth. *See Providence*, 954 F.3d at 39 (an agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities").

Indeed, Defendants make no effort, anywhere in their NOFO, to identify a statutory basis for any of these conditions—because there is none. All they rely on are Executive Orders, but the President has no more power "to enact, to amend, or to repeal statutes" than do agencies. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Accordingly, Defendants' efforts to add conditions are "in excess of statutory . . . authority[.]" 5 U.S.C. § 706(2)(C).

### 2. The Challenged Conditions violate the McKinney-Vento Act and are thus contrary to law

Additionally, the Challenged Conditions violate the McKinney-Vento Act and are therefore contrary to law under the APA. "An agency may not . . . simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009). 5 U.S.C. § 706(2)(A) requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024). The Challenged Conditions violate multiple provisions of the McKinney-Vento Homeless Assistance Act and its implementing regulations and should therefore be enjoined.

22

To begin with, the De Facto Cap is "irreconcilable" with various provisions of the statute that require the majority of CoC funds to be used for renewal of permanent housing projects. *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1113 (9th Cir. 2020) (enjoining funding conditions incompatible with statutory requirements as contrary to law). 42 U.S.C. § 11386c(b) requires that renewal funds for existing projects "*shall* be available for the renewal of contracts in the case of tenant-based assistance, *successive* 1-year terms[.]" (emphasis added). This statutory "emphasis on renewals allows for the continuity necessary for Continuums to avoid funding gaps, which would otherwise disrupt their ability to provide stable housing, leverage funding from other sources, and plan long-term projects." *Washington II*, 171 F.4th at 481. But because eighty-seven percent of existing project funds eligible for renewal are permanent housing projects, the De Facto Cap would preclude renewal of nearly two-thirds of those funds in plain violation of the statute. Further, Congress' direction that "[t]he Secretary shall determine whether to renew . . . *on the basis of certification by the collaborative applicant* . . . that (1) there is a demonstrated need for the project; and (2) the project complies with program requirements and appropriate standards of housing quality and habitability," makes clear that HUD lacks discretion to arbitrarily withhold funds that Congress directed it to spend on renewals. *Id.* (emphasis added).

By the same token, capping permanent housing at sixty-eight percent adds renewal factors beyond what Congress permitted HUD to consider. This is because HUD will not only consider the statutorily required factors of demonstrated need and compliance with program requirements and habitability. Instead, the De Facto Cap now also requires HUD to consider whether renewal would exceed HUD's unlawful and arbitrary cap.

23

The 2026 Challenged Conditions also conflict with HUD's obligation to evaluate projects based on statutorily "[r]equired [c]riteria" including "the extent to which the recipient will . . . incorporate comprehensive strategies for reducing homelessness," which by statute includes strategies "proven to be effective at reducing homelessness" like "*permanent supportive housing*" and "*rapid rehousing*[.]" 42 U.S.C. §§ 11386a(b)(1)(B)(iv); 11386b(d)(2) (emphasis added). The 2026 Challenged Conditions turn these legal obligations on their head, punishing applicants for doing the things the McKinney-Vento Act requires HUD to prioritize.

Defendants might argue that the THUD Act permitted HUD to cap renewals insofar as it directed HUD to "select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 et seq." THUD Act § 2, 140 Stat. at 399. But in permitting HUD to cap Tier 1 funding, Congress only sought to restrict Continuums' abilities to prioritize projects for funding. This provision was not intended to undermine the McKinney-Vento Act's statutory requirement that CoC funding "shall be available for the renewal of contracts" for permanent housing. 42 U.S.C. § 11386c(b); *see also* Mondau Decl. (WA) at 4–5 (explaining that, until FY 2025, the Washington Balance of State CoC "received funding for all eligible projects placed in Tier 1, and most projects placed in Tier 2"). Nor does it alter the Act's requirement that the Secretary prioritize Housing First programs "that have proven to be effective at reducing homelessness," while requiring notice and comment before proceeding with other strategies. 42 U.S.C. § 11386b(d).

Defendants might also argue that because 42 U.S.C. § 11386c(b)(2) allows the Secretary to determine "program requirements" that projects must meet to be renewed, HUD therefore has discretion to impose a "program requirement" in the form of the De Facto Cap. But the CoC

24

"program requirements" are spelled out at 42 U.S.C. § 11386. Additionally, the Secretary's discretion to implement "other terms and conditions as [he] may establish to carry out this part in an effective and efficient manner," is plainly limited to the same type of prosaic administrative conditions explicitly detailed in the statute and does not license a wholesale revision of the Congressional mandate. *See City of Seattle v. Trump*, 808 F. Supp. 3d 1204, 1218–19 (W.D. Wash. 2025); 42 U.S.C. § 11386(b)(8).

Likewise, the 2026 Service Requirement Conditions conflict with the statutory project selection criteria that prioritize projects that demonstrate success with rapid and permanent rehousing. "When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985) (per curiam). Under the selection criteria codified at 42 U.S.C. § 11386a(b)(1), HUD "shall" evaluate projects based on "previous performance" of service providers, as measured by, *inter alia*, "(i) the length of time individuals and families remain homeless; (ii) the extent to which individuals and families who leave homelessness experience additional spells of homelessness; (iii) the thoroughness of grantees in the geographic area in reaching homeless individuals and families; [and the] (iv) overall reduction in the number of homeless individuals and families[.]" Congress thereby made its instructions clear: projects are to be evaluated by how quickly they can get people housed and the extent to which they keep them housed. "In interpreting statutes and regulations, courts must try to give them a harmonious, comprehensive meaning, giving effect, when possible, to all provisions." *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 168 (1st Cir. 1987). Related provisions instruct that services and treatment are to be

25

a complement, rather than a precondition, to housing placement. *See* 42 U.S.C. § 11385(a) ("*To the extent practicable*, each project shall provide supportive services for residents of the project and homeless persons using the project[.]") (emphasis added); 42 U.S.C. § 11386a(b)(1)(F) ("independent living in permanent housing" can "*includ[e]* assistance to address" issues like "mental health conditions, substance addiction . . . or multiple barriers to employment[]") (emphasis added).

Congress has directed HUD to fund Housing First policies through various statutory provisions, and it has directed HUD to prioritize renewals to ensure that individuals and families who have successfully exited homelessness are not evicted back onto the streets. 42 U.S.C. § 11386c(b). The 2026 Challenged Conditions would interfere with rather than promote "efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families" and therefore contravenes Congress's overall purpose in establishing the CoC program. 42 U.S.C. § 11381(2); *Penobscot Nation v. Frey*, 3 F.4th 484, 501 (1st Cir. 2021) ("[W]e cannot interpret . . . statutes to negate their own stated purposes." (quoting *King v. Burwell*, 576 U.S. 473, 493 (2015)). Those Conditions are thus contrary to law.

### 3.    The 2026 Challenged Conditions were adopted without notice and comment

The 2026 Challenged Conditions are also independently unlawful because they were adopted without notice and comment, which is the procedure required by the McKinney-Vento Act and HUD's own regulations. The APA requires courts to "hold unlawful and set aside agency action[]" found to be "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(D). This includes agency actions that are contrary to an agency's own regulations.

First, HUD's own regulations require that HUD engage in notice and comment rulemaking for matters that relate to grants, but HUD failed to do so here. Under the APA, government agencies

are required to publish "general notice of proposed rule making" and provide "interested persons an opportunity to participate in the rule making" by submitting comments on the proposed agency rule. 5 U.S.C. § 553(b), (c). The provisions of Section 553 do not apply to matters relating to "public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). But HUD's regulations have long "provide[d] for public participation in rulemaking with respect to *all* HUD programs and functions, *including* matters that relate to public property, loans, grants, benefits, or contracts *even though such matters would not otherwise be subject to rulemaking* by law or Executive policy." 24 C.F.R. § 10.1 (emphasis added). Where notice and comment is required, "[f]ailure to abide by these requirements renders a rule procedurally invalid." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018).

The De Facto Cap and 2026 Service Requirement Conditions represent a sharply consequential shift in how HUD will prioritize over $4 billion in federal funds for homelessness— shifting away from long-term housing and towards transitional housing that requires work and addiction treatment, or service-only grants that provide no housing at all. Here, Defendants have unilaterally created a $1.3 billion set-aside—or, put differently, have implemented a cap on permanent housing—that will result in funding cuts for organizations across the board and tens of thousands of individuals being evicted back into homelessness. This De Facto Cap would override statutory provisions regarding renewals and undermine Congress' goal of promoting stable housing. Such substantive changes to the HUD CoC program must be made through notice and comment rulemaking—as required by HUD's own regulations—which HUD wholly failed to do.[12] *Cf. Comm. For Fairness v. Kemp*, 791 F. Supp. 888, 893 (D.D.C. 1992) (HUD's changed methods

---

[12] Notice and public procedures may be omitted if HUD determines that, in a particular case or class of cases, notice and public comment procedures are "impracticable, unnecessary[,] or contrary to the public interest." 24 C.F.R. § 10.1. But to counsel's knowledge, HUD has not stated such a determination.

27

for calculating subsidies for public housing authorities were substantive or legislative rules and violated notice and comment); 81 Fed. Reg. 48366 (July 25, 2016) (HUD's own practice in seeking additional comment on the formula used to allocate CoC funds).

Second, and making matters worse, the McKinney-Vento Act specifically requires HUD to engage in notice and comment if it wishes to provide "incentives" for projects outside the "proven strategies" explicitly laid out in the statute—i.e., permanent supportive housing and rapid rehousing. 42 U.S.C. § 11386b(d). Neither temporary, transitional housing nor supportive service-only grants are "proven strategies," within the meaning of the statute. *Id.* HUD's refusal to undergo notice and comment therefore bars it from "provid[ing] . . . incentives" for these activities, including in the form of a massive set-aside. *Id.*

As this Court recently put it, "[w]hile HUD may alter its approach, identify new goals, and award funds in support of achieving them, it may do so only after conducting research and undertaking a public notice and comment process." *Washington I*, 2026 WL 1863886, at *2 (citing 42 U.S.C. § 11386b(d)(2)(C)). Because HUD failed to do so, the 2026 Challenged Conditions should be enjoined.

### 4. The 2026 Challenged Conditions are arbitrary and capricious

The 2026 Challenged Conditions are also arbitrary and capricious. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Fed. Commc'n Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection

28

between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983) (citation modified). In doing so, the agency cannot rely on "factors which Congress has not intended it to consider[.]" *Id*. The "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

In addition, when an agency "rescinds a prior policy," the agency must, at minimum, consider the "alternatives" which are "within the ambit of the existing [policy,]" "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (internal quotation marks omitted) (quoting *State Farm*, 436 U.S. at 51).

An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem before" it. *Regents*, 591 U.S. at 25 (citation modified); *see also id.* at 30. An agency must "pay[] attention to the advantages *and* the disadvantages" of its decision. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) (emphasis in original).

As set forth below, the 2026 Challenged Conditions are arbitrary and capricious for each of four independent reasons: (1) Defendants failed to consider important aspects of their decision including the disadvantages of the decision, namely, what would happen when states and housing providers suddenly lost federal funding; (2) the 2026 Challenged Conditions are inconsistent with Congress' directives; (3) Defendants failed to provide a reasoned basis or explanation for their new policies; and (4) Defendants reversed longstanding prior policies without weighing reliance interests.

29

### a.    Defendants failed to consider the impacts of the 2026 Challenged Conditions on individuals who are likely to lose their housing

Defendants utterly failed to consider what is going to happen to the entities and, more importantly, people who will be cut off by the Challenged Conditions. *See Michigan*, 576 U.S. at 753 (an agency must "pay[] attention to the advantages *and* the disadvantages of [its] decisions").

This Court already held that Defendants acted arbitrarily and capriciously in "eliminat[ing] the Housing First approach" without "consider[ing] the impact that its decision . . . would have on the existing system created by Congress and HUD itself." *Washington I*, 2026 WL 1863886, at *3. As the Court explained, HUD "failed to substantively consider the impact that a rapid, untimely overhaul would have on the organizations that administer these programs and the individuals that rely upon them." *Id.* And crucially, "HUD did not attempt to meaningfully forecast the harm caused by the disruption these NOFOs created at any point, most notably the instability faced by individuals who would undoubtedly experience homelessness because of this breakneck transition." *Id.* (citing *State Farm*, 463 U.S. at 43). HUD also "g[a]ve[] little to no thought or analysis of the negative externalities created by its transition from a Housing First approach to one that mandates enrollment in various programs designed to address challenges other than a lack of stable housing," and "HUD failed to meaningfully balance its new emphasis on fostering a competitive environment for grantees to seek funding against HUD's prior concern with housing stability." *Id.* at *4. "Even more significantly," this Court explained, "HUD failed to meaningfully consider . . . the benefits it could have achieved from waiting to implement this new policy and rolling out its new priorities on a non-emergency basis." *Id.*

Everything the Court said about the FY 2025 NOFOs is true of the FY 2026 NOFO (aside from the fact that the FY 2026 NOFO is not untimely). Jettisoning its decades-long approach to

30

Housing First, via a NOFO with less than three months to respond, inevitably causes disruption for states, services providers, and residents.  Declaration of Matthew Heckles (DE) (Heckles Decl.) at 6, 11; Declaration of Paula Kaiser Van Dam (MI) (Van Dam Decl.) at 4; Smith Decl. (KY) at 12-13, 19–20; Declaration of Lily Sojourner (VT) (Sojourner Decl.) at 5; Haley Decl. (IL) at 4, 18; Declaration of Janel Winter (NJ) (Winter Decl.) at 5–6; Kirkeby Decl. (CA) at 7, 9–10. Capping permanent housing renewals, while adopting onerous service requirements, means that organizations and projects receiving funding, and that reasonably expected to continue receiving funding, will lose that funding. That loss of funding will have unavoidable and devastating effects on the vulnerable people living in the housing, many of whom will be evicted back into homelessness. Almost certainly, tens of thousands of people, if not more, will end up being evicted back into homelessness. *See*, *e.g.*, Declaration of Nancy Navarretta (CT) (Navaretta Decl.) at 5–6; Heckles Decl. (DE) at 7–8; Declaration of Corrin Buchanan (CA) (Buchanan Decl.) at 4; Haley Decl. (IL) at 5; Kaye Smith Decl. (KY) at 13–14; Winter Decl. (NJ) at 4–5; Declaration of Stephanie Meyer (PA) (Meyer Decl.) at 3; Mondau Decl. (WA) at 6–7. Yet, Defendants entirely fail to address this in the FY 2026 NOFO. *See* Knoepfler Decl., Ex. A at 28–34 (outlining reasoning behind FY 2026 NOFO without acknowledging that people will lose their housing). HUD's failure to consider, or even acknowledge, this basic reality would be shocking if they had not unlawfully done the exact same thing just last year.

The entire purpose of the CoC Program is to help those experiencing homelessness find stable housing. 42 U.S.C. § 11381. In adopting policies that will evict untold number of Americans back into homelessness, Defendants have "entirely failed to consider an important aspect of the problem[.]" *State Farm*, 463 U.S. at 43; *see also R.I. Coal. Against Domestic Violence*, 812 F. Supp. 3d at 193 (finding that Defendants failed to consider "the harmful impact their

decision would have 'on the Coalitions and the vulnerable populations they serve'") (quoting *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 71 (D.R.I. 2025))

### b.      Defendants relied on factors Congress did not intend them to consider

Defendants compounded their failure to consider important aspects of the problem by relying on factors which "Congress ha[d] not intended it to consider," *State Farm*, 463 U.S. at 43, and "neglect[ing] to consider a statutorily mandated factor[.]" *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

The most glaring example of this inappropriate reliance is Defendants' blithe rejection of Congress' explicit finding that "permanent supportive housing" and "rapid rehousing services" are among the "activities that have been proven to be effective at reducing homelessness[.]" 42 U.S.C. § 11386b(d)(2). The statute directs that Defendants "*shall* provide bonuses or other incentives to" CoCs that implement these strategies. 42 U.S.C. § 11386b(d)(1) (emphasis added). Defendants are not at liberty to overrule Congress on this point.

Moreover, as discussed above, the McKinney-Vento Act already describes the "Required Criteria" that must be used to assess grant applications. Yet, rather than following these statutorily mandated and highly detailed criteria, Defendants have imposed the new 2026 Challenged Conditions. These conditions are arbitrary and capricious, as Defendants did not "look to" nor "discuss" statutory "requirements" while imposing them. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 682 (2020).

### c.      Defendants failed to provide a reasoned explanation for their abandonment of Housing First

Defendants' rationalizations for the 2026 Challenged Conditions—and their abrupt abandonment of Housing First—are also arbitrary and capricious because they "run[] counter to the evidence before the agency[.]" *State Farm*, 463 U.S. at 43.

32

To start, Defendants' argument that permanent housing is ineffective is dead on arrival because Congress has explicitly found that "permanent supportive housing" and "rapid rehousing services" are among the "activities that have been proven to be effective at reducing homelessness[.]" 42 U.S.C. § 11386b(d)(2). Defendants lack the power to simply disregard these statutory findings.

Defendants' justifications also contradict HUD's *own* recent analysis of data finds considerable support for a Housing First approach emphasizing permanent housing. For example, according to HUD's most recent strategic plan, "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." *Supra* n.1 at 27.

In contrast to HUD's prior evidence-backed strategic plan, Defendants' recent about-face is entirely unsupported by the materials they cite in their NOFO and administrative record. The FY 2026 NOFO justifies the 2026 Challenged Conditions by attempting to link evidence of increasing rates of homelessness to prioritization of CoC funding for permanent housing. Knoepfler Decl., Ex. A at 28–29. The apparent decisional memo—by Caitlyn McKenney, Deputy Assistant Secretary for Community Planning and Development's Office of Special Need (the "McKenney Memo")—takes the same tack. *See* Knoepfler Decl., Ex. B at 2 ("The data is clear that this [Housing First] approach has failed, and we've been left instead with record high rates of homelessness despite year-over-year increases in funding for the program."). But the NOFO and the McKenney Memo ignore HUD's own data showing that homelessness in fact *declined* between January 2024 and January 2025, when permanent housing projects still received most CoC funding. *See The 2025 Annual Homelessness Assessment Report (AHAR) to Congress*, The U.S.

33

Dep't       of       Hous.       and       Urb.       Dev.       v       (2026),
https://www.huduser.gov/portal/sites/default/files/pdf/2025-AHAR-Part-1.pdf    (2025    AHAR
Report). Although HUD tries to obscure the import of this data, HUD's report shows a 3.3 percent
decrease in homelessness "driven by an 11.3 percent decrease among families experiencing
homelessness, a 7.9 percent reduction in homelessness among unaccompanied youth, a 2.9 percent
decrease among people who are unsheltered, and a 1.2 percent decrease among homeless
veterans." Tim Murphy, *Long-Awaited Federal Data Shows the First Overall Reduction in
Homelessness Since 2016*, Nat'l All. to End Homelessness (May 29, 2026),
https://endhomelessness.org/media/news-releases/long-awaited-federal-data-shows-the-first-
overall-reduction-in-homelessness-since-2016/.

To be sure, the number of Americans experiencing homelessness in 2025 is still
unacceptably high and, as HUD notes, considerably higher than it was in 2013. *See* Knoepfler
Decl., Ex. A at 29. But Defendants do not point to *any* causal link between this prior increase in
homelessness and HUD's longstanding commitment to fund permanent housing. *See Brown v. Ent.
Merch. Ass'n*, 564 U.S. 786, 800 (2011) (explaining that studies "based on correlation, not
evidence of causation," do not establish causation) (quotation omitted); *United States v. Jacques*,
784 F. Supp. 2d 59, 65 (D. Mass. 2011) ("Of course, without more, this statistic is virtually
meaningless in light of the well-known principle that correlation does not imply causation.").

Defendants cannot even establish a correlation between an increase in homelessness and
the Housing First policy. HUD claims that homelessness has increased since Housing First "policy
was first mandated by HUD in 2013," Knoepfler Declaration, Exhibit A at 29 but its own data
shows that homelessness *declined* after 2013, reaching a low of 549,928 in 2016. *See* 2025 AHAR
Report at 1. By 2022, the number of people experiencing homelessness was still well below where

34

it was in 2007. *Id.* Homelessness in America only began its sharp increase following the COVID-19 pandemic. *Id.*

HUD's own analyses further contradict its newfound claim that permanent housing policies are responsible for increased homelessness. According to HUD's 2024 Annual Homelessness Assessment Report (AHAR) to Congress, "[s]everal factors likely contributed" to the recent spike in homelessness, including "[o]ur worsening national affordable housing crisis, rising inflation, stagnating wages among middle- and lower-income households, . . . the persisting effects of systemic racism, . . . public health crises, natural disasters that displaced people from their homes, rising number of people immigrating to the U.S., and the end of homelessness prevention programs put in place during the COVID-19 pandemic[.]" *The 2024 Annual Homelessness Assessment Report (AHAR) to Congress*, The U.S. Dep't of Hous. and Urb. Dev. Off. of Cmty Plan. and Dev. v (Dec. 2024), https://www.huduser.gov/portal/sites/default/files/pdf/2024-AHAR-Part-1.pdf.[13]

In short: HUD's correlation-only analysis fails to even demonstrate correlation—let alone causation—and simply ignores alternative explanations previously given by the agency.

The FY 2026 NOFO also points to evidence that overdose deaths among individuals experiencing homelessness sharply increased between 2020 and 2023. Knoepfler Decl., Ex. A at 32. But here again, Defendants make no effort to show this increase had anything to do with any HUD policies. To the contrary, the San Francisco study they cite suggests that increased overdose mortality during the COVID-19 pandemic was likely "driven by the growing presence of fentanyl," combined with COVID-related disruptions in services and COVID mitigation policies

---

[13] The McKenney Memo does not dispute this, other than to make the baseless claim that "there is no evidence to support the claim that 'systemic racism' *existed* or had a causal impact on the 2024 increase." AR 48 (emphasis added). And the Memo concedes that a recent increase in homelessness "was driven in large part by immigration" and "there are likely a multitude of factors driving changes in homelessness across the country." Knoepfler Decl., Ex. B at 10-11.

35

that reduced contact between those at risk of overdose deaths and those who might have intervened. Caroline Cawley, et al., *Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic*, JAMA Network Vol. 5, No. 3 (Mar. 10, 2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789907. And indeed, the study *specifically found* that "San Francisco's alternative shelter program," through which the City placed high-risk individuals in hotel rooms (without, apparently, requiring sobriety or other preconditions), "*did not appear* to be associated with increased overdose deaths among people experiencing homelessness[.]" *Id.* (emphasis added). Similarly, the FY 2026 NOFO cites a City of Seattle audit report that shows a 282% increase in overdose deaths between 2020 and 2023 for "people who are recently homeless and living in permanent supportive housing, subsidized housing, or recovery housing[.]" Claudia Gross Shader, *Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach,* Seattle Off. of the Auditor 6 (Jul. 9, 2024), https://seattle.gov/documents/Departments/CityAuditor/auditreports/OverdoseAndCrimeConcent rationsAudit.pdf (Seattle Audit); *see also* Knoepfler Decl., Ex. A at 32. Except that this report undermines Defendants because as awful as that 282% increase is, it is much lower than the 436% increase in fatal overdoses "[f]or those living unsheltered or in emergency shelters[.]" Seattle Audit at 6. The City of Seattle report thus seems to show that those in permanent supportive housing saw much lower rates of overdose deaths than those who were in emergency shelters.[14] More broadly, the City of Seattle report lends further support to the conclusion reached by the San Francisco study: that post-2020 increases in fatal overdoses were driven largely by fentanyl's relentless

---

[14] The City of Seattle report also does not explain what it means by "recovery housing," but it appears it refers to the type of sober housing that the FY 2026 NOFO aims to encourage. *See Recovery Residences*, Wash. Health Care Auth., https://www.hca.wa.gov/free-or-low-cost-health-care/i-need-behavioral-health-support/recovery-residences (last visited Jul. 16, 2026).

infiltration of the national drug supply, *id.* at 3–4, not by any HUD policy. Defendants' decision "to rely on portions of studies in the record that support its position, while ignoring [information] in those studies that do[es] not" is arbitrary and capricious. *Genuine Parts Co. v. E.P.A.*, 890 F.3d 304, 313 (D.C. Cir. 2018).

Nationwide statistics bear out these studies' conclusions: overdose deaths sharply increased nationwide between 2020 and 2023 as fentanyl infiltrated the national drug supply. *Provisional Drug Overdose Death Counts*, U.S. Ctrs. for Disease Control and Prevention, Nat'l Ctr. for Health Stat., https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited Jul. 16, 2026).[15] But since 2023, nationwide numbers have begun to fall even more sharply: April 2025 overdose deaths were actually lower than April 2020 overdose deaths—despite the fact that HUD maintained its Housing First priority unchanged during the entire time period. *Id.* In other words, Defendants cannot show even a correlation between permanent housing and overdose deaths.

Defendants further fail to establish causation by neglecting to cite any evidence whatsoever that defunding permanent housing, and shifting funds to things like transitional housing, would actually reduce homelessness or other problems. Again, HUD has previously found that providing permanent housing as a front-line intervention to address homelessness leads to better outcomes than other approaches. *Supra* n.1 at 26–27. For example, HUD's "landmark Family Options study found that families who received priority access to deep housing subsidies experienced major decreases in returns to homelessness and increases in family well-being relative to those offered usual care in shelters, and documented major cost savings of rapid rehousing and permanent

---

[15] The Court may take judicial notice of "information published on the website of the Centers for Disease Control and Prevention (CDC)" because the accuracy of this information "cannot reasonably be questioned." *Cox v. City of Bos.*, 734 F. Supp. 3d 173, 177 n.1 (D. Mass. 2024); *see also Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of factual information on CDC's website).

housing relative to shelter and transitional options on a per-month basis." *Id.* at 25–26 (citing Daniel Gubits et al., *Family Options Study: 3-Year Impacts of Housing and Services Interventions for Homeless Families*, Off. of Pol'y Dev. and Rsch. (Oct. 25, 2016), https://www.huduser.gov/portal/publications/Family-Options-Study.html). HUD similarly cited to a bevy of "[r]andomized controlled trials evaluating PSH programs that use a Housing First approach show that it improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." *Id.* at 27 (citing *Permanent Supportive Housing: Evaluating the Evidence for Improving Health Outcomes Among People Experiencing Chronic Homelessness*, Nat'l Academies of Sciences, Eng'g, and Med. (Jul. 11, 2018) https://www.ncbi.nlm.nih.gov/books/NBK519597/#ref_000409)).

The FY 2026 NOFO completely ignores these studies that HUD previously relied on to find that permanent housing improves outcomes, over and above other interventions. And the McKenney Memo at best tries to muddle things by claiming that the evidence is "mixed." Knoepfler Decl., Ex. B at 7. Hardly. The very first study they cite concludes:

> Evidence from this systematic review indicates that Housing First programs c*an more effectively reduce homelessness and improve housing stability for homeless populations* with a disability than Treatment First or TAU. Housing First programs offer permanent housing with accompanying health and social services, and their clients are able to maintain a home without first being substance-free or in treatment. Clients in stable housing experienced better quality of life and generally showed reduced hospitalization and emergency department use. For clients living with HIV infection, Housing First programs improved physical and mental health and reduced mortality. With stable housing, clients with HIV infection had a place to receive, store, and take their medications, leading to improved adherence, reduced viral loads, and downstream health benefits.

Knoepfler Decl., Ex. C at 4 (emphasis added). For those without HIV, the Peng study shows that Housing First worked as well as (but not worse than) treatment first models in addressing "physical and mental health and substance use." *Id.*

The McKenny Memo also cites a 2023 article from HUD itself that concludes that "Housing First Works" and describes in detail why Housing First can be used to "effectively solve homelessness" and summarizes a "number of studies" that "indicate the effectiveness of Housing First approaches for outcomes such as housing stability, health, and reduced use of high-cost services such as emergency departments and jails." Knoepfler Decl., Ex. D. The McKinney Memo only briefly mentions this article and merely addresses one of the many studies and literature reviews cited in the article, ignoring the article's overall conclusion about the effectiveness of Housing First. *See* Knoepfler Decl., Ex. B at 7.

The remainder of the studies cited in the McKenney Memo appear to suggest that permanent housing works best when coupled with support. *See* Knoepfler Decl., Ex. B. This is a model called permanent supportive housing, and it is part of the permanent housing that Defendants are attempting to slash in the FY 2026 NOFO. Permanent supportive housing provides residents with any array of supportive services that they may elect to participate in on a voluntary basis. Permanent supportive housing is very effective, which makes Defendants' decision to cap permanent housing—including permanent supportive housing—arbitrary and capricious. The FY 2026 NOFO utterly fails to address HUD's prior conclusions, or the evidence on which those conclusions rested. This is arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (requiring the agency to "examine the relevant data and articulate a satisfactory explanation for its action").

### d.      Defendants failed to consider reliance interests

Defendants also acted arbitrarily and capriciously by rescinding prior policies without considering alternatives within the ambit of the existing policies, assessing whether there were reliance interests, and weighing any such interests against competing policy concerns. The 2026 Challenged Conditions are an extreme deviation from HUD's long history of applying a Housing First model and prioritizing renewals. Defendants "failed to address whether there was 'legitimate reliance' on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30 (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996)).

For years, Continuums, applicants, and service providers developed their programs along the lines that HUD repeatedly urged. Per HUD's guidance, applicants have built Housing First programs to provide long-term, stable housing and services for individuals and families to exit homelessness. Now, suddenly, these entities will be immediately forced to fundamentally reshape their programs or forego this critical funding. Programs providing stable housing to formerly homeless individuals cannot simply turn on a dime to become transitional housing or suddenly develop relationships with service providers sufficient to meet the 2026 Service Requirement Conditions. Nor have Defendants apparently given any thought to whether there is sufficient supportive service capacity in any (let alone all) CoC geographic areas to even meet HUD's new requirements. Given that it would be extremely difficult for programs to quickly implement these abrupt shifts, many programs are likely to lose out on funding, with their clients bearing the worst of it. *E.g.*, Kaiser Van Dam Decl. (MI) at 5; Jaeckel Decl. (CO) at 14; Winter Decl. (NJ) at 7; Miné (DC) at 6; Declaration of Tamarah A. Holmes (VA) (Holmes Decl.) at 3.[16] The cuts in the

---

[16] Moreover, as of the date of this filing, HUD has failed to post the online application for the FY 2026 NOFO despite the rapidly approaching application deadline and the fact that HUD historically posts the applications within three weeks after publishing the NOFO, which has long passed. *See* Declaration of Karen R. Byron (MA) (Byron Decl.) at 5, 6, 11. The online application contains extensive instructions that are necessary for applications.

Challenged NOFO would be catastrophic and local governments and charities could not make up the aid. *E.g.*, Mondau Decl. (WA) at 7, 28; Jaeckel Decl. (CO) at 7. But the FY 2026 NOFO entirely fails to consider any alternatives within the ambit of existing Housing First policies that could achieve the goal of reducing homelessness.

Similarly, Defendants failed to consider the reliance interests of states who rely on CoC-funded projects as part of the homelessness response systems. Most notably, the De Facto Cap threatens to destabilize existing CoC-funded permanent housing projects that receive state funding or other support. These projects rely on the availability of both CoC and state funding to remain viable and serve participants. Further, HUD fails to consider how the disruption to and potential failure of these jointly funded projects will increase the population of unsheltered homeless persons, increase utilization of State-funded healthcare, crisis response, and shelter-avoidance systems. In turn, these increases will inevitably place financial strains that they are not prepared to absorb and cannot readily address. Defendants fail to address or even mention these interests and the likely impacts of these caps on Plaintiff States' homelessness response systems. This failure is even more problematic given that States reasonably relied on HUD's prior federal directives promoting the development of permanent housing and rapid rehousing when developing their own homelessness response systems.

Because the Challenged Conditions were adopted "with no regard for the [States'] reliance interests[,]" and Defendants "did not acknowledge—much less justify—[their] adoption" of the

---

*Id.*; *see also* Squirrel Decl. (ME) at 6–7. Additionally, on July 16, 2026, HUD sowed further chaos by indicating its intent to modify the FY 2026 NOFO within seven days to include a direct-to-HUD application process for one particular CoC, which creates confusion given HUD's statement that its changes are "pending further agency deliberation" and may also create additional delays in the FY 2026 NOFO application process. *Continuum of Care Program Competition*, HUD, https://www.hud.gov/hud-partners/coc-program-competition (last visited Jul. 17, 2026).

new conditions, they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters v. Nat'l Lab. Rels. Bd.*, 61 F.4th 169, 180 (D.C. Cir. 2023).

**C.    Plaintiffs Are Entitled to the Full Suite of APA and Injunctive Relief on Summary Judgment**

### 1.    The Court should vacate and set aside the 2026 Challenged Conditions

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action" found to be unlawful. 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of unlawful agency actions. *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Id.* at 830. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see Illinois v. Noem*, 813 F. Supp. 3d 282, 309 (D.R.I. 2025) ("[E]xisting Supreme Court and First Circuit precedent affirms vacatur to be appropriate under the remedy."); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) (acknowledging the continuing vitality of this rule); *FEMA*, 801 F. Supp. 3d at 97 (explaining that "[t]he holding in *Trump v. CASA* restricted universal injunctions, but the Court expressly left unaffected the APA's command to 'set aside' unlawful agency action").

Under Section 706(2), a court must "hold unlawful and set aside agency action" that is arbitrary and capricious, contrary to law, or in excess of statutory jurisdiction. For the reasons discussed above, the 2026 Challenged Conditions should be vacated with respect to Plaintiff States. *See Env't Def. Fund v. Fed. Energy Regul. Comm'n*, 2 F.4th 953, 960–961 (D.C. Cir. 2021)

(explaining that "vacatur is the normal remedy" under the APA, and vacating approval of a pipeline that had since entered operation (citation modified)).

**2.      The Court should permanently enjoin Defendants from implementing the 2026 Challenged Conditions**

Plaintiff States are also entitled to permanent injunctive relief to effectuate the vacatur of the 2026 Challenged Conditions and to protect Plaintiff States from future irreparable harm. In general, courts issue injunctive relief where "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

The APA expressly authorizes "actions for . . . prohibitory or mandatory injunction" in addition to vacatur. 5 U.S.C. § 703. "[C]ourts use this broad remedial power to issue permanent injunctive relief for APA violations." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021). The D.C. Circuit has held that, in the APA context, "once the court reache[s] the conclusion that the rule was indeed illegal (i.e., not merely that the plaintiffs had a reasonable probability of success on the merits, as would be necessary for a preliminary injunction), there [is] no separate need to show irreparable injury, as that is merely one possible 'basis for showing the inadequacy of the legal remedy.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting 11A Wright & Miller's *Federal Practice & Procedure: Federal Rules of Civil Procedure* § 2944 (2d ed. 1995)). This principle alone suffices to support the issuance of permanent injunctive relief against implementation of the 2026 Challenged Conditions against Plaintiff States. Regardless, as discussed below, examining the

43

equitable factors in greater detail leads to the same result for each of the unlawful actions taken by defendants.

An injunction against the 2026 Challenged Conditions would effectively redress Defendants' unlawful actions and prevent Plaintiff States from suffering irreparable injury.

### a.    Plaintiff States succeed on the merits of their APA challenges to the 2026 Challenged Conditions

For all of the reasons stated *supra* at Sections IV.A and B, Plaintiff States have demonstrated that their claims that the 2026 Challenged Conditions violate the APA are entitled to summary judgment, and thus that they succeed on the merits for purposes of entitlement to permanent injunctive relief.

### b.    The States will suffer irreparable harm absent injunctive relief

Plaintiff States will suffer irreparable harm from the 2026 Challenged Conditions absent permanent injunctive relief. In connection with Plaintiff States' challenge to the FY 2025 NOFO, this Court and the First Circuit found that Defendants could not challenge Plaintiffs' "uncontested evidence that allowing HUD to enforce the [FY 2025 NOFO] would wreak havoc: In anticipation of potential funding cuts, housing programs and support services would be ended or drastically curtailed, personnel would be laid off, and relationships with local housing and service providers would be ruined." *Washington II*, 171 F.4th at 493. "And of course, the plaintiffs submitted ample evidence that an implementation of the [FY 2025 NOFO] would be immediately destabilizing and disastrous for their constituents." *Id.*

As before, so too here: The 2026 Challenged Conditions will irreparably harm Plaintiff States by taking an axe to the foundation of their homelessness response programs, which have been built on HUD's Housing First programming for decades. This will directly result in a disastrous increase in the number of individuals experiencing homelessness in Plaintiff States,

which will in turn result in a devastating increase in the reliance on already overburdened state emergency services.

The number of currently stably housed individuals at risk of losing their residence and potentially entering homelessness as a direct result of the 2026 Challenged Conditions is staggering. As just a few examples, approximately 700 permanent housing subsidies are at risk in Connecticut. Navarretta Decl. (CT) at 5–6. Approximately 15,000 individuals are at risk in California. Buchanan Decl. (CA) at 4. Approximately 3,733 individuals in Illinois are at risk. Haley Decl. (IL) at 5. In Kentucky, the number is approximately 630. Kaye Smith Decl. (KY) at 14, 16-17. In New Jersey, it is approximately 2,573. Winter Decl. (NJ) at 4–5. In Pennsylvania, it is approximately 5,148. Meyer Decl. (PA) at 3. And in Washington, it is approximately 2,900. Mondau Decl. (WA) at 6–7. Altogether, the National Alliance to End Homelessness projects the FY 2026 NOFO's shift to funding temporary programs will result in at least 97,000 residents of CoC-funded permanent housing being at risk of losing their housing,[17] and Plaintiff States' declarations demonstrate that tens of thousands of those individuals reside in the Plaintiff States.

Critically, the 2026 Challenged Conditions will harm Plaintiff States across the board by leading to statewide increases in homelessness, shifting enormous costs to other state public services. For example, because "[p]oor health and chronic disease such as hypertension, lung disease, and heart disease are common among adults experiencing homelessness" while "many lack access to regular care or a primary care provider," homeless individuals "often end up engaging with the health care system in higher cost, more urgent settings, such as emergency departments and inpatient facilities." Buchanan Decl. (CA) at 4–5. With potentially tens of thousands of stably housed individuals at risk of homelessness because of Defendants' unlawful

---

[17] *Changes to HUD Policy Threaten Efforts to End Homelessness: At Least 97,000 People Could Lose Housing*, *supra* p. 14.

shift in programming, Plaintiff States will experience "significant financial strain on [their] other state public services, including medical systems, state- and federally-funded behavioral-health providers, and child-welfare programs serving unhoused families." Haley Decl. (IL) at 10–11; *see also* Buchanan Decl. (CA) at 5; Navarretta Decl. (CT) at 4; Kaiser Van Dam Decl. (MI) at 5 ("Reducing already-limited rental assistance resources will logjam the shelter system."); Winter Decl. (NJ) at 5; Declaration of Serita Nair (NM) (Nair Decl.) at 8; Meyer Decl. (PA) at 4–6; Vilello Decl. (PA) at 5; Sojourner Decl. (VT) at 5; Jolin Decl. (OR) at 5; Miné Decl. (DC) at 5; Holmes Decl. (VA) at 3; Staff Decl. (WI) at 4; Declaration of Dana Greenberg (NY) (Greenburg Decl.) at 7; Meister Decl. (MD) at 6 ("Increased unsheltered homelessness will result in increased costs for emergency services such as police, fire, EMS, shelter, hospitals, and jails by $125 million annually in Maryland.").

These risks are not solely the result of Defendants' unlawful move away from Housing First, but are also the foreseeable outcome—unaddressed by Defendants—of the services requirement scoring in the FY26 NOFO. "Service requirements tend to create a lack of trust between program participants and providers and can make people looking for housing solutions reluctant to engage in the program in the first place." Mondau Decl. (WA) at 7–8; *see also* Vilello Decl. (PA) at 5; Heckles Decl. (DE) at 10; Haley Decl. (IL) at 6–7; Smith Decl. (KY) at 19-20; Byron Decl. (MA) at 9. In at least one Plaintiff State, *no* subrecipient requires participation in services, putting every program in the state at risk of substantial defunding. *See, e.g.*, Kaiser Van Dam Decl. (MI) at 5–6. In another Plaintiff State, a severe shortage in behavioral health workers makes expansion of service requirements "a near impossibility." Nair Decl. (NM) at 6.

Moreover, the 2026 Challenged Conditions will irreparably harm *all* permanent housing projects by creating uncertainty about whether future funding is available, meaning that subrecipients cannot "enter into leases, hire staff, and plan agency budgets accordingly while ensuring compliance with regulations" that require initial leases to cover at least one year. Byron Decl. (MA) at 7–8; *see also* Meister Decl. (MD) at 4–5. Subrecipients may "be unable to agree to full year leases as required by applicable regulations, may need to stop accepting referrals to preserve funding under their current grants, may need to lay-off staff, cease hiring for open positions, or be forced to take other similar actions." Byron Decl. (MA) at 8–9.

While paling in comparison to the true stakes of Defendants' actions, which can only be measured in human lives, the operational burdens created by the FY 2026 NOFO are substantial. Plaintiff States, which have relied heavily on the predictability of the CoC program for decades, must now "revise program policies, modify coordinated entry and referral practices, retrain staff, restructure service delivery models, amend funding applications, and reevaluate existing partnerships" while also reconciling the new federal requirements with sometimes conflicting state requirements. *See, e.g.*, Heckles Decl. (DE) at 6, 11; *see also* Kaiser Van Dam Decl. (MI) at 4; Kaye Smith Decl. (KY) 12–13, 19–20; Sojourner Decl. (VT) at 4–5; Haley Decl. (IL) at 4, 8–9; Winter Decl. (NJ) at 5; Kirkeby Decl. (CA) at 7, 9–10; Squirrell Decl. (ME) at 6–7; Dhillon-Williams Decl. (AZ) at 6; Meister Decl. (MD) at 11; Greenberg Decl. (NY) at 6–8; Ventura Decl. (RI) at 5–6. Additionally, as described above, many states make substantial investments in homelessness and supportive housing that are dependent on the existence of CoC-funded capacity and rely on and are intertwined with predictable CoC funding. *Supra* Section II.E.

47

"[T]he resulting implementation costs and challenges are ultimately to the detriment of those who currently benefit from [Plaintiff States' permanent supportive housing] project[s] and are on the path to self-sufficiency and recovery. They are scared and confused." Squirrell Decl. (ME) at 7; *see also* Leimaile Ho Decl. (MN) at 6 ("Consequences for program participants will be severe. Program participants are among the most vulnerable people in our State and often face challenges in addition to being without a home, in particular in Minnesota's cold winter months where the risk of mortality is high."). "Beyond the re-traumatization and destabilization likely to result for impacted individuals and families, people may end up back on the streets and others— like survivors of domestic violence—may face the impossible choice of returning to an abuser or enduring unsheltered homelessness." Byron Decl. (MA) at 5; *see also* Staff Decl. (WI) 5–6.

In summary, the FY 2026 NOFO will result in a "cascading crisis" for Plaintiff States, where "CoCs will be forced to reduce [permanent and rapid rehousing] programs; state funded permanent housing sites will face immediate operating shortfalls; and thousands of individuals currently stably housed will face an increased risk of eviction or program displacement." Declaration of Megan Marshall (CA) at 11. These harms are irreparable and cannot be compensated by monetary damages. *See Ross-Simons of Warwick*, *Inc. v. Baccarat*, *Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).

### c.    The equities and public interest weigh strongly in the States' favor

The equities and the public interest strongly tip in the Plaintiff States' favor. The final two permanent injunction factors merge when the government is a party. *Noem*, 813 F. Supp. 3d at 310 (quoting *Nken*, 556 U.S. at 435). "When weighing these factors, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief paying particular regard for the public consequences that would result from granting the emergency relief sought." *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 54

48

(D.R.I. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)) (citation modified). "Under the [public interest] factor, [courts] consider the interests of the public in general, including people affected by homelessness, not just the interests of the parties." *Washington II*, 171 F.4th at 488.

As explained above, the 2026 Challenged Conditions significantly restructure the CoC program on which Plaintiffs have long relied to serve their most vulnerable communities, putting those communities at serious risk. *See supra* Section IV.C.2.b. HUD implemented these conditions without congressional authorization or observance of their own procedures. The balance of equities and public interest support a permanent injunction.

**D.     Alternatively, Plaintiff States Are Entitled to a Preliminary Injunction to Preserve the Status Quo Ante Pending Resolution of Their Summary Judgment Motion**

In the alternative, if the Court is unable to render a decision on Plaintiff States' summary judgment motion by August 10, 2026, Plaintiff States respectfully request that the Court preliminarily enjoin the 2026 Challenged Conditions pending the outcome of that motion. For all of the reasons stated above, Plaintiff States are entitled to a preliminary injunction because they are likely to succeed on the merits; they will suffer irreparable harm absent an injunction; and the balance of equities and the public interest weigh heavily in Plaintiff States' favor to safeguard the lives and wellbeing of their residents. *See Winter*, 555 U.S. at 20.

## V.     CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that this Court enter an order vacating, setting aside, and permanently enjoining the 2026 Challenged Conditions in the FY 2026 NOFO within the Plaintiff States, including as to their instrumentalities and subdivisions. Alternatively, Plaintiff States respectfully request that this Court enter an order preliminarily enjoining the 2026 Challenged Conditions in the FY 2026 NOFO within the Plaintiff States,

49

including as to their instrumentalities and subdivisions. Plaintiffs respectfully request that the Court issue an order by August 10, 2026 to avoid the irreparable harm that would result from Continuums being required to announce local competition results pursuant to the unlawful FY 2026 NOFO.

DATED this 17th day of July 2026.

Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES*
ALIANA KNOEPFLER*
ZANE MULLER*
Assistant Attorneys General
CRISTINA SEPE*
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Zane.Muller@atg.wa.gov
Cristina.Sepe@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

**LETITIA JAMES**
Attorney General of New York

*/s/ Stephen Thompson*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
STEPHEN C. THOMPSON*
Special Counsel
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov
*Attorneys for Plaintiff State of New York*

50

**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Special Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ William Y. Durbin*
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
WILLIAM Y. DURBIN*
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO*
Supervising Deputy Attorney General
BRIAN BILFORD*
LAUREN GREENAWALT*
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov
*Attorneys for Plaintiff State of California*

**WILLIAM TONG**
Attorney General of State of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
NORA PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of State of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Laurac.Tipton@ky.gov
*Attorneys for Plaintiff Office of the Governor*
*ex rel. Andy Beshear, in his official capacity as*
*Governor of the Commonwealth of Kentucky*

**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Nicole Hill*
NICOLE HILL*
SAMANTHA HALL*
Assistant Attorneys General
Office of the Attorney General
of the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
202-788-2081
Nicole.Hill@dc.gov
Samantha.Hall@dc.gov
*Attorneys for Plaintiff District of Columbia*

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Aleeza Strubel*
ALEEZA STRUBEL*
Complex Litigation Counsel
ELENA S. METH*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
773-914-3046
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**AARON M. FREY**
Attorney General of Maine

*/s/ Katherine W. Thompson*
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Tompson@maine.gov
*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

/s/ James C. Luh
JAMES C. LUH*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
JLuh@oag.maryland.gov
*Attorneys for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ Michelle Pascucci
KATHERINE DIRKS*
Chief State Trial Counsel
MICHELLE PASCUCCI*
NITA KLUNDER*
State Trial Counsel
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

/s/ Neil Giovanatti
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

/s/ Brian S. Carter
BRIAN S. CARTER*
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.Carter@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

/s/ Daniel Resler
DANIEL RESLER*
Assistant Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@njoag.gov
*Attorney for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

/s/ Anjana Samant
ANJANA SAMANT*
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
ASamant@nmdoj.gov
*Attorneys for the State of New Mexico*

53

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

**JENNIFER C. SELBER**
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER*
STEPHEN R. KOVATIS*
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov
717-460-6786
*Attorneys for Plaintiff Governor Josh
Shapiro, in his official capacity as Governor
of the
Commonwealth of Pennsylvania*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
SAM STRATTON*
Assistant Attorney General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov
Sam.Stratton@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**JAY JONES**
Attorney General of Virginia

*/s/ Megan C. Keenan*
MEGAN C. KEENAN*
Deputy Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Attorneys for Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

54