**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF WASHINGTON, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,

Defendants.

C.A. No. 1:26-cv-00439-MSM-AEM

**PLAINTIFF STATES' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 3

A. The Challenged Conditions are Unlawful ..... 3

1. Congress did not grant the Secretary discretion to add the 2026 Challenged Conditions ..... 3

2. The 2026 Challenged Conditions are contrary to law ..... 5

3. As this Court already found, HUD cannot adopt new funding priorities without notice and comment ..... 8

4. The 2026 Challenged Conditions Are Arbitrary and Capricious ..... 11

a. HUD failed to meaningfully consider the harmful impacts of the 2026 Challenged Conditions ..... 11

b. Defendants relied on factors Congress did not intend for them to consider ..... 14

c. Defendants' explanation for the 2026 Challenged Conditions is belied by the record ..... 15

d. Defendants' conclusory statements dismissing Plaintiffs' reliance interests do not satisfy their burden under the APA ..... 17

B. The Court Should Enter a Permanent Injunction ..... 19

C. CoCs Need at Least 90 Days to Re-Open the Competition if the Challenged Conditions are Enjoined ..... 20

III. CONCLUSION ..... 20

## TABLE OF AUTHORITIES

**Cases**

*Asiana Airlines v. F.A.A.*,
134 F.3d 393 (D.C. Cir. 1998) .......... 10

*Ass'n of Am. Univs. v. Dep't of Defense*,
806 F. Supp. 3d 79 (D. Mass. 2025) .......... 18

*Ass'n of Am. Univs. v. Dep't of Energy*,
789 F. Supp. 3d. 118 (D. Mass. 2025) .......... 18

*Butte County v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) .......... 17

*City & County. of San Francisco v. Trump*,
No. 3:25-cv-01350-WHO, 2025 WL 2426858
(N.D. Cal. Aug. 22, 2025) .......... 4

*City of Seattle v. Trump*,
808 F. Supp. 3d 1204 (W.D. Wash. 2025) .......... 4

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025) .......... 20

*Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.*,
No. 1:26-cv-00132-JJM-PAS, 2026 WL 1622708
(D.R.I. June 5, 2026) .......... 17

*Illinois v. Noem*,
813 F. Supp. 3d 282 (D.R.I. 2025) .......... 19

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
No. 1:25-cv-03501-SLS, 2026 WL 1784297
(D.D.C. June 22, 2026) .......... 18

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 7, 8

*Martin Luther King, Jr. County v. Turner*,
785 F. Supp. 3d 863 (W.D. Wash. 2025) .......... 4

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 13, 16

*New York v. U.S. Dep't of Justice*,
804 F. Supp. 3d 294 (D.R.I. 2025) .......... 11

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) .......... 10

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
374 F.3d 1209 (D.C. Cir. 2004) .......... 14

*Ramirez v. U.S. Immigration and Customs Enforcement*,
568 F. Supp. 3d. 10 (D.D.C. 2021) .......... 19

*Rancheria v. Jewell*,
776 F.3d 706 (9th Cir. 2015) .......... 17

*Rhode Island v. Trump*,
810 F. Supp. 3d 283 (D.R.I. 2025) .......... 5

*Rodway v. U.S. Department of Agriculture*,
514 F.2d 809 (D.C. Cir. 1975) .......... 10

*United States v. Williams*,
553 U.S. 285 (2008) .......... 4

*Washington v. Dep't of Hous. & Urban Dev.*,
C.A. No. 1:25-cv-00626-MSM-AEM, 2026 WL 1863886
(D.R.I. June 29, 2026) .......... 5, 8, 12

*Washington v. United States Dep't of Educ.*,
161 F.4th 1136 (9th Cir. 2025) .......... 5

**<u>Statutes</u>**

25 U.S.C. § 13 .......... 7

42 U.S.C. § 11386(b) .......... 5

42 U.S.C. § 11386a(b) .......... 4

42 U.S.C. § 11386b(d) .......... 7, 8, 9, 14

42 U.S.C. § 11386c .......... 8

42 U.S.C. § 11386c(a) .......... 6

42 U.S.C. § 11386c(b) .......... 6, 7

42 U.S.C. § 11386c(c) ........................................................ 6

**Regulations**

24 C.F.R. § 10.1 ........................................................ 10, 11

24 C.F.R. § 578.37(a) ........................................................ 12

**Other Authorities**

HUD,
*Fiscal Year 2022-2026 HUD Strategic Plan* (Mar. 28, 2022),
https://archives.hud.gov/reports/FY2022-2026HUDStrategicPlan.pdf ........................................................ 13, 15

HUD,
*FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants* (Aug. 29, 2025)
https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf ........................................................ 15

Rulemaking,
*Black's Law Dictionary* (12th ed. 2024) ........................................................ 10

# I. INTRODUCTION

Defendants have caused chaos to the Continuum of Care program by abandoning decades of policy and imposing brand new conditions on CoC funding that will have devastating impacts on Plaintiff States and their residents. In doing so, Defendants have repeatedly violated the Administrative Procedure Act, the McKinney-Vento Act, and the Department of Housing and Urban Development's own regulations.

Instead of engaging with the illegality and harm from the 2026 Challenged Conditions, Defendants' cross-motion and opposition (ECF No. 37) merely seeks to distract from these issues altogether. The 2026 Challenged Conditions violate the APA for four independent reasons, and Defendants fail to adequately respond to any of them.

First, HUD lacked authority to create the 2026 Challenged Conditions. Defendants improperly seek to invent "discretion" for HUD to create new conditions that do not appear anywhere in the statute. However, the "criteria established by the Secretary" in the McKinney-Vento Act include over a dozen highly specific statutory criteria that "shall" be considered, not an open-ended grant of discretion. And as many courts have held, HUD's ability to administer the statute efficiently and effectively does not include the authority to create novel substantive conditions like the 2026 Challenged Conditions.

Second, the 2026 Challenged Conditions violate the McKinney-Vento Act's provisions prioritizing renewals. Defendants' attempts to argue otherwise involve partial quotes from the statute that are taken out of context and spun to give the Secretary nearly unbounded discretion to deny renewals. Defendants' characterizations flip the statute on its head. Aside from these mischaracterizations, Defendants cite HUD's past prioritization of permanent housing, but that history only further supports Plaintiffs' argument that the McKinney-Vento Act requires the incentivization and renewals of permanent housing projects.

Third, the 2026 Challenged Conditions were adopted without notice and comment. Defendants grasp at straws to argue that the McKinney-Vento Act governs only "mandatory incentives" and leaves all remaining discretion to HUD, but this directly contradicts the statute's requirement that "any other activity" the Secretary wishes to incentivize should be "based on research and after notice and comment to the public." Moreover, Defendants' creative suggestion that notice and comment has been satisfied through informal public statements is contradicted by numerous cases and defies common sense.

Fourth, the 2026 Challenged Conditions are arbitrary and capricious. The evidence in the Administrative Record does not support—and instead *actively undermines*—HUD's issuance of the 2026 Challenged Conditions. Defendants' argument that the Conditions will actually decrease homelessness does not include a citation to a single source or any evidence-based explanation. This unsupported reasoning is even more improper given that HUD has previously and repeatedly concluded that "Housing First Works." In issuing the 2026 Challenged Conditions, Defendants also failed to rely on the McKinney-Vento Act's instruction that permanent supportive housing and rapid rehousing are proven to be effective at reducing homelessness. And although Defendants vaguely speculate that an unknown number of applicants could be eligible for transition grants, this ignores that transitioning away from permanent housing is itself a harm. Further, Defendants' public announcement of their intentions does not qualify as a reasoned explanation for disregarding Plaintiffs' serious reliance interests.

Finally, Defendants challenge this Court's power to grant permanent injunctive relief, but it is well settled that a permanent injunction is an available remedy under the APA. This is appropriate here, especially because Defendants do not respond to Plaintiffs' substantial evidence of irreparable harm.

Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment and deny Defendants' Cross-Motion for Summary Judgment.

## II. ARGUMENT

### A. The Challenged Conditions are Unlawful

As detailed in the Plaintiff States' Motion, the 2026 Challenged Conditions are unlawful under the APA for four independent reasons: (1) HUD lacked authority to create the Conditions on its own initiative; (2) the Conditions violate the McKinney-Vento Act; (3) the Conditions were adopted without notice and comment; and (4) the Conditions are arbitrary and capricious. Defendants respond with essentially the same arguments they did in the prior Continuum of Care litigation. This Court should once again reject them.

#### 1. Congress did not grant the Secretary discretion to add the 2026 Challenged Conditions

As the McKinney-Vento Act and case law make clear, Defendants are flat wrong to claim that Congress delegated discretion to HUD to set new conditions on CoC awards that are wholly untethered to any statutory provision.

First, Defendants insist that Secretary Turner has this discretion because the statute provides that the Secretary "awards funds to recipients through a national competition between geographic areas *based on criteria established by the Secretary*." ECF No. 37 at 40 (quoting 42 U.S.C. § 11386a(a) (emphasis added by Defendants)). However, Defendants neglect to mention that the statute then immediately provides that "[t]he criteria established" by the Secretary "*shall include*" dozens of highly specific criteria, including eight criteria related to the previous performance of the recipient regarding homelessness, five criteria concerning the contents of a recipient's plan, criteria related to a geographic area's need for homeless services and the formula for determining allocations among geographic areas, and other specific criteria.

*See* 42 U.S.C. § 11386a(b) (emphasis added). Congress's extensive and specific enumeration of the specific criteria the Secretary "shall include" in making awards belies Defendants' claim that Congress intended to gift the Secretary a blank check to set whatever requirements he wanted. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[T]he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated.").

Second, Defendants argue that the 2026 Challenged Conditions are authorized by HUD's authority to establish factors to carry out this part of the statute "in an effective and efficient manner." ECF No. 37 at 40 (citing 42 U.S.C. § 11386a(b)(1)(G)); *see also* ECF No. 37 at 48-50. But courts have repeatedly rejected this exact argument by HUD regarding similar conditions on CoC funds. *See, e.g.*, *Martin Luther King, Jr. County v. Turner*, 785 F. Supp. 3d 863, 886–87 (W.D. Wash. 2025) (rejecting argument that HUD may impose new conditions due to the "effective and efficient manner" provision because under the canon *ejusdem generis*, "[s]ubstantive conditions implicating controversial policy matters" are not "of the same kind" as the statute's enumerated conditions, nor would they relate to efficiency and effectiveness); *see also City & Cnty. of San Francisco v. Trump*, No. 3:25-cv-01350-WHO, 2025 WL 2426858, at *5 (N.D. Cal. Aug. 22, 2025) (same); *see also City of Seattle v. Trump*, 808 F. Supp. 3d 1204, 1218-19 (W.D. Wash. 2025) (finding that this "effective and efficient manner" provision does not grant Defendants unilateral authority to add whatever "substantively distinct and extraneous objective" they want, "untethered from the statutory purpose of ensuring efficient program administration"). Indeed, as this Court already found, in enacting the McKinney-Vento Act, Congress explicitly *restricted* the Secretary's ability to "alter [HUD's] approach, identify new goals, and award funds in support of achieving them," by providing that the agency "may do so only after conducting

research and undertaking a public notice and comment process." *Washington v. Dep't of Hous. & Urban Dev.*, C.A. No. 1:25-cv-00626-MSM-AEM, 2026 WL 1863886, at *2 (D.R.I. June 29, 2026) (*Washington I*) (citing 42 U.S.C. § 11386b(d)(2)(C)). Rather than engaging with any of this case law relating to HUD's lack of authority to impose similar conditions on CoC funding—including this Court's own prior opinion—Defendants merely cite an unrelated case involving a statue allowing a CIA director to terminate any CIA employee's employment "within his discretion." ECF No. 37 at 41 (citing *Webster v. Doe*, 486 U.S. 592, 600 (1988)). *Webster* is entirely inapposite. *See, e.g.*, *Washington v. United States Dep't of Educ.*, 161 F.4th 1136, 1140 (9th Cir. 2025) (rejecting DOJ's invocation of *Webster* in grant discontinuance case); *Rhode Island v. Trump*, 810 F. Supp. 3d 283, 304 (D.R.I. 2025) (same in case involving dismantling of statutorily created agencies). Nothing in the CoC statute gives Secretary Turner the discretion he claims to remake the program in his image.[1]

**2. The 2026 Challenged Conditions are contrary to law**

Not only did Defendants lack the authority to adopt new conditions never approved by Congress, but the Conditions themselves are doubly unlawful because they violate the McKinney-Vento Act and HUD's own regulations.

The De Facto Cap, for example, violates provisions of the McKinney-Vento Act requiring HUD to renew contracts for permanent housing in most circumstances, explicitly limiting the factors HUD can consider in making such renewals, and requiring HUD to evaluate projects based on proven, statutorily enumerated criteria. *See* ECF No. 34 at 33-34.

[1] Defendants point out that the State Plaintiffs incorrectly cited to 42 U.S.C. § 11386(b)(8) in discussing the limits of the Secretary's authority to establish factors "appropriate to carry out this part in an effective and efficient manner." ECF No. 37 at 43 n.12. Plaintiffs apologize for the error, but it is ultimately beside the point: as explained above, and as multiple courts have found, this provision does not give Secretary Turner carte blanche to adopt whatever conditions he thinks might be good policy. Rather, it permits him only to adopt conditions of the same nature as those laid out in the statute.

With respect to the first of these conflicts, Defendants start by misconstruing the McKinney-Vento Act's renewal provision. They claim that 42 U.S.C. § 11386c(a) only says that the renewal of expiring contracts "may" be funded, and thus renewals are perforce discretionary. ECF No. 37 at 44. But this language merely refers to where the funding "may" come from: "either" the "appropriations account for this subchapter" or "the section 8" rental assistance account. 42 U.S.C. § 11386c(a). Here, of course, funding for renewals was "made available" by Congress "under the appropriations account for this subchapter[.]" 42 U.S.C. § 11386c(a), (b). The fact that funding "may" come from two different sources does not give Defendants power to withhold or redirect funding "made available" by Congress, or to ignore the remainder of the statute.

Subsection (b) of the statute makes this clear. It provides that "[t]he sums made available under subsection (a) *shall be available for the renewal of contracts* in the case of tenant-based assistance, *successive* 1-year terms, and in the case of project-based assistance, *successive* terms of up to 15 years[.]" 42 U.S.C. § 11386c(b) (emphasis added). Defendants' reading of the statute, under which renewals are "at [the Secretary's] discretion," ECF No. 37 at 45, flips the meaning of "shall" on its head and ignores the word "successive." After all, this statutory guarantee that HUD "shall" make "successive" renewals means nothing if the Secretary has discretion to cut off funds for renewals on a whim. By the same token, the McKinney-Vento Act's clear directive that "[t]he Secretary shall determine whether to renew a contract for such a permanent housing project on the basis of certification" of two, and only two, conditions, 42 U.S.C. § 11386c(b), makes little sense if, as HUD now claims, ECF No. 37 at 45, the Secretary can decide to simply not allocate funding toward renewals.

Defendants suggest that subsection (c) provides discretion because it states that "[n]othing in this section shall be construed as prohibiting the Secretary from renewing contracts under this

part in accordance with criteria set forth in a provision of this part other than this section." *See* ECF No. 37 at 44. But this merely preserves the Secretary's discretion to award renewals that might not otherwise meet the requirements of subsection (b)—it does not give him discretion to deny or indefinitely withhold renewals that Congress otherwise directed Defendants to fund.

Moving away from the statute, Defendants claim that just as HUD once prioritized permanent housing, so too it may now prioritize transitional housing. ECF No. 37 at 45-46. That is, if HUD could move money one way, it can move it back. Otherwise, according to Defendants, "HUD's historical choices [would] convert into congressional mandates with the passage of time." *Id.* at 46. What this ignores is that Congress specifically chose to prioritize permanent housing, and HUD's prior prioritization of permanent housing complied with this one-way statutory mandate. *See, e.g.*, 42 U.S.C. § 11386b(d). In particular, Congress directed HUD to prioritize renewals of permanent housing. This was intentional. By requiring renewals in most cases, Congress furthered the critical statutory goal of stability, ensuring that individuals living in CoC-funded permanent housing will not suddenly lose their housing because of shifting political winds. This one-way ratchet is thus not an artifact of "HUD's historical choices." It is the very "congressional mandate" HUD must follow.

*Lincoln v. Vigil*, 508 U.S. 182 (1993), does not support Defendants' arguments either. There, plaintiffs sued the Indian Health Service following its decision to discontinue a program serving children with disabilities in the Southwest and reallocate resources to a nationwide effort to assist children. *Id.* at 184. The Service received yearly lump-sum appropriations from Congress, "for the benefit, care, and assistance of the Indians[,]" 25 U.S.C. § 13, and the Court held that the action could not be subject to judicial review under the APA because the Service's decision to discontinue the program was committed to agency discretion by law. *Id.* at 184. The Court

emphasized that, "where 'Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions . . . ." *Id.* But here, Defendants do not argue that that the Challenged Conditions are so discretionary so as to be unreviewable under the APA. And unlike the lump-sum funding appropriation in *Lincoln*, where there were no restrictions on how that funding must be used, Congress did not give a lump-sum appropriation to HUD to allocate as it sees fit. Instead, as set out above, Congress set a statutory framework that prioritizes permanent housing and requires successive renewals for permanent housing.

Finally, Defendants claim that because CoC awards are competitive grants, Defendants should not be required to grant the majority of renewals each year. ECF No. 37 at 47 (citing 42 U.S.C. §§ 11382(a), 11386a(a)). But Defendants ignore that the statute consistently treats renewals differently than new applications, which are subject to a more rigorous competition. *Id*. § 11386c (addressing renewals separately). Again, this is by design: by prioritizing renewals, Congress sought to ensure that individuals and families would not be evicted back into homelessness. By ignoring Congress's directives and capping permanent housing funds at sixty-eight percent, Defendants undermine that goal.

**3. As this Court already found, HUD cannot adopt new funding priorities without notice and comment**

Defendants' adoption of the 2026 Challenged Conditions violated both statutory and regulatory notice-and-comment provisions. ECF No. 34 at 36-38. Indeed, this Court already noted that Section 11386b(d)(2)(C) of the McKinney-Vento Act prohibits Defendants from adopting new financial incentives without "conducting research and undertaking a public notice and comment process." *Washington I*, 2026 WL 1863886, at *2. Because Defendants did not engage

in a public notice-and-comment process before radically altering their priorities and adopting the 2026 Challenged Conditions, the Conditions are unlawful.

Defendants' efforts to get around the clear statutory requirement are unavailing. First, they try a convoluted argument that the statute governs only "mandatory incentives" but does not restrict "discretion[ary]" incentives. ECF No. 37 at 83. This argument makes no sense—the statute clearly lays out types of programs the Secretary "shall" incentivize, and then says that if the Secretary wishes to incentivize "any other activity" they must "determine[] . . . , based on research and after notice and comment to the public," that the other activity achieves the statutory goal of reducing homelessness. 42 U.S.C. § 11386b(d)(2)(C). Defendants' newfound reading—that, actually, the Secretary has "discretion to incentivize activities not covered" (ECF No. 37 at 83)—simply cannot be squared with the statutory text.[2]

Defendants pivot and insist that they did notice and comment of a sort when they "issue[d] numerous public statements about the intended changes" and then held "forums" at which they "solicited and received public comments[.]" *Id.* at 84. Notice and comment requires more than forums at which curated guests are permitted to give feedback. Rather, it requires "a three-step procedure" in which the agency "must" first "issue a '[g]eneral notice of proposed rule making,' ordinarily by publication in the Federal Register"; second, "the agency must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments' and "must consider and respond to significant comments received during the period for public comment"; and "[t]hird, when the agency promulgates the final rule, it must include in

[2] Elsewhere in their brief, Defendants claim that "creating a 'set-aside' is not a bonus or incentive[.]" ECF No. 37 at 63. This is nonsense. Creating a dedicated pot of money that can only be used for two types of programs is the very definition of an incentive. Indeed, in the McKenney Memo, Defendants admit that the entire purpose of the "set aside" is to "restor[e] balance to the continuum of care" by encouraging more transitional housing and service-only programs. ECF No. 35-2 at 13-14.

the rule's text 'a concise general statement of [its] basis and purpose.'" *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting 5 U.S.C. § 553).

Defendants did not do any of this. And so, they contend, they did not have to because the McKinney-Vento Act "does not reference the APA, nor does it set any requirements on what the notice-and-comment process should entail." ECF No. 37 at 84. Here, Defendants run into three, independently fatal difficulties. First, the APA's notice and comment procedure governs federal agencies generally, and so when Congress, in the McKinney-Vento Act or whatever other statute, directs agencies to undertake "notice and comment," it is the APA's requirements that govern. *See* 5 U.S.C. § 553 (providing limited exemptions for rulemaking by notice and comment, none of which are applicable here); *Asiana Airlines v. F.A.A.*, 134 F.3d 393, 396-97 (D.C. Cir. 1998) (courts look "askance at agencies' attempts to avoid the standard notice and comment procedures" unless an exemption under § 553 is satisfied or the relevant regulatory scheme conflicts with the APA). Indeed, Defendants do not point to any other statutory, regulatory, or even dictionary definition of "notice and comment" that could plausibly apply instead of the APA definition.[3] Second, HUD's own policy—which Defendants are not at liberty to ignore, *Rodway v. U.S. Department of Agriculture*, 514 F.2d 809, 814 (D.C. Cir. 1975)—explicitly binds HUD to undertake APA-style notice-and-comment procedures "with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts[.]" 24 C.F.R. § 10.1. That is, the regulation requires HUD to "publish[] notices of proposed rulemaking in the Federal Register and gives interested persons an opportunity to

[3] In fact, Black's Law Dictionary largely tracks the APA standard, defining "notice-and-comment rulemaking" as "[a]gency rulemaking in which the agency publishes a proposed regulation and receives public comments on the regulation, after which the regulation can take effect without the necessity of a formal hearing on the record." Rulemaking, *Black's Law Dictionary* (12th ed. 2024).

participate in the rulemaking through submission of written data, views, and arguments with or without opportunity for oral presentation" and to "afford the public not less than sixty days for submission of comments." *Id.*[4] Third, even if Defendants were permitted to engage in some undefined, perhaps CoC-specific Notice and Comment Lite procedure, they do not actually point to any place in which they announced the De Facto Cap or 2026 Service Requirement Conditions prior to publishing the NOFO. *See* ECF No. 37 at 84. Thus, even on their own terms, Defendants are missing the "notice" part of "notice and comment."

Because Defendants failed to undertake notice and comment before adopting the 2026 Challenged Conditions, the Conditions are unlawful and should be vacated.

### 4. The 2026 Challenged Conditions Are Arbitrary and Capricious

#### a. HUD failed to meaningfully consider the harmful impacts of the 2026 Challenged Conditions

HUD does not dispute, because it cannot dispute, that slashing funding for permanent housing will result in projects and providers losing funding, and formerly homeless people losing their housing. But despite the Plaintiff States—and the Court—noting the critical importance of considering these harmful effects, HUD cannot point to anywhere in the administrative record in which it "attempt[ed] to meaningfully forecast the harm caused by the disruption these NOFOs created at any point, most notably the instability faced by individuals who would undoubtedly experience homelessness because of this breakneck transition" away from Housing First.

[4] Defendants' argument that this regulation does not apply because the NOFO—including the 2026 Challenged Conditions—is merely "a statement of policy or an interpretive rule" is incorrect. ECF No. 37 at 85. The NOFO plainly sets new, operative rules for the CoC program that reflect "'a discretionary policy judgment'"; that purport to rely on studies, public sentiment, and policy judgments rather than "bread-and-butter statutory interpretation arguments"; that are "'[i]nconsisten[t] with past regulations'" "substantially change eligibility for a . . . federal program[]"; and that will have dramatic effects on Continuums of Care, service providers, and the populations they serve. *New York v. U.S. Dep't of Justice*, 804 F. Supp. 3d 294, 314-17 (D.R.I. 2025) (quoting *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 71 (1st Cir. 2018)). They are thus substantive rules that, according to HUD's policy, required notice and comment procedures.

*Washington I*, 2026 WL 1863886, at *3. Instead, Defendants offer a handful of arguments for why the likely de-housing of tens of thousands of individuals is apparently of no concern, but none "withstand[s] even the bare minimum level of scrutiny." *Id.*

Defendants first note that some applicants may be eligible for "transition grants." ECF No. 37 at 60-61. But Defendants offer no analysis, nor have they offered any guidance to state agencies, as to whether transitioning is even feasible for any of the many programs who will see their funding otherwise cut due to the 2026 Challenged Conditions. And more significantly, these transition grants require applicants to transition *away from* permanent housing, *id.* at 60, thus furthering, rather than ameliorating, the loss of permanent housing and the harm to program participants.

Defendants downplay the conceded reduction in housing availability by arguing that "residents currently living in Permanent Housing may be eligible for assistance to Transitional Housing." ECF No. 37 at 61. But even if every permanent housing bed lost were converted to a temporary, transitional housing bed, tens of thousands of people would still be losing their *permanent* homes. They would be going from having a guaranteed place to live, to being at most two years away from losing their homes. *See* 24 C.F.R. § 578.37(a)(2).

But even this "best-case" scenario is unlikely because, as Defendants admit, their plan will actually reduce beds by shifting significant funds from housing to service-only programs. ECF No. 37 at 61. And what will happen to those individuals and families who fall into this gap? Defendants don't say.[5] Instead, they claim that will not be a problem because their plan "will alleviate" this "potential harm . . . by increasing the number of homeless served and addressing

[5] In a different section their brief, Defendants claim they "planned for these individuals to move to Transitional Housing." ECF No. 37 at 65. If such a plan were drawn up, Defendants failed to include it in the administrative record.

the root causes of homelessness." *Id.* at 61. In other words, Defendants are fine with cutting housing because they insist doing so will proportionally reduce the number of Americans experiencing homelessness, apparently within a single fiscal year. Yet Defendants cite *no evidence* for this extraordinary claim. All they cite to is a single paragraph in the McKenney Memo in which "HUD finds"—without a single citation, or any evidence-based explanation—"that the increased investment in Transitional Housing helps alleviate this concern." ECF No. 37 at 61; ECF No. 35-2 at 20. Even if HUD had not previously concluded, over and over again, that "Housing First Works," this conclusory analysis would be insufficient. ECF No. 35-4 at 3; *see also* HUD, *Fiscal Year 2022-2026 HUD Strategic Plan* 18, 27 (Mar. 28, 2022), https://archives.hud.gov/reports/FY2022-2026HUDStrategicPlan.pdf. But in light of HUD's repeated, evidence-based findings that providing permanent housing achieves better outcomes for those experiencing homelessness, Defendants' blithe reasoning is even less credible. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency decision is "arbitrary and capricious if the agency . . . offered an explanation for its decision that runs counter to the evidence before the agency").

Finally, Defendants insist that the 2026 Challenged Conditions should not come as a surprise to providers because it has "forecasted and worked with stakeholders over the course of a year to prepare them for the change[.]" ECF No. 37 at 60; *see also* ECF No. 37 at 63 ("States and stakeholders have been on notice for at least a year of program changes."). In truth, last year Defendants haphazardly rolled out sweeping changes to fundamentally undermine the CoC program, were blocked by this Court, and were rebuked by Congress, meaning that those changes never went into effect. And now they are trying again (without undertaking notice and comment).

Defendants cannot rely on their recent history of chaos and mismanagement as evidence that applicants were fairly warned.

**b. Defendants relied on factors Congress did not intend for them to consider**

As the FY 2026 NOFO makes clear, the core policy decision animating the 2026 Challenged Conditions is Defendants' view that "'Housing First' has been a profound failure by any measure." ECF No. 35-1 at 29. But as explained in Plaintiffs' opening brief, Defendants cannot repudiate Congress's findings that providing permanent housing, without preconditions, is proven to be effective at reducing homelessness. ECF No. 34 at 42. Because Congress has written into statute that permanent supportive housing and rapid rehousing are "proven to be effective at reducing homelessness[,]" 42 U.S.C. § 11386b(d)(2), each of Defendants' policies premised on rejecting that determination are perforce arbitrary and capricious. *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) ("'[T]he complete absen[c]e of any discussion' of a statutorily mandated factor 'leaves us with no alternative but to conclude that [the agency] failed to take account of this statutory limit on [its] authority,' making the agency's reasoning arbitrary and capricious." (quoting *United Mine Workers v. Dole,* 870 F.2d 662, 673 (D.C. Cir.1989))).

Defendants do not engage with Plaintiffs' argument but instead rehash their same argument that the Secretary has discretion to adopt new, non-statutory conditions based on his own policy preferences. ECF No. 37 at 63–64. For the same reasons these arguments fail in response to Plaintiffs' contrary to law claim, they fail as against the arbitrary and capricious claim. *See supra* at Section II.A.2.

**c. Defendants' explanation for the 2026 Challenged Conditions is belied by the record**

In addition to Congress's findings, Defendants themselves have repeatedly found over and over again that Housing First policies work. *See, e.g.*, ECF 35-4 at 3. Their efforts to explain their sudden about-face are belied by the evidence on which they purport to rely.

To start, Defendants try to downplay HUD's prior conclusions as "stale" because HUD made those statements four years ago, and relied on a 2014 study. ECF No. 37 at 66. In fact, HUD has made similar statements repeatedly since 2022, including in its 2023 article "Housing First Works," and the FY 2024-2025 NOFO. *See* ECF No. 35-4; HUD, *FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants* 8, 17 (Aug. 29, 2025) https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf. Moreover, HUD's prior conclusion did not rest on "a 2014 study," ECF No. 37 at 66, but in fact on a "considerable research literature" showing that programs "that use a Housing First approach show that it improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." HUD, *Fiscal Year 2022-2026 HUD Strategic Plan* at 26. To wit, HUD's 2022-2026 strategic plan cited an analysis that itself identified at least *twenty-two studies*, published over more than two decades, about the effectiveness of permanent supportive housing. *See id.* at 26 n. 23 (citing Nat'l Academies of Sciences, Engineering & Medicine, *Permanent Supportive Housing: Evaluating the Evidence for Improving Health Outcomes Among People Experiencing Chronic Homelessness* (July 11, 2018), https://www.ncbi.nlm.nih.gov/books/NBK519597/#ref_000409). And on top of that, as Plaintiffs

already explained in their Motion, the studies Defendants now point to as showing that the research is supposedly "mixed" in fact undermine Defendants' claims. *See* ECF No. 34 at 48-49.

Defendants then try to sidestep the fact that, as Plaintiffs point out, Defendants cannot convincingly show correlation—let alone causation—between Housing First and an increase in homelessness. ECF No. 37 at 66. They say that all they need to show are "good reasons for" the policy "and that the agency *believes* it to be better." *Id.* at 66 (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)) (emphasis in original). But what they may not do is "offer[] an explanation for its decision that runs counter to the evidence before the agency[.]" *State Farm*, 463 U.S. at 43. Instead, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). Simply put, this is not a case where the evidence supports competing inferences and the agency simply chooses one over the other; this is a case in which the evidence on which the agency purports to rely actively *undermines* its position, and so the agency simply chose to ignore it. *See*, *e.g.*, ECF No. 34 at 44-45 (explaining that the administrative record undermines HUD's argument of a correlation between Housing First and increased homelessness); *id.* at 45-47 (explaining that the administrative record, if anything, supported the notion that Housing First policies reduced overdose deaths); *id.* at 47-49 (explaining that HUD simply ignored voluminous evidence it had previously relied on to support Housing First policies and largely misinterpreted the studies it relied on in the McKenney Memo).[6] This type of cursory, fact-free

[6] Defendants accuse Plaintiffs of "quibbling with" the studies on which Defendants relied, ECF No. 37 at 67, but the fact is that Defendants relied on studies that simply did not support—and instead undermined—Defendants' purported reasoning. Moreover, in their brief, Defendants fail to point the Court toward any studies in the administrative record that do support their newfound policies.

reasoning is arbitrary and capricious. *See Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency cannot ignore evidence contradicting its position[.]"); *Rancheria v. Jewell*, 776 F.3d 706, 714 (9th Cir. 2015) ("An agency's decision is arbitrary and capricious if it ignores . . . relevant evidence on the record.") (citing cases).

#### d. Defendants' conclusory statements dismissing Plaintiffs' reliance interests do not satisfy their burden under the APA

As detailed at length in Plaintiffs' opening brief and the more than two dozen declarations submitted in support thereof, Plaintiffs and CoCs have, for decades, relied on stable funding for Housing First-oriented programs to combat homelessness in their states. ECF No. 34 at 50-52. In response, Defendants claim no harm, no foul, because 1) Plaintiffs were warned of Defendants' intention to change their priorities in advance, including in the 2025 NOFOs that this Court vacated as being in violation of the APA; and 2) the eminently foreseeable fallout from a sudden defunding of permanent housing projects—the unhousing of currently housed program participants and added stress to emergency response apparatuses—was too "speculat[ive]" for Defendants to trouble themselves over. ECF No. 37 at 69-71. That response, combined with the conclusory and self-serving statements in the McKenney Memo, do not satisfy Defendants' obligation to seriously and rationally consider Plaintiffs' significant reliance interests before instigating a sea change in the nation's largest homelessness response program.

First, with respect to the impact that the De Facto Cap will have on existing permanent housing projects, "'[w]hile [HUD], arguably, display[s] awareness that it is changing position' . . . the agency 'provides no reasoned explanation for disregarding Plaintiffs' serious reliance interests" in the constancy of the McKinney-Vento Act programming over the last two decades. *Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.*, No. 1:26-cv-00132-JJM-PAS, 2026 WL 1622708, at *50 (D.R.I. June 5, 2026) (cleaned up, quoting

*Saghafi v. Edlow*, No. GLR-26-100, 2026 WL 1127468, at * 9 (D. Md. Apr. 24, 2026)). Instead, Defendants' analysis of that interest, such as it is, is limited to recognition that the De Facto Cap means that "renewal projects will be limited." ECF No. 35-2 at 17.

Further, Defendants have not rid themselves of the need to consider reliance interests by publicly announcing their intentions. ECF No. 37 at 69-70. An agency's duty to carefully consider reliance interests is not satisfied by issuing public statements and/or press releases announcing an intention to make a change in the near future. *See League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-03501-SLS, 2026 WL 1784297, at *29 (D.D.C. June 22, 2026) (acknowledgment of reliance interests and change in position in press releases did not satisfy APA requirements); *Ass'n of Am. Univs. v. Dep't of Defense*, 806 F. Supp. 3d 79, 119-20 (D. Mass. 2025) (agency's "bold[]" reliance on publicly available memorandum announcing policy change did not absolve agency of considering reliance interests).

Second, and worse still, the administrative record fails to include any consideration whatsoever of the very real likelihood that tens of thousands of individuals in Plaintiffs' jurisdictions, and more across the nation, are at risk of losing their housing as a direct result of Defendants' change in position. *Compare* ECF No. 34 at 55 (arguing that the 2026 Challenged Conditions put thousands at risk of homelessness) *with* ECF No. 37 at 69-71 (failing to identify administrative record's consideration of risk of increased homelessness). Defendants demur that "HUD was under no obligation to consider" how the 2026 Challenged Conditions will harm Plaintiffs by increasing homelessness. ECF No. 37 at 71. Defendants are wrong; the APA obliges Defendants to consider "the potential consequences of the policy change." *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d. 118, 143 (D. Mass. 2025). More importantly, Defendants miss the point: an increase in homelessness is precisely the harm the CoC program exists to prevent,

and the APA does not permit Defendants to look away from the central consequence of its own policy change.

**B. The Court Should Enter a Permanent Injunction**

Defendants limit their challenge to Plaintiffs' request for permanent injunctive relief to a suggestion that injunctive relief is unavailable as a remedy for an APA violation, ECF No. 37 at 100-02; a one-paragraph argument that Plaintiffs have not alleged irreparable harm, *id.* at 102; and a one-paragraph argument on the balance of the equities. *Id.* at 103. All three arguments fail.

First, it is well settled that permanent injunctive relief is an available remedy under the APA where a plaintiff satisfies the traditional four-factor test. *See*, *e.g.*, *Illinois v. Noem*, 813 F. Supp. 3d 282, 309 (D.R.I. 2025) (McElroy, J.); *Ramirez v. U.S. Immigr. and Customs Enf't*, 568 F. Supp. 3d. 10, 22 (D.D.C. 2021). Defendants appear to conflate Plaintiffs' request for a permanent injunction barring Defendants from implementing similar unlawful provisions going forward with a "structural injunction." ECF No. 37 at 101-102. But relief that prevents an agency from implementing the same unlawful action again is standard in APA cases and does not constitute a "structural injunction." *See*, *e.g.*, *Illinois*, 813 F. Supp. 3d at 313 (enjoining enforcement of "materially similar terms" to those held to be unlawful). As demonstrated in Plaintiffs' opening brief, the 2026 Challenged Conditions violate the APA several times over, and Defendants lack discretion to implement them or any similar conditions. *See supra* Sections II.A.1.-2.

Second, Defendants do not address the more than two dozen declarations Plaintiffs submitted as evidence of the irreparable harm they stand to suffer should the 2026 Challenged Conditions be implemented. Instead, Defendants merely argue that no one can predict what harms Plaintiffs will suffer should some future, unknown agency action be taken. ECF No. 37 at 102. But

Plaintiffs do not challenge unknown, future agency action, and instead challenge the Conditions and any materially similar terms.

Finally, Defendants' argument concerning the balance of the equities rests on the lawfulness of Defendants' actions. But since, again, Plaintiffs have demonstrated the unlawfulness of the 2026 Challenged Decisions, the balance of the equities tips heavily in Plaintiffs' favor. *See Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025).

### C. CoCs Need at Least 90 Days to Re-Open the Competition if the Challenged Conditions are Enjoined

Defendants urge this Court to "limit relief to those conditions" it deems unlawful "and permit the remainder of the 2026 NOFO to go into effect." ECF No. 37 at 98. Plaintiffs do not disagree with this in principle. However, if the Court decides to grant relief from any of the challenged conditions while permitting the remainder of the 2026 NOFO to go into effect, CoCs will need sufficient time to undertake the work necessary to complete the competition. This work includes re-announcing the funding opportunity, accepting applications, processing and ranking applications, and notifying projects that they have been picked for submission. While striking certain conditions may be less onerous on CoCs and applicants, conditions such as the De Facto Cap fundamentally alter the goals and priorities set forth in the 2026 NOFO. CoCs and applicants deserve a meaningful opportunity of at least 90 days after this Court's Order to put as much time into the new competition as they did before any provisions have been enjoined.

## III. CONCLUSION

The Court should grant Plaintiff States' Motion for Summary Judgment and deny Defendants' Cross-Motion for Summary Judgment. As set forth in Plaintiffs' Motion, Plaintiffs respectfully request relief by August 10, 2026, or alternatively, that the Court grant Plaintiff States'

Motion for a Preliminary Injunction pending the outcome of Plaintiffs' Motion for Summary Judgment.

DATED this 31st day of July 2026.

Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES
ALIANA KNOEPFLER
Assistant Attorneys General
CRISTINA SEPE
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Cristina.Sepe@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY
Special Trial Counsel
STEPHEN C. THOMPSON
Special Counsel
VICTORIA OCHOA
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov
*Attorneys for Plaintiff State of New York*

**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Special Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ William Y. Durbin*
HAYLEIGH S. CRAWFORD
Deputy Solicitor General
WILLIAM Y. DURBIN
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL
Deputy Attorney General
MICHAEL L. NEWMAN
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
BRIAN BILFORD
LAUREN GREENAWALT
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov
*Attorneys for Plaintiff State of California*

**WILLIAM TONG**
Attorney General of State of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov
*Attorney for Plaintiff State of Connecticut*

**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ
Deputy Solicitor General
NORA PASSAMANECK
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov
Nora.Passamaneck@coag.gov
*Attorneys for Plaintiff State of Colorado*

**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Samantha Hall*
SAMANTHA HALL
NICOLE S. HILL
Assistant Attorneys General
Office of the Attorney General
of the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
202-788-2081
Samantha.Hall@dc.gov
Nicole.Hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

**KATHLEEN JENNINGS**
Attorney General of State of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
ROBIN L. JACOBS
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov
Vanessa.Kassab@delaware.gov
Robin.Jacobs@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Aleeza Strubel*
ALEEZA STRUBEL
Complex Litigation Counsel
ELENA S. METH
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
773-914-3046
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO
General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Laurac.Tipton@ky.gov
*Attorneys for Plaintiff Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky*

**AARON M. FREY**
Attorney General of Maine

*/s/ Katherine W. Thompson*
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Tompson@maine.gov
*Attorney for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
JLuh@oag.maryland.gov
*Attorney for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

*/s/ Michelle Pascucci*
KATHERINE DIRKS
Chief State Trial Counsel
MICHELLE PASCUCCI
NITA KLUNDER
State Trial Counsel
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov
*Attorney for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

*/s/ Brian S. Carter*
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.Carter@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

*/s/ Daniel Resler*
DANIEL RESLER
Assistant Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@njoag.gov
*Attorney for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
ANJANA SAMANT
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
ASamant@nmdoj.gov
*Attorney for the State of New Mexico*

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

**JENNIFER C. SELBER**
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER
STEPHEN R. KOVATIS
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
JacobBoyer@pa.gov
717-460-6786
*Attorneys for Plaintiff Governor Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE
Solicitor General
SAM STRATTON
Assistant Attorney General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov
Sam.Stratton@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**JAY JONES**
Attorney General of Virginia

*/s/ Megan C. Keenan*
MEGAN C. KEENAN
Deputy Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Attorneys for Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov
*Attorney for Plaintiff State of Wisconsin*