**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>*Defendants*. | Case Nos. 26-cv-436-MSM-AEM<br>26-cv-439-MSM-AEM<br><br>District Judge Mary S. McElroy<br>Magistrate Judge Amy E. Moses<br><br>**DEFENDANTS' COMBINED EMERGENCY MOTION FOR A STAY OF THE SUMMARY JUDGMENT ORDERS PENDING APPEAL** |
| STATE OF WASHINGTON, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>*Defendants.* | **EXPEDITED RELIEF REQUESTED BY AUGUST 17, 2026** |

**MOTION TO STAY ORDER PENDING APPEAL**

Defendants file this motion pursuant to Federal Rule of Appellate Procedure 8(a)(1) to stay this Court's summary judgment order in these two related cases pending appeal. Defendants respectfully request relief on this motion from this Court by August 17 and will seek the same relief from the United States Court of Appeals for the First Circuit no later than August 17.

**BACKGROUND**

In the 2026 Appropriations Act, Congress mandated that the U.S. Department of Housing & Urban Development (HUD) issue a notice of funding opportunity by June 1, 2026 and issue awards by December 1, 2026 for HUD's Continuum of Care (CoC) program. Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 400 (2026 Appropriations Act). In accordance with the 2026 Appropriations Act, HUD issued its Fiscal Year (FY) 2026 Continuum of Care Notice of Funding Opportunity ("NOFO"). Plaintiffs challenged the NOFO on various grounds.

On August 7, 2026, the Court entered partial summary judgment against Defendants HUD and Scott Turner, Secretary of HUD, and partial summary judgment for Defendants in these two related cases. *See* ECF 41, *Washington, et al., v. HUD, et al.*, 1:26-cv-00439 (D.R.I.) ("*State Litigation*"); ECF 34, *Nat'l All. to End Homelessness, et al., v. HUD, et al.,* 1:26-cv-00436 (D.R.I) ("*NAEH Litigation*"), (collectively "MSJ Order"). The MSJ Order set aside, in its entirety, the NOFO as procedurally deficient for not having followed notice-and-comment procedures to implement a set-aside for transitional housing projects and supportive services. *See* MSJ Order at 10. The Court's rationale was two-fold: that the set-aside was an incentive, and that 42 U.S.C. § 11386b(d) requires notice-and-comment procedures to identify activities to incentivize. *Id.* The Court declined to permanently enjoin the challenged conditions. *Id.*

## LEGAL STANDARD

Courts consider four factors in assessing a motion for a stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). When the government is a party, its interests and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

A stay is warranted here. Defendants are likely to succeed on the merits of their appeal, because the Court erred in concluding that HUD was required to go through APA-style notice and comment before establishing a set-aside for transitional housing projects and supportive services. Moreover, the equities support a stay, because the MSJ Order irreparably harms the government and the public. *See Nken*, 556 U.S. at 426. The MSJ Order irreparably harms HUD and the public because it prevents HUD from giving effect to its NOFO and therefore prevents HUD from meeting the deadlines set by Congress to award funds and from giving effect to its considered policy judgments. The MSJ Order further harms HUD and the public because, without a NOFO in place, there is a risk of a funding gap.

### I. Defendants are Likely to Succeed on the Merits

Defendants are likely to succeed on appeal on the merits of their argument that a notice-and-comment procedure was not required to create a $1.3 billion set-aside for transitional housing projects.

*First*, contrary to the Court's finding that the set-aside is an incentive, creating a "set-aside" is not a bonus or incentive. The Secretary can create the set-aside through his separate statutory discretion to establish other selection criteria that, in his judgment, are "appropriate to carry out" the CoC program "in an effective and efficient manner"—including criteria that may influence

applicants to propose certain activities. 42 U.S.C. § 11386a(b)(1)(G). The Court erred in finding that the set-aside was a "bonus" or "incentive" within the meaning of 42 U.S.C. § 11386b(d). MSJ Order at 7-8. The Court reasoned that creating a separate category of funding that exceeds $1 billion dollars would incentivize grantees to conform their CoC programs to HUD's goals. *Id.* But under the Court's reasoning, *any* requirement or scoring within the competition would be an "incentive" or "bonus" requiring notice-and-comment under 42 U.S.C. § 11386b(d) because any requirement or scoring would have the effect of causing grantees to conform their CoC programs to HUD goals. That cannot be correct. If so, it would effectively eliminate the Secretary's statutory discretion to establish selection criteria that, in his judgment, are "appropriate to carry out" the CoC program "in an effective and efficient manner." 42 U.S.C. § 11386a(b)(1)(G). And, by rendering any requirement or scoring into a bonus or incentive, this reading would violate "one of the most basic interpretive canons" that a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks omitted).

Instead, a NOFO's requirements and scoring criteria determine which projects receive standard funding. And, depending on what activities those projects fund, grantees may be eligible for additional funding in the form of bonuses or incentives, which they can use for a range of CoC activities. *See* 42 U.S.C. § 11386b(e). But reading the set-aside to be an incentive would erase this funding distinction.

*Second,* the Court erred in finding 42 U.S.C. § 11386b(d) restricts the activities that can be incentivized. The CoC statute creates a floor for what must be incentivized, not a restriction on what can be incentivized. It states that HUD must "provide bonuses or other incentives to geographic areas for using funding under this part for" activities "that have been proven to be

effective at reducing homelessness generally." 42 U.S.C. § 11386b(d)(1). It then notes what this category "includes," such as those that are "determined . . . based on research and after notice and comment to the public" to have "been proven effective" at achieving certain goals. *Id.* § 11386b(d)(2)(C). The use of "includes" "is significant because it makes clear that the examples enumerated in the text are to be illustrative, not exhaustive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012). Section 11386b(d)(2) thus does not say that the Secretary may *only* provide "bonuses or other incentives" for the listed activities. Section 11386b(d) instead establishes a mandatory floor: HUD must provide incentives for the activities covered by that subsection. It does not limit HUD's discretion to incentivize activities not covered. And it would be particularly inappropriate to read "shall" as "shall only" when neighboring provisions show that Congress speaks clearly when it wishes to limit HUD's discretion to incentivize certain activities. *See* 42 U.S.C. § 11386b(d)(3) ("The Secretary shall not implement bonuses or incentives that specifically discourage collaborative applicants from exercising their flexibility to serve families with children and youth defined as homeless under other Federal statutes.").

Accordingly, whether an activity qualifies as one "determined by the Secretary . . . , after notice and comment to the public, to have been proven effective" denotes only whether § 11386b(d) *requires* HUD to incentivize that activity—not whether HUD *may* incentivize it. And even where § 11386b(d) does not compel an incentive, the Secretary retains his separate statutory discretion to establish other selection criteria that, in his judgment, are "appropriate to carry out" the CoC program "in an effective and efficient manner"—including criteria that may influence applicants to propose certain activities. 42 U.S.C. § 11386a(b)(1)(G). This reading balances Congress's grant of discretion to HUD with the activities or project types that must be incentivized year over year. Because 42 U.S.C. § 11386b(d) sets a floor on what must be incentivized, rather

than limiting what may be incentivized, HUD did not act unlawfully in creating the $1.3 billion set-aside without notice and comment.

The statutory context of § 11386b(d) bolsters this permissive reading. First, paragraph (d)(1) states that HUD "shall provide bonuses or other incentives to geographic areas . . . for activities that have been proven to be effective at reducing homelessness." 42 U.S.C. § 11386b(d)(1). The use of "includes" in paragraph (d)(2) "contrasts with the legislators' use of a mandatory 'shall' in the very same section." *Lopez v. Davis*, 531 U.S. 230, 241 (2001). This distinction between subsections is deliberate and emphasizes that § 11386b(d)(2) describes only some ways to establish that various activities are effective at combatting homelessness. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate exclusion or inclusion." (alteration in original)).

Next, in the succeeding paragraph, the statute notes that HUD "shall not implement bonuses or incentives that specifically encourage Collaborative Applicants from exercising their flexibility to serve families with children and youth defined as homeless under other Federal statutes." 42 U.S.C. § 11386b(d)(3). So, when enacting this section, Congress knew how to express that HUD shall not do something. Thus, the statutory context throughout § 11386(d)—between the restrictive "shall" and "shall not" and the permissive "includes"—indicates that § 11386b(d)(2) is nonexclusive, and the set-aside is valid.

The CoC program's structure also supports this interpretation. Subsection (c) states, "Nothing in this chapter may be construed to establish a limit on the amount of funding that an applicant may request under this part for acquisition, construction, or rehabilitation activities for

the development of permanent housing or transitional housing." *Id.* § 11386b(c). Applicants may thus apply for however much funding they want *for Transitional Housing*. Statutes should be construed so that no part will be "inoperative." *Corley*, 556 U.S. at 314 (2009). Yet if Permanent Housing were all that mattered under § 11386b, then that would functionally limit how much Transitional Housing funding applicants could request. Construing § 11386b(d)(2) to be exclusive, as the court did, would render § 11386b(c) inoperative.

Finally, HUD practice confirms this reading. The "longstanding practice" of the government can inform a court's determination of what the law is. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). Since the statute was enacted in 2009, HUD has never identified proven activities through notice and comment, yet it has consistently used NOFOs to set CoC funding priorities without controversy. The set-aside is just another example of this practice. Research and notice and comment under § 11386b(d)(2)(C) is not the only way of deeming CoC activities to be proven effective, and the set-aside is thus a valid means of incentivizing Transitional Housing and Supportive Services.

The Court erred in interpreting 42 U.S.C. § 11386b(d) as requiring notice-and-comment procedures before incentivizing "any other activity" outside the two specified types of permanent housing described in the statute. The Court did not perform any statutory interpretation that would lead to the conclusion that the term "shall" means "shall only." Nor is there any basis in the statutory text to reach such a conclusion.

*Third*, the Court erred in finding HUD's research and notice to the public did not satisfy procedural requirements. The Court held that HUD's activities did not rise to APA procedures, but the statute does not require APA style notice-and-comment: the statute merely requires that HUD

identify the activity "based on research and notice and comment to the public." 42 § 11386b(d)(2)(A)–(B)). This does not refer to full APA rulemaking.

Indeed, Congress knows how to import APA notice-and-comment language into HUD statutes. In administering its housing-voucher programs, HUD "shall, under the rulemaking procedures under Section 553 of Title 5, establish procedure for designating troubled public housing agencies." 42 U.S.C. § 1437d(j)(2)(A)(i). And even more directly are HUD's statutes governing manufactured-home standards: In revising standards, a committee "shall provide a proposed revised standard . . . to the Secretary who shall, not later than 30 days after receipt, cause such proposed revised standard to be published in the Federal Register for *notice and comment in accordance with section 553 of Title 5*." 42 U.S.C. § 5403(a)(4)(B)(i) (emphasis added). Not just "notice and comment," but specifically notice and comment in accordance with the APA's rulemaking provision. If Congress had intended for § 11386b(d)(2)(C) to incorporate full APA rulemaking, then it would have said so. The fact that it did not shows that "notice and comment" in § 11386b(d)(2)(C) carries a separate meaning.

And under a plain-language translation, HUD provided research and notice and comment. As stated in Defendants' briefing, HUD reviewed articles and peer-reviewed research on the benefits of Transitional Housing. AR52-54, 62-63. It identified problems with the Housing First policy. AR42-47. It provided notice by issuing "numerous public statements" about the intended changes, including through dozens of forums informing stakeholders of the upcoming changes. AR54. And HUD solicited and received public comments through those forums and through separate discussions with CoC recipients and other homelessness-service providers. *Id.*

Because 42 U.S.C. § 11386b(d) does not impose any procedural requirements to incentivize other activities, and even assuming it did, HUD met them, HUD is likely to succeed on the merits on appeal.

To the extent any other issues are relevant on appeal, Defendants are likely to prevail on those issues as well. *See NAEH Litigation*, ECF 32 at 28-85; *NAEH Litigation*, ECF 37 at 28-85.

**II. The Balance of Equities and Public Interest Favor a Stay Pending Appeal**

The equitable factors favor a stay pending appeal, because the harm to HUD and the public far outweighs any harm that Plaintiffs can identify from permitting HUD to begin implementation of the NOFO in time to make awards under the NOFO by the congressional deadline of December 1, 2026. *See Nken*, 556 U.S. at 435 (holding that the balance of the equities and the public interest "[m]erge when the Government is the opposing party").

The MSJ Order harms HUD and the public interest. The MSJ Order effectively bars HUD from implementing its congressional mandate to set housing policies and priorities. "[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (first alteration in original); *see also Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (invoking *King*). Irreparable harm to the Government—if shown—can independently justify the stay of an order preventing the Government from effectuating its chosen policy. *Trump v. CASA, Inc.*, 606 U.S. 831, 859–60 (2025); *see also Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). And because the MSJ Order has just that effect, Defendants here "suffer[] a form of irreparable injury." *CASA*, 606 U.S. at 860–61 (quoting *King*, 567 U.S. at 1303).

In particular, after careful research and consideration, including over 40 forums across the nation with interested stakeholders, HUD determined that the CoC program would be more

effective in achieving its statutory goals of reducing homelessness and improving self-sufficiency if it restored a measure of balance to the program by increasing focus on Supportive Services and Transitional Housing. *See NAEH Litigation*, ECF 32 at 8-23; *NAEH Litigation*, ECF 37 at 8-23. Since 2013, chronic homelessness has increased 80.5%, unsheltered homelessness has increased 36.1%, and literal homelessness (on the street, in emergency shelters, or in transitional housing) has increased 27%, despite a 44% increase nationwide in Permanent Supportive Housing beds and an increase in CoC spending of 111%. AR42; NOFO 28. And while the supply of Permanent Housing (which includes Permanent Supportive Housing and Rapid Rehousing) has increased by 188% since 2007, the supply of Transitional Housing beds has decreased by 59.5%. AR42-43. In contrast, from 2007 to 2009 when the supply of bed types nationwide had a nearly equal distribution between Emergency Shelter, Transitional Housing, and Permanent Supportive Housing, homelessness decreased. AR50; *see also* AR5035.

The set-aside is meant to effectuate the policy goal of restoring transitional housing and supportive services. AR49; AR5035. By vacating the NOFO (including the set-aside), HUD cannot pursue its policy. And this harms individuals served by the CoC program and the public, because an the current ineffective policy does not meaningfully address homelessness.

Without a stay, HUD will not be able to comply with Congress's deadline to award the funds in question. Decl. of Caitlyn McKenney ¶ 5. Congress has compelled HUD to make awards by December 1, 2026. 2026 Appropriations Act, 140 Stat.173, 400. Running the CoC competition is complex and time-intensive. Decl. of Caitlyn McKenney ¶ 5-7. If HUD prevails on appeal and reissues its NOFO, applicants will require time to perform their local competition, which typically takes 90 days. *Id* ¶ 5. HUD then performs a multi-layered review process on not only approximately 400 CoC consolidated applications but an additional approximately 8,000

individual new and renewal project applications, which takes typically takes 4 months. *Id* ¶ 7. However, HUD could marshal resources to review applications in 92 days if a stay is granted. *Id.* ¶ 9. In total, following appeal, HUD would require approximately 92 days to run the competition under the reissued NOFO, passing the December 1 deadline and potentially causing funding gaps when grants end on January 1. *Id.* ¶¶ 10-11. In contrast, a stay would allow the competition to proceed, and HUD could run the competition by December 1. *Id.* ¶ 9.

Nor could HUD undergo notice-and-comment rulemaking in time to meet the December 1 deadline. Even if HUD published the proposed rule today and issued the final rule immediately after notice-and-comment, a sixty-day notice and comment period would mean the new NOFO would issue, at the earliest, in October. Applicants would need time to run their local competitions and submit applications, and then HUD would need at least 92 days to review. Decl. of Caitlyn McKenney ¶¶ 5, 9. Awards, then, would be made far past the Congressional deadline and when grants begin to lapse.

Absent a stay, CoC grantees will also suffer real harms. In particular, a delay in running the competition will result in funding gaps, leaving CoC grantees unable to run their programs. Decl. of Caitlyn McKenney ¶ 11. Thus, even if the Court is unable to grant relief by August 17, 2026, every day relief is delayed amplifies the harm by extending the funding gap. *Id.*

To avoid such harm, the Court should grant the requested stay to allow HUD to continue processing applications while the matter is resolved on appeal. Nor would a stay substantially harm Plaintiffs. Should the NOFO ultimately be found defective on appeal, Plaintiffs will be exactly where they would be without a stay: responding to a new NOFO that conforms to the appellate decision. But if HUD prevails on appeal, all parties will be better off because the applications will have been processed and grants will be ready to be made. Indeed, absent a stay, CoC grantees,

including Plaintiffs, risk harm in the form of funding gaps. Decl. of Caitlyn McKenney ¶ 11. That in turn harms the homeless individuals CoC grantees serve—and because the effects of homelessness reach the broader community, the public will suffer as well.

## CONCLUSION

For the reasons identified above, Defendants respectfully request that this Court stay its MSJ Order pending resolution of Defendants' forthcoming appeal to the U.S. Court of Appeals for the First Circuit.

DATED: August 13, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

AMBER RICHER
Assistant Branch Director

*/s/ Michael Bruns*____
MICHAEL BRUNS
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

*Counsel for Defendants*

**Certificate of Service**

I hereby certify that, on August 13, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

*/s/ Michael Bruns*

Michael Bruns

Trial Attorney