UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>Defendants. | C.A. No. 26-cv-436-MSM-AEM |
| STATE OF WASHINGTON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>Defendants. | C.A. No. 26-cv-439-MSM-AEM |

**MEMORANDUM AND ORDER**

MARY S. MCELROY, United States District Judge.

These related cases are the latest in a series of challenges to the criteria the Department of Housing and Urban Development ("HUD") uses to award Continuum of Care ("CoC") funds, this time under the 2026 appropriation. In *National Alliance to End Homelessness v. HUD*, No. 26-cv-436, the plaintiffs (the "NAEH Plaintiffs")

move for summary judgment, ECF No. 44, and Defendants cross-move, ECF No. 46. In *Washington v. HUD*, No. 26-cv-439, twenty states, the District of Columbia, and the Governors of Kentucky and Pennsylvania (the "Plaintiff States") renew their Motion for Summary Judgment, ECF No. 51, and Defendants cross-move, ECF No. 52. For the reasons that follow, the Court GRANTS IN PART AND DENIES IN PART the Motions in both cases.

## I. BACKGROUND

### A. Procedural Posture

These suits were filed in July 2026 challenging the 2026 Notice of Funding Opportunity ("2026 NOFO") issued by HUD for CoC funding appropriated by Congress.[1] This Court ruled quickly on summary judgment and held, on August 7, 2026, that the challenged actions violated the Administrative Procedures Act as HUD had failed to conduct the required notice-and-comment period. ECF No. 34. Because the Court held that issue alone was dispositive, it did not reach the other challenges to the 2026 NOFO. Defendants appealed and were granted a stay of this Court's Order by a panel of the United States Court of Appeals for the First Circuit on September 16, 2026. ECF No. 40 at 5-6; *See Washington v. HUD*, 192 F.4th 39 (1st Cir. 2026). On September 24, 2026, the same panel of the Court of Appeals granted the Plaintiff-Appellees' Emergency Motion for Summary Vacatur and Remand. ECF

[1] This opinion addresses two cases that involve different plaintiffs but challenge the same actions of the same defendants. Although the cases are not consolidated, they were consolidated for appeal by the First Circuit and since the cases involve overlapping issues this Order will be entered in both cases. Unless otherwise noted record cites are to 26-cv-436-MSM.

No. 41. In that motion the Plaintiff-Appellees "abandoned and formally waived any claim that the challenged actions … were contrary to law because of a failure to undertake any statutory notice-and-comment requirements." ECF No. 41. With no other live issue on appeal the Circuit vacated the judgment and remanded the case for further proceedings in this Court. *Id.* After supplemental briefing, both cases are now before the Court on the parties' Cross-Motions for Summary Judgment. ECF Nos. 44 & 46; States ECF Nos. 51, 52.

Related cases were first before this Court in 2025 on the Plaintiffs' challenges to the 2025 Notice of Funding Opportunity ("2025 NOFO") issued by HUD.[2] For a detailed history of the statutory scheme enacted by Congress to address homelessness and the history of similar provisions in the 2025 NOFO, *See Washington v. HUD*, 171 F.4th 473 (1st Cir. 2026); and 26-cv-626. ECF No. 113 (this Court's Memorandum and Order Granting in Part and Denying in Part Plaintiffs' Motions for Summary Judgment and Denying in Part and Granting in Part HUD's Cross-Motions for Summary Judgment.)

When HUD issued the 2026 NOFO in June 2026, the NAEH Plaintiffs brought this challenge seeking to invalidate several aspects of the new NOFO. ECF No. 1. Plaintiffs challenged the 2026 NOFO and the Office of Management and Budget's (OMB) efforts to "restrict the funding to advance ideological goals." ECF 44-2 at 19. Plaintiffs' primary challenge is to HUD's decision to set aside $1.3 billion for new

[2] Those cases are *State of Washington et al. v. HUD et. al.*, 25-cv-00626-MSM, and *National Alliance to End Homelessness et al. v. HUD et. al.*, 25-cv-636.

transitional housing and supportive-services only projects (the Set Aside). ECF No. 44-2 at 22-33. They argue that the Set-Aside would privilege these new housing programs even if permanent housing projects scored higher on merits-based criteria. ECF No. 44-2 at 16. The Plaintiffs also challenge the inclusion of criteria that they allege force communities to abandon the "Housing First" approach to homelessness in favor of programs that may be less effective and less responsive to local needs. *Id.*

The Plaintiff States challenge two of the same features: (1) the Set-Aside, which they call a "De Facto Cap" because it limits permanent housing to roughly 68% of available CoC funds, and a group of scoring and threshold criteria they call the "2026 Service Requirement Conditions." States ECF No. 1; States ECF No. 34 at 12, 23-26. They claim that these provisions exceed HUD's statutory authority and are contrary to law (Count 1) and are arbitrary and capricious (Count 3). States ECF no. 51 at 5-6. They ask the Court to vacate both sets of provisions, to require HUD to make Tier 1 awards by December 1, 2026, and to give CoCs a new opportunity to apply for Tier 2 awards. *Id.* at 6-7.

To overhaul the Housing First model of responding to homelessness, HUD has continued its replacement of permanent housing programs with funding for programs that emphasize more interim housing solutions and enrollment in services that do not directly relate to providing individuals with shelter. *See, e.g.*, ECF No. 46 at 11-21. The 2026 NOFO seeks to accomplish this by allocating $1.3 billion of appropriated funds to new projects, prioritizing those that employ the use of transitional housing and that emphasize enrollment in supportive services. ECF No. 44-2 at 23.

In their renewed Motion for Summary Judgment, the NAEH Plaintiffs no longer seek the invalidation of the 2026 NOFO in its entirety, and instead now ask the Court to:

1. Sever, vacate, and declare unlawful ten sets of provisions in the 2026 NOFO identified by Plaintiffs in Appendix A of their Motion for Summary Judgment ("the Challenged Provisions"), ECF No. 44-1 (Appendix of Challenged Provisions of FY 2026 NOFO);
2. Permanently enjoin Defendants from applying the Challenged Provisions in awarding grants under the 2026 NOFO;
3. If the Court holds unlawful the 2026 NOFO provisions establishing a $1.3 billion "set-aside" for transitional housing and supportive services only projects, order Defendants to allow NOFO applicants to amend and resubmit grant application for "Tier 2" funding;
4. Enjoin Defendants from making "Tier 2" grant awards until after NOFO applicants have had the opportunity to resubmit applications for that funding;
5. Order Defendants to submit interim and final compliance reports certifying Defendants' compliance with this Court's orders; and
6. Sever and declare unlawful the two challenged OMB "apportionment footnotes." ECF No. 44.

This Memorandum and Order addresses each request for relief.

### B. The 2026 NOFO

The CoC program provides funding to nonprofit providers and state and local governments to "promote a community-wide commitment to the goal of ending homelessness" and "to quickly rehouse homeless individuals and families." 42 U.S.C. § 11381(1)-(2); *see also* 24 C.F.R. pt. 578. The 2026 NOFO sets forth a complex selection process through which CoCs apply for funding under a two-tier system. ECF No. 44 at 14-15. CoCs' applications include their priority listings of projects, which are grouped into Tier 1 and Tier 2, with Tier 1 being the higher priority for the applying CoC. *Id.* Tier 1 must total at least 60 percent of each collaborative applicant's annual renewal demand. *Id.* 2026 Appropriations Act, Pub. L. No 119-75, div. D, tit. II, 140 Stat. at 399. When making awards, HUD allocates funds to Tier 1 projects first (after certain administrative awards) as long as they pass three stages of initial review. ECF No. 33-1 at 638-39, 640.[3]

After a CoC has prioritized its Tier 1 projects, the remaining projects are placed in the second tier. "Tier 2 projects compete nationally." ECF No. 44-2 at 15. The 2026 NOFO requires Tier 2 projects to also undergo threshold, risk, and additional factor review, but Tier 2 projects also undergo so-called "merit review." ECF No. 33-1 at 621-38, 640-42. That merit review step assigns a score to the CoC overall based on a long list of criteria, and that CoC score is then the most heavily weighted of several factors that determine each individual project's score. *Id.* at 621-38, 642. The

[3] Citations to the administrative record are to Plaintiffs' Consolidated Excerpts of the Administrative Record found at ECF No. 33-1.

2026 NOFO establishes a priority ordering that designates different categories of projects to which funds can be allocated. *Id.* at 640-41. Within each level of the priority ordering at Tier 2, projects are generally selected in order of score, unless they are disqualified based on HUD's review of "risk" or additional factors. *Id.* at 641,

The NAEH Plaintiffs challenge ten sets of provisions in the 2026 NOFO as unlawful for a range of reasons including that they are: In Excess of Statutory Authority (Count 1); Contrary to Law (Count 2); Arbitrary and Capricious (Count 3); Contrary to the Constitution (Count 8); and Contrary to the First Amendment – Free Speech Clause (Count 11). ECF No. 1 at 49-63.

### C. The OMB Apportionment Footnotes

In its apportionment of FY 2026 funds for the CoC program, OMB imposed two footnotes (Apportionment Footnotes) that—Plaintiffs allege—restrict HUD from obligating the funds unless HUD complies with two executive orders. ECF No. 44-2 at 54-56. Homeless Assistance Grants, OpenOMB, https://perma.cc/JWZ6-WBGN (last accessed November 19, 2026). OMB reissued the footnotes in its fiscal year 2027 apportionment. ECF No. 47 at 34 (n.7).

## II. LEGAL STANDARDS

A court will grant a litigant's motion for summary judgment when a genuine dispute of material fact does not exist, and the movant demonstrates their entitlement to judgment as a matter of law. *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022). When parties file cross-motions for summary judgment, the court will review each motion separately and draw both facts and inferences in favor of the

non-moving party. *Scottsdale Ins. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020). Despite these procedural steps, courts apply an alternative framework on summary judgment in the context of an APA claim. *See Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). In such cases, summary judgment provides the court with the ability to engage in a more exacting review of the merits underlying an alleged APA violation. *Id.* As a result, the reviewing court will not engage in the typical task of identifying factual disputes but will instead scrutinize the administrative record to reach a conclusion on whether the relevant agency's actions violated the APA. *Id.*

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And an injunction should not issue if a less drastic remedy, such as vacatur, would redress the plaintiff's injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).

## III. DISCUSSION

Although Plaintiffs challenge several categories of 2026 NOFO provisions, one set is of particular importance as it concerns a $1.3 billion "set-aside" for transitional housing and supportive services only programs. Should this Court find the Set-Aside unlawful, Plaintiffs seek an order requiring Defendants to allow CoCs to resubmit Tier 2 applications to account for the distortion created by the inclusion of the Set-Aside in the original 2026 NOFO. The Court therefore addresses the Set-Aside provisions first, followed by the other challenged 2026 NOFO provisions, and finally the OMB Apportionment Footnotes. The NAEH Plaintiffs challenge ten sets of provisions; the Plaintiff States challenge two of them, the Set-Aside and the service requirements.

### A. The $1.3 Billion "Set-Aside"

For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Any action that an agency takes outside the bounds of its statutory authority" violates the Administrative Procedure Act. *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

In the 2026 Appropriations Act, Congress appropriated a little over $4 billion for the entire continuum of care program to fund projects that support homeless individuals and families, including by providing housing, rental assistance, and supportive services that help participants maintain housing long-term. *See* 2026

Appropriations Act, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399; 42 U.S.C. 11381 *et seq.*

The 2026 NOFO establishes two tiers of funding for project applications. This is consistent with the 2026 Appropriations Act and similar to past practices by the agency. Under this system, CoCs are required to rank their programs into Tier 1 and Tier 2. Tier 1 projects are funded as long as they meet three stages of review as detailed in the 2026 NOFO. ECF No. 30-3 at 430-432. The 2026 NOFO set the funding for Tier 1 at the minimum required by Congress which is 60% of the Annual Renewal Demand (ARD). CoCs then place 60% of their renewing programs into Tier 1 and the remaining projects are placed into Tier 2. Tier 2 can include projects not prioritized in Tier 1 and new projects.

In the 2026 NOFO, HUD earmarked $1.3 billion, or roughly 1/3 of the $4 billion total available funds, for "Transitional Housing (TH) or Supportive Service Only (SSO)" projects and new projects. *See* ECF No. 30-3 at 378-379 NOFO Sec. III.F.1 (Program History). These funds come from funds remaining after HUD has allocated Tier I funds and are allocated to Tier 2.

The implementing provisions of the 2026 NOFO clarify that in selecting programs to fund, HUD will first verify that at least $104 million has been awarded to "DV Bonus" projects, then that at least $430 million has been awarded to "Permanent Housing projects for families with children already selected for funding." NOFO Sec. V.D.2.a(3)-(4). Following these awards, the selection process continues:

> "(5) HUD will then select new Transitional Housing (TH) or Supportive Service Only (SSO) projects ranked in Tier 2 that meet project eligibility

> thresholds in the order of project score as described in section V.D.3.b below until $1,300,000,000 of new projects have been selected.
>
> (6) HUD will then continue selecting new projects ranked in Tier 2 that meet project eligibility thresholds in the order of project score as described in section V.D.3.b below until $1,300,000,000 of new projects have been selected.
>
> (7) If at any point, HUD selects new projects in an amount more than $1,300,000,000 HUD will remove all remaining unselected new projects, recalculate Tier 2 scores, and continue selecting projects."
> NOFO Sec. V.D.2.a(5)-(7)

Plaintiffs argue that the Set-Aside is unlawful on several grounds. First, they argue that HUD acted outside its statutory authority in creating the Set-Aside. ECF No. 44-2 at 23-25. Second, they argue that the Set-Aside is contrary to statutory provisions protecting permanent housing renewals. *Id.* at 25-26. Third, that HUD acted in an arbitrary and capricious manner in creating the Set-Aside. *Id.* at 26-30. Defendants respond that 42 U.S.C. § 11386a(a) and § 11386a(b)(1)(G) let HUD and the Secretary create additional application criteria for administering the CoC program, allowing HUD to create the Set-Aside, and that HUD acted reasonably in creating it. ECF No. 46 at 40-50, 61-77. Because, as explained below, the Court finds that HUD exceeded its statutory authority in creating the Set Aside, the Court does not reach Plaintiffs' arguments that the Set-Aside is contrary to 42 U.S.C. § 11386c(b) or arbitrary and capricious.

In 42 U.S.C. § 11386a(a), Congress delegated authority to the HUD Secretary to "award funds to recipients through a national competition between geographic areas based on criteria established by the Secretary." 42 U.S.C. § 11386a(a). Congress cabined this discretion by establishing a series of mandatory criteria that

HUD "shall include" when awarding grants through this competition. *Id.* §§ 11386a(a), (b). These are listed at 42 U.S.C. §§ 11386a(b)(1)(A)-(F) and include such factors as a CoC's or project's prior success and its plans to get participants into permanent housing. The statute also allowed HUD to establish "such other factors" for reviewing CoC applications "as the Secretary determines to be appropriate to carry out this part in an effective and efficient manner." 42 U.S.C. § 11386a(b)(1)(G).

Although Congress delegated to the Secretary the power to create *additional* criteria for awarding funds, this residual clause cannot be read as allowing HUD to nullify the other congressionally established mandatory factors. *See generally* 42 U.S.C. § 11386a(b). The $1.3 billion Set-Aside does just that by deciding not to evaluate the merits of existing projects and permanent housing projects under the §§ 11386a(b)(1)(A)-(F) factors until HUD has awarded $1.3 billion of Tier 2 to TH, SSO, and new project applications.

Defendants argue that the Set-Aside is permissible because (1) the new TH and SSO projects funded by the Set-Aside will still be evaluated under the mandatory §§ 11386a(b) criteria, and (2) upon exhaustion of the Set-Aside funds, all other projects will be evaluated under the statutory criteria and funded accordingly based on any remaining funds. ECF No. 46 at 42-43.

But this argument cannot be squared with the other provisions of the statute. The first listed mandatory criterion is "the previous performance of the recipient regarding homelessness." 42 U.S.C. § 11386a(b)(1)(A). For some applicants serving homeless families with children and youth, HUD must consider "program goals and

outcomes, which shall include [...] achieving independent living in permanent housing." *Id.* § 11386a(b)(1)(F)(ii). The Set-Aside works against these mandatory factors by excluding projects with demonstrated prior successes and projects that provide permanent housing to homeless families with children and youth from consideration for the vast majority of Tier 2 funding.

The residual clause does not give HUD discretion to exclude existing projects and permanent housing projects from consideration for most of the Tier 2 funding regardless of the merits of these projects under the other mandatory factors. *Cf. Cnty. of King v. Turner*, 189 F.4th 819, 835 (9th Cir. 2026) (explaining that, when "interpret[ing] a residual clause," courts "give effect, if possible, to every clause and word of the statute") (cleaned up). *Lincoln v. Vigil*, 508 U.S. 182 (1993), does not change this analysis. Congress "may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes," *id.* at 193, and the mandatory criteria of § 11386a(b) are such restrictions.

The First Circuit's stay order did not resolve the question of HUD's authority to establish the Set-Aside. That order concluded that HUD was likely to succeed on the argument that the Set-Aside is not a "bonus or other incentive[]" under 42 U.S.C. § 11386b(d) and therefore not subject to Notice and Comment. *See Washington v. U.S. Dep't of Hous. & Urb. Dev.*, 192 F.4th 39, 42 (1st Cir. 2026) (alteration in original).

The Plaintiff States also challenge the Set-Aside on the same excess-of-authority theory the Court accepts above. States ECF No. 34 at 31–32; States ECF

No. 39 at 8–10. The Set-Aside therefore exceeds HUD's statutory authority in No. 26-cv-439 as well, and the Court does not reach the Plaintiff States' remaining arguments. *See* States ECF No. 34 at 31–34. HUD's September 11, 2026, notice proposing to find supportive-services-only projects "proven to be effective," 91 Fed. Reg. 57901, does not change this conclusion; it concerns incentives under § 11386b(d), not the criteria § 11386a permits.

Accordingly, the Set-Aside provision is vacated, severed, and declared unlawful. ECF No. 30-3 at 401. With steps (5) through (7) vacated, HUD shall, after completing steps (3) and (4), select Tier 2 projects, new and renewal alike, that meet project eligibility thresholds in order of project score as described in NOFO Sec. V.D.3.b, until Tier 2 funds are exhausted. For clarity, Defendants HUD and Secretary Scott Turner, their agents, and all persons acting in concert or participation with them are enjoined from applying any funding priority rule or policy that categorically prioritizes Transitional Housing, Supportive Service Only, or new projects over existing or Permanent Housing projects in implementing the 2026 NOFO. Such an injunction is necessary to accord Plaintiffs complete relief given Plaintiffs' limited ability to seek further relief should Defendants attempt to re-impose amended versions of provisions presently declared unlawful prior to their obligation of funds under the 2026 NOFO. *Cf. Monsanto Co.*, 561 U.S. at 164 (noting that injunctions are disfavored when Plaintiffs have "ample opportunity to challenge" administrative actions prior to being irreparably harmed).

Plaintiffs have requested that the Court require Defendants to reopen the application window for Tier 2 funding because the Set-Aside distorted CoCs' application incentives and prevented them from applying for funds for projects they would otherwise have applied for. ECF No. 44-2 at 31-33 (citing ECF No. 30-4, Declaration of Ann Marie Oliva). Defendants object to this request, arguing that Plaintiffs cannot show that they have been irreparably harmed and that the balance of the equities favor Defendants. ECF No. 46 at 101-02. On irreparable harm, Defendants argue that Plaintiffs' argument fails because there is no guarantee that any particular Tier 2 projects would have received funding. *Id.* The balance of the equities and public interest favor Defendants, they argue, because granting Plaintiffs' requested relief "would result in Tier 2 funds not being obligated by the required December 1 deadline". *Id.* at 102 (citing 2026 Appropriations Act, 140 Stat. at 400). And if Defendants are required to rerun the Tier 2 competition, HUD would not be able to make awards until "long past December 1," which could cause funding gaps when existing grants begin to expire on January 1, 2027. *Id.* The Plaintiff States seek the same relief, States ECF No. 51 at 6-7 & n.3, and it is granted in both cases.

Defendants offer no evidence contradicting Plaintiffs' showing that the Set-Aside distorted the application process; they argue only that any resulting harm is speculative because Tier 2 is competitive. ECF No. 46 at 102. Plaintiffs face irreparable harm, not because of the loss of specific guaranteed funds, but because by promulgating the unlawful Set-Aside, Defendants prevented CoCs and sub-grant applicants with disfavored projects from applying for and competing for funding on a

level basis. *Cf. Hosp. Klean of Tex, Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) ("[A] lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm."). An injunction is necessary to allow CoCs to resubmit Tier 2 applications under a lawful NOFO, as mere vacatur of the Set-Aside will not cure the distortion caused by its inclusion in the original 2026 NOFO. *See Monsanto*, 561 U.S. at 165 (holding that in APA cases an injunction may be permitted where it has "meaningful practical effect independent of" vacatur of the challenged agency action).

The equities and public interest also favor Plaintiffs, as HUD may still obligate Tier 1 funds—which account for 60% of each CoC's annual renewal demand—by December 1, and there is a strong public interest in HUD awarding funds to the projects that Congress has mandated to be renewed and supported. *See Nken*, 556 U.S. at 435 (the balance of the equities and the public interest merge when the government is the opposing party).

The Court is mindful of the First Circuit's stay of this Court's August 7 Order and its finding that "HUD would suffer irreparable injury absent a stay, given that HUD only has until December 1, 2026 to make awards to applicants for Continuum of Care funds." *Washington*, 192 F.4th at 42. The First Circuit's September 2026 stay was premised on a different legal basis for the invalidation of the 2026 NOFO. Nor does the concern underlying the stay arise here. This Order does not delay Tier 1 awards, which HUD remains able and required to make by December 1, 2026. Only Tier 2 awards are deferred. The Appropriations Act's directive that HUD make

awards "not later than December 1, 2026," 140 Stat. at 400, does not by itself withdraw HUD's authority to make awards after that date. *See Brock v. Pierce Cnty*, 476 U.S. 253, 260 (1986) (agency's failure to act within a statutory deadline did not divest it of the power to act). Requiring HUD to complete Tier 2 awards shortly after that date, to remedy the unlawful Set-Aside, is therefore within this Court's remedial authority.

Because this Court concludes for the reasons discussed above that the Set-Aside is unlawful, under the *eBay* factors the Court finds an injunction is necessary. *See eBay*, 547 U.S. at 391. Plaintiffs prevail on the merits of their challenge to the Set-Aside, are irreparably harmed absent the ability to resubmit Tier 2 funding applications, and have no legal remedy that will remedy the injury. Lastly, the public interest weighs in favor of ensuring that the CoC program is lawfully administered. *See Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Imm. Servs.*, No. 26-cv-132, 2026 WL 2042424, at *10 (D.R.I. July 15, 2026) ("[A]n agency is not harmed by an order prohibiting it from violating the law."). A delay of up to 30 days in obligating Tier 2 funds should have minimal impact, because Tier 2 awards will be complete before existing grants begin to expire on January 1, 2027. Any such delay is more than outweighed by CoCs being able to fund projects based on their own actual funding priorities.

This Order does not delay Tier 1 awards, and HUD shall make them by December 1, 2026, as the Appropriations Act requires. Defendants are therefore ordered to reopen and allow CoCs to resubmit applications for Tier 2 funding until

11:59pm Eastern Time on December 1, 2026. Defendants must make all Tier 2 grant funding decisions using all CoCs' latest-submitted funding application as of that date, and must award all such Tier 2 funds under the 2026 NOFO no later than December 31, 2026. Should any party have specific objections to the deadlines imposed by the Court in this Order, they may submit a letter of no more than 2 pages on the topic, filed no later than November 24.

**B. The Other Challenged 2026 NOFO Provisions**

In determining whether an agency's actions have violated the APA, courts must evaluate whether the agency has "examined the relevant data and articulated a satisfactory explanation for [its] decision." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (cleaned up). In assessing an agency's work, the reviewing court must also determine whether the agency articulated a "rational connection between the facts [that it] found and the choices [that it] made." *Id.*

While a court may not substitute its judgment for the agency itself, it may still find that an agency engaged in arbitrary and capricious action "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.; Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

The record before this Court shows that the Defendants failed to consider the impact of many of the challenged provisions on different categories of grant

applicants, and offered explanations for their decisions inconsistent or incompatible with the evidence before the agency. Relatedly, HUD failed to meaningfully balance its new emphasis on fostering a competitive environment for grantees to seek funding against HUD's prior concern with housing stability. As to some provisions, HUD also exceeded its statutory authority, and one provision violates the First Amendment. *See City of Providence*, 954 F.3d at 31. The Court addresses Plaintiffs' challenges to the nine other sets of 2026 NOFO provisions identified in their briefing and Appendix A. ECF No. 44-1. The Plaintiff States join only the challenge to the service requirements; the remaining holdings in this Part only apply in No. 26-cv-436.

**1. Service Requirements Criteria**

The 2026 NOFO sets forth a point system for Tier 2 projects which includes criteria encouraging and prioritizing funding for programs that require beneficiaries to engage in supportive services. Up to ten points may be awarded to Supportive Service Only projects. ECF No. 33-1 at 642 (NOFO Sec. V.D.3.b(3)). Points are also awarded to CoCs for which 100% of the housing projects have participation requirements, and fewer points are awarded to CoCs for which 50% of the housing projects have participation requirements. ECF No. 33-1 at 631 (NOFO Sec. V.B.1.c(7)). Points are also awarded to CoCs that show that for every two or four "persons reporting chronic substance use in the CoC's most recent PIT count, there is at least 1 CoC-funded unit that requires program participant engagement in substance abuse treatment services as a condition of continued participation in the program." ECF No. 33-1 at 630 (NOFO Sec. V.B.1.c(5)). The 2026 NOFO also creates

a new threshold criterion requiring the expansion of supportive services, and requiring the supportive services ensure participants are "able to successfully obtain self sufficiency and exit homelessness." ECF No. 33-1 at 615-16, 619-20 ( NOFO Sec. V.A.4.c(4)(a) (Transitional Housing),(e) (Permanent Housing)).

Plaintiffs argue that these provisions are arbitrary and capricious for a series of reasons including because HUD failed to consider the negative externalities caused by mandating services, failed to identify evidence that service requirements are effective, ignored evidence that Housing First is effective, and failed to adequately account for the disadvantage the criteria inflict on CoCs that aid survivors of domestic violence and sexual assault—entities that cannot lawfully mandate supportive services. ECF No. 44-2 at 33-37.

Defendants respond that HUD identified a study showing that service requirements have better outcomes with respect to engagement and hospitalization, ECF No. 46 at 67 (citing AR61), and also identified data correlating Permanent Supportive Housing with increased overdose deaths. *Id.* at 72 (citing AR 59-60). Defendants also argue that the review process includes bonus funds made available to domestic violence service providers, and that the merit review criteria have a Violence Against Women Act carveout. *Id.* at 79-80 (citing AR 55-56, 5022, 5084, 5095). These DV Bonus funds and a VAWA carveout, demonstrate, they argue, that HUD "explicitly considered the impact to domestic violence service providers." *Id.* at 80. Defendants also contend that the Family Violence Prevention and Services Act's

bar on mandatory services applies only to services funded under that Act, not to the CoC program. *Id.* (citing 42 U.S.C. § 10408(d)(2)).

Neither of these arguments is compelling. The DV Bonus funds HUD refers to arise from a congressional earmark of $52 million that includes funding for projects serving survivors of domestic violence. *See* Pub. L. No. 119-75, 140 Stat. at 399-400. They are therefore not a remedial measure meant to combat DV-unfriendly policies in the 2026 NOFO, but a Congressionally mandated bonus pot of funds designated for DV service providers. And the VAWA "carveout" that Defendants refer to states that providers should not deny assistance to an otherwise-eligible participant "on the basis or as a direct result of the fact that the participant is or has been a victim of domestic violence" or a related crime. ECF No. 33-1 at 45, 631, 642. This carveout is unrelated to whether HUD penalizes DV *providers* for not including mandated service conditions in their applications.

The Court finds that HUD has not considered the need to address (1) the disadvantaging domestic violence providers will face in the competition for all non-DV Bonus CoC funding (because they cannot earn the points awarded to projects that impose service requirements, *see id.* at 642, and (2) the chilling effect of the Service Requirement criteria on the provision of domestic violence services caused by limiting points available to CoCs who might choose to provide such services. Defendants' argument that the Family Violence Prevention and Services Act bars mandatory services only in programs its funds does not change this. *See* ECF No. 46 at 80. Domestic violence providers commonly combine CoC funding with funding under that

Act and the Violence Against Women Act. Oliva Decl. ¶¶ 128–29, ECF No. 30-4. Both statutes prohibit grantees from mandating services, see 34 U.S.C. § 12351(b)(3); 42 U.S.C. § 10408(d)(2), and HUD did not consider how such providers could earn points for requirements those statutes forbid. Neither the congressionally mandated DV Bonus pool, nor the VAWA provision protecting DV survivors from individual discrimination demonstrates that HUD considered these important factors, rendering the Service Requirements Criteria arbitrary and capricious. *See State Farm*, 463 U.S. at 43. Because this failure is sufficient, the Court does not reach Plaintiffs' remaining arguments.

The Service Requirements Criteria that award points for service participation requirements, ECF No. 44-1 at 3-4 (NOFO Sec. V.D.3.b(3), Sec. V.B.1.c(5), and Sec. V.B.1.c(7)), are vacated, severed, and declared unlawful. Because the Court's reasoning concerns the points domestic violence providers cannot earn, it does not reach the threshold criteria in NOFO Sec. V.A.4.c(4)(a) and (e), which award no points. An injunction is warranted in addition to vacatur because vacatur alone would not adequately protect Plaintiffs, given Plaintiffs' limited ability to seek further relief should Defendants seek to re-impose amended versions of provisions presently declared unlawful before their obligation of funds under the 2026 NOFO, or to implement substantially the same policy through reliance on other 2026 NOFO language not specifically identified by the Court in this Order. *Cf. Monsanto*, 561 U.S. at 164 (noting that injunctions are disfavored when Plaintiffs have "ample opportunity to challenge" administrative actions prior to being irreparably harmed).

The Plaintiff States challenge an overlapping group of provisions they call the "2026 Service Requirement Conditions." States ECF No. 34 at 24-26. Two of them, NOFO Sec. V.B.1.c(5) and Sec. V.B.1.c(7), are vacated above, and that vacatur sets them aside as to all applicants, including the Plaintiff States and their instrumentalities. The Court therefore need not separately decide Plaintiff States' challenge to those two provisions. The Plaintiff States also challenge provisions that the NAEH Plaintiffs do not. They challenge the inclusion of points for investing in supportive services, ECF No. 30-3 at 421-422; points for partnering with outpatient treatment providers, ECF No. 30-3 at 419-420; a point for operating sober housing, ECF No. 30-3 at 420-421; and the services points in the new rapid rehousing project-quality threshold, ECF No. 30-3 at 406 and 410-411. The Plaintiff States' arguments are directed at HUD's abandonment of Housing First generally, not at these provisions, none of which requires a provider to mandate services. States ECF No. 34 at 38-52. On this record, the Court cannot say that rewarding CoCs for investing in services, partnering with treatment providers, or offering sober housing is arbitrary and capricious or contrary to law. The Plaintiff States' Motion is denied as to those provisions.

### 2. Safe Drug Use Criteria

Plaintiffs challenge 2026 NOFO provisions that discourage or outright prohibit CoCs from engaging in harm-reduction activities such as needle exchanges, safe consumption sites, and the like. Plaintiffs challenge two of these provisions, a Safe Drug Use Certification ECF No. 30-3 (NOFO Sec. V.A.4.a(6)), and Safe Drug Use

Condition (NOFO Sec. VII.A.3) as exceeding HUD's authority, and the provisions pertaining to harm reduction activities generally as arbitrary and capricious. *See* ECF No. 44-2 at 37-40; ECF No. 44-1 at 5-6; ECF No. 33-1 at 637 (NOFO Sec. V.B.2.b). Plaintiffs argue that the Certification and Condition exceed HUD's authority because they restrict applicants from engaging in harm reduction activities outside the scope of their CoC program-funded projects.

The Safe Drug Use Certification provides in relevant part;

> "Project applicants must certify affirmatively to the following: [...] The project applicant will not operate drug injection sites or 'safe consumption sites' in violation of 21 U.S.C. 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 U.S.C. 863."
>
> ECF No. 33-1 at 612 (NOFO Sec. V.A.4.a(6))

The Safe Drug Use Condition in turn provides that:

> "Awards made under this NOFO will not be used to fund any project, service provider, or organization that operates illegal drug injection sites or 'safe consumption sites' in violation of 21 U.S.C. § 856, knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 USC 863."
>
> ECF No. 33-1 at 660 (NOFO Sec. VII.A.3)

Plaintiffs also point out that the certification language in the application form that applicants must submit to HUD is not limited to activities conducted "in violation of federal laws." ECF No. 44-2 at 38 n.11 (citing ECF No. 33-2, Suppl. Oliva Decl. & Exh. A).[4] Because 42 U.S.C. § 11386a(b)(1)(G) limits the Secretary to

---

[4] The relevant text of the certification states: "The project applicant will not operate drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution

adopting criteria "appropriate to carry out [the CoC program] in an effective and efficient manner," and the challenged Safe Drug Use Criteria constrain grantees' conduct outside the scope of the CoC program, Plaintiffs argue that the Certification and Condition cannot be relevant to carrying out the CoC program in an effective or efficient manner and are thus beyond HUD's authority. ECF No. 44-2 at 38-39.

Defendants raise three arguments in response: (1) 42 U.S.C. § 11386a(b)(1)(G) authorizes the Secretary to create criteria requiring CoCs to attest to their compliance with Federal law, ECF No. 46 at 50, (2) the Secretary can impose restrictions that apply to CoCs' activities outside of their CoC funded activities under three listed criminal statutes based on existing Federal regulation 2 C.F.R. § 200.300(a), *id.* at 50-51, and (3) the NOFO is limited to activities and projects funded with CoC funds. *Id.* at 51 (citing AR 5090, 5113).

By its terms 42 U.S.C. § 11386a(b)(1)(G) cabins the Secretary's authority to adopting criteria relevant to the "effectiveness" and "efficiency" of the CoC program. The Certification and Condition extend to conduct beyond such HUD-funded projects because they constrain the "applicant," "service provider," and "organization" generally, not just their HUD-funded activities. *See* ECF No. 33-1 at 612, 660. Defendants respond that the NOFO limits these provisions to activities and projects funded with CoC funds, ECF No. 46 at 51 (citing AR 5090, 5113), but the Condition's text says that it bars awards to any "service provider, or organization" that engages

---

of illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction.'" ECF No. 33-2, Suppl. Olivia Decl. Exh. A

in the listed conduct, wherever that conduct occurs. ECF No. 33-1 at 660. And the application form is neither limited to activities conducted as part of the CoC program, nor to activities in violation of federal laws. Section 11386a(b)(1)(G) therefore does not authorize the Certification and Condition nor the application form in its present state. Nor does 2 C.F.R. § 200.300(a) supply the missing authority. As Defendants describe it, that regulation requires that "all projects supported by Federal funding" be carried out in accordance with federal law. ECF No. 46 at 51. It does not address a recipient's conduct outside the funded project. In any event, a regulation cannot confer authority that the statute withholds. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

The Certification and Condition are therefore declared unlawful and vacated to the extent they reach conduct outside CoC-funded projects. The certification in the application form, which is not limited to conduct that violates federal law, is declared unlawful and vacated.

Plaintiffs challenge all of the harm reduction provisions, including as relevant here a provision assigning points to projects demonstrating that they will not engage in harm reduction activities, NOFO Sec. V.B.2.b, as arbitrary and capricious because Defendants allegedly (1) fail to address the significant body of research demonstrating the effectiveness of harm-reduction activities, (2) fail to address the chilling effect of the 2026 NOFO language on applicants' lawful harm-reduction activities (e.g., requiring that applicants not operate "illegal" safe consumption sites or distribute "drug paraphernalia"—without explaining the bounds of the

prohibition), and (3) fail to consider that a provision stating that "program participants [need not] be evicted or exited from assistance for a first-time [drug] violation" will have a chilling effect by implying that grantees must exit people who violate drug-related rules more than once. ECF No. 44-2 at 39-40.

Defendants respond that the provisions are not arbitrary or capricious because HUD considered evidence pertaining to harm reduction activities and overdose deaths and made reasonable factual findings supported by the evidence that "the former lead to the latter, and that ending these activities will lead to a reduction in the same." ECF No. 46 at 77-78 (citing AR 58-62, 69, 5036). Defendants point to, for example, a Memorandum from Caitlyn McKenney, Deputy Assistant Secretary for Community Planning & Development's Office of Special Needs which concludes that that there was insufficient evidence to conclude that harm reduction activities reduced overdoses and overdose fatalities, but there was sufficient evidence to suggest that "isolated housing for individuals with SUD and the facilitation of illicit drug use in that housing has only compounded the effects of an opioid crisis." *Id.* at 77 (citing AR 60).

Although Defendants point to evidence in the record, HUD's explanation for it "run[s] counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. The sources cited in the Memo that HUD relies on at AR 58-62 (AR 3089-3269, sources cited), do not support HUD's conclusion that harm reduction activities are harmful. None of the studies cited analyze overdose rates based on the availability or unavailability of harm reduction services. *See generally* ECF No. 33-1 at 40-42, 345-

525. To the extent that any of the scientific studies mention harm reduction, they recommend it, or identify harm reduction as a "well established" strategy for "reducing overdoses." ECF No. 33-1 at 355, 459-60. The source for HUD's claim that "isolated housing for individuals with SUD and the facilitation of illicit drug use in that housing has only compounded the effects of an opioid crisis," is not a scientific publication, but an Executive Order (No. 14367). HUD cannot avoid the APA's reasoned decision-making requirement by relying on Executive Orders that "hav[e] the President direct the agency to take an action." *Nat'l Ctr. for Learning Disabilities v. OMB*, No. 26-cv-13019, 2026 WL 2754447, at *15 (D. Mass. Sept. 17, 2026).

Defendants argue that having found that "CoC providers engaged in illegal harm reduction activities in [Permanent Supportive Housing] units," and that "there were higher rates of overdose and persisting substance use disorder in Permanent Supportive Housing," "[i]t is reasonable for HUD to conclude that the former lead to the latter, and that ending these activities will lead to a reduction in the same." ECF No. 46 at 78 (citing AR 60). But AR 60 supports at most the two findings, not the causal link between them, and Defendants cite nothing in the record for that inference. The studies in the record that address harm reduction point the other way. *See, e.g.*, ECF No. 33-1 at 355, 459-460.Accordingly, the remaining anti-harm-reduction provisions identified in the Appendix of Challenged NOFO provisions, ECF No. 44-1 at 5-6, including NOFO Sec. V.B.2.b, are held to be arbitrary and capricious, and are vacated, severed, and declared unlawful. Defendants HUD and Secretary Scott Turner, their agents, and all persons acting in concert or participation with

them are enjoined from applying these criteria, or any grant funding priority rule or policy having materially the same effect in implementing the 2026 NOFO. Such an injunction is necessary to accord Plaintiffs complete relief.

**3. Law Enforcement Criteria**

Plaintiffs challenge three 2026 NOFO criteria concerning CoCs' cooperation with law enforcement. The first is a threshold requirement that new SSO Street Outreach applicants "cooperate and not interfere or impede with the enforcement of local laws such as public camping and public drug use laws." NOFO Sec. V.A.4.c(4)(c); ECF No. 33-1 at 617. The second awards points for street outreach projects that "cooperate with first responders and law enforcement to increase positive interactions." NOFO Sec. V.B.1.c(11); ECF No. 33-1 at 632. The third awards points to CoCs that do not "interfere with or impede local efforts" to clear encampments, decrease public drug use, "[u]tilize standards that address homeless individuals who are a danger to themselves or others (e.g., involuntary commitment)," and share information under the Sex Offender Registry and Notification Act. NOFO Sec. V.B.1.c(14); ECF No. 33-1 at 632–33. Plaintiffs argue that one of these provisions, the "Local Policies Criterion," NOFO Sec. V.B.1.c(14), violates the First Amendment rights of the four nonprofit Plaintiffs that bring this claim (National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads Rhode Island, and Youth Pride, Inc.) to discuss the best policies for combatting homelessness, and that all the Law Enforcement Criteria are arbitrary and capricious because they fail to consider multiple important aspects of the problem. ECF No. 44-2 at 41-42.

Defendants argue that the Local Policies Criterion does not violate the First Amendment because the Federal government has significant discretion to impose funding conditions in grant programs that "may affect the recipient's exercise of its First Amendment rights," ECF No. 46 at 95 (citing *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)), and because the challenged provision is a content neutral condition, narrowly tailored to advance a substantial government interest. *Id.* at 95-96 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 796-98 (1989); *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968)). Defendants argue that the directive advances the government's interest in "ensuring that law enforcement officers are not interfered with in the performance of their duties," and only burdens CoCs' freedom of speech when their speech "can reasonably be found to have interfered with a law enforcement officer in the performance of the officer's duties." ECF No. 46 at 96.

Defendants' framework does not fit. The Local Policies Criterion is a condition on federal funding, and the governing question is whether the condition defines the limits of the federally funded program or instead uses funding to regulate speech outside it. *See All. for Open Soc'y*, 570 U.S. at 214-15, 217. The criterion directs CoCs to "[d]emonstrate, by providing evidence, that the CoC cooperates and does not interfere with or impede local efforts to advance the objectives below," which include "[q]uickly clear[ing] tents and encampments on public property," "[d]ecreas[ing] the public use of illicit drugs," and "[u]tiliz[ing] standards that address homeless individuals who are a danger to themselves or others (e.g., involuntary commitment)."

ECF No.33-1 at 632-33 (NOFO Sec. V.B.1.c(14)). It also directs CoCs to "[i]dentify local laws, policies, or other practices that help or hinder" those objectives and to explain how they will overcome "the harmful effects of restrictive ones." *Id.* The criterion is worth up to 14 of the 130 points available on the CoC Application and a CoC's application score in turn accounts for up to 50 points of the score of each of its Tier 2 projects. ECF No. 33-1 at 632, 642. That language is not limited to interference with officers performing their duties. It measures the CoC's activity in the community generally, not the conduct of any funded project, and it rewards CoCs for working to overcome local laws that "restrict[]" encampment clearing and similar measures. A CoC that instead supports those laws, or advocates against the measures HUD favors, can be found to "impede local efforts" and lose points as a result. A condition that penalizes a recipient's views expressed outside the funded program does not define the program's scope. *See All. for Open Soc'y*, 570 U.S. at 217 (holding that the government may not restrict "protected [speech] outside the scope of the federally funded program") (citing *Rust*, 500 U.S. at 197). *Rust* is not to the contrary. It allows the government to fund a program that advances its chosen goals, not to withhold funds because a recipient opposes those goals elsewhere. *See* 500 U.S. at 194. And because here the criterion penalizes opposition to particular policies, it is not content neutral even under Defendants' framework. The Local Policies Criterion is therefore severed, vacated, and declared unlawful. *See* 5 U.S.C. § 706(2)(B).

Plaintiffs argue that two other law enforcement related criteria are arbitrary and capricious. These criteria provide:

1. As part of Threshold review for new SSO projects, applicants "must cooperate and not interfere or impede with the enforcement of local laws [...] and assist/be willing to assist first responders in their efforts to engage homeless individuals." (ECF No. 33-1 at 617 (NOFO Sec. V.A.4.c(4)(c)). And,

2. As part of Merits review the NOFO may award up to 5 points to "Street Outreach projects (including co-response) [that] cooperate with first responders and law enforcement to increase positive interactions in order to increase housing and service engagement and promote use of CoC services." ECF No. 33-1 at 632 (NOFO Sec. V.B.1.c(11)).

Plaintiffs argue that these provisions are unlawful because HUD failed to consider important aspects of the problem including that Congress encourages "constructive alternatives to criminalizing homelessness" to minimize trauma among homeless individuals and communities, and that evidence shows that the promoted policies (including involuntary commitment and encampment clearing) are ineffective, cause significant trauma, and do not reduce homelessness. ECF No. 44-2 at 41-42 (quoting 42 U.S.C. § 11313(a)(13)).

Defendants justify these criteria only in that they argue that the criteria serve the statutory purpose of minimizing the trauma of homelessness. ECF No. 46 at 88 (citing 42 U.S.C. § 11381(2)). But HUD did not consider the trauma that enforcement itself can cause. Congress has recognized that problem, *see* 42 U.S.C. § 11313(a)(13) (directing the United States Interagency Council on Homelessness to develop "constructive alternatives to criminalizing homelessness"), and HUD itself acknowledged it in disclaiming any aim "to jail, fine, or endlessly move unsheltered

individuals," ECF No. 33-1 at 49. HUD did not explain how requiring SSO applicants, as a condition of eligibility, to "cooperate and not interfere or impede with the enforcement of local laws," including laws against public camping, ECF No. 33-1 at 617, squares with that disclaimer or advances the purpose HUD invokes. This failure to consider an important aspect of the problem renders NOFO Sec. V.A.4.c(4)(c) arbitrary and capricious and it is severed, vacated, and declared unlawful. *See State Farm*, 463 U.S. at 43.

The Court declines to hold NOFO Sec. V.B.1.c(11) unlawful, as the Court is not convinced that awarding points for "cooperat[ing] with first responders and law enforcement to increase positive interactions" fails to consider important aspects of the problem under *State Farm*. Unlike the threshold, this criterion does not condition eligibility on cooperation with enforcement. It awards points for cooperation aimed at "positive interactions" that "increase housing and service engagement," which is consistent with the purpose HUD invokes.

Accordingly, Plaintiffs' motion, ECF No. 44, is GRANTED IN PART as to NOFO Sec. V.B.1.c(14) and Sec. V.A.4.c(4)(c) and DENIED IN PART as to NOFO Sec. V.B.1.c(11). Defendants' motion, ECF No. 46, is correspondingly DENIED IN PART as to NOFO Sec. V.B.1.c(14) and Sec. V.A.4.c(4)(c) and GRANTED IN PART as to NOFO Sec. V.B.1.c(11).

#### 4. Self-Sufficiency Criteria

The 2026 NOFO contains Self-Sufficiency Criteria that allow HUD to disqualify applicants that do not adequately promote "self-sufficiency", presently

defined by HUD as "the ability to meet basic needs, including a place to live, without public or private assistance." ECF No. 33-1 at 558 (NOFO Sec. I.A.1) (defining "self-sufficiency"); *id.* at 613 (NOFO Sec. V.A.4.b.(1)(c)) (assessing projects' performance in assisting program participants in achieving self-sufficiency on a pass/fail basis); *id.* at 639 (NOFO Sec. VC) (identifying as a "sufficient and independent basis" for rejection the "[a]bility to promote self-sufficiency and economic independence."). Plaintiffs argue that these Self-Sufficiency Criteria exceed HUD's authority because the concept or definition of "self-sufficiency" adopted by HUD is contrary to the statute and are therefore arbitrary and capricious. *See generally* ECF No. 44-2 at 44-45. Throughout the statute, Congress makes clear that the CoC program should help people get assistance from mainstream programs like Medicaid, SNAP, and Supplemental Security Income. *Id.* at 44 (citing 42 U.S.C. §§ 11313(a)(7), 11381(3), 11386a(b)(1)(D), 11386b(d)(2)(B)). The same section of the statute that provides that the CoC program should "optimize self-sufficiency" also provides that the program should "promote access to, and effective utilization of, mainstream programs … and programs funded with State or local resources." *Id.* (quoting 42 U.S.C. §§ 11381(3), (4); *id.* § 11313(a)(7) (defining "mainstream programs")). Based on the statute's encouragement of applicants' use of other non-CoC assistance programs, HUD's attempt to define self-sufficiency as excluding participants' reliance on such resources, Plaintiffs argue must be contrary to statute. *Id.* at 44-45.

Defendants counter that HUD acted within its authority and consistent with law because it "relied on the plain, ordinary meaning of 'self-sufficiency' provided by

Oxford English Dictionary and confirmed by Merriam Webster." ECF No. 46 at 52. The criteria are permissible, they argue, as additional selection criteria authorized under 42 U.S.C. § 11386a(b)(1). *Id.* The criteria are not inconsistent with the congressional mandate that HUD promote "efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families," 42 U.S.C. § 11381(2) because they further the other enumerated congressional directive of "optimiz[ing] self-sufficiency among individuals and families experiencing homelessness." ECF No. 46 at 52-53 (citing 42 U.S.C. § 11381(4)). Lastly, Defendants argue that HUD can define "self-sufficiency" as the ability to meet basic needs "without public or private assistance" because while the NOFO "recognizes that many homeless individuals over time can eventually transition to not needing benefits, [...] [n]othing in the NOFO assumes or requires all homeless individuals to become self-sufficient [...] [a]nd those who can never achieve self-sufficiency can continue to receive assistance." *Id.* at 53.

Defendants' argument that HUD is simply obeying the plain meaning of the statute through its reliance on "a dictionary definition" of self-sufficiency is unpersuasive. The Court must "account for the governing statutory context," when interpreting statutory language. *Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010). Here, that context includes Congress' instruction that HUD "promote access to, and effective utilization of, mainstream programs" immediately prior to the directive that HUD also "optimize self-sufficiency." 42 U.S.C. §§ 11381(3)-(4). The Court cannot interpret these provisions as being contradictory. *Penobscot Nation v.*

*Frey*, 3 F.4th 484, 501 (1st Cir. 2021) ("[W]e cannot interpret . . . statutes to negate their own stated purposes."). Nor does § 11386a(b)(1)(G) authorize use of the definition of self-sufficiency that HUD asserts. *See* ECF No. 46 at 52. Criteria "appropriate to carry out this part" cannot penalize applicants for doing what the part directs HUD to promote: connecting participants with mainstream programs. 42 U.S.C. § 11381(3).

Defendants' assertion that the NOFO does not assume or require all homeless individuals to become self-sufficient, and assurance that those who can never achieve self-sufficiency "can continue to receive assistance" does not cure the problem. The criteria still disfavor projects whose participants rely on the assistance that Congress directs HUD to promote.

Because the Court finds that Defendants' definition of "self-sufficiency" is contrary to statute, the Court does not reach Plaintiffs' arguments that the self-sufficiency provisions are also arbitrary and capricious.

The Court holds that NOFO Sec. I.A.1 (defining "self-sufficiency") is severed, vacated, and declared unlawful. *See* ECF No. 44-1 at 8. NOFO Sec. V.A.4.b(1)(c), which assesses on a pass/fail basis the applicant's success in helping participants "achieve and maintain self-sufficiency independent living," is vacated to the extent it incorporates the vacated definition. HUD may not apply it to treat participants' reliance on mainstream programs, as a failure of self-sufficiency or independent living, nor may HUD deprioritize projects because their participants rely on such

programs. The self-sufficiency factor in NOFO Sec. V.C is addressed with the Risk Review criteria below.

Accordingly, Plaintiffs' Motion for Summary Judgment, ECF No. 44, is GRANTED IN PART and DENIED IN PART as to the challenged Self-Sufficiency criteria, and Defendants' Motion for Summary Judgment, ECF No. 46, is DENIED IN PART and GRANTED IN PART as to the same. Defendants HUD and Secretary Scott Turner, their agents, and all persons acting in concert or participation with them are enjoined from applying an unlawful definition of self-sufficiency, or from applying the other surviving self-sufficiency criteria inconsistently with this order in implementing the 2026 NOFO. Such an injunction is necessary to accord Plaintiffs complete relief.

### 5. "Risk Review" and "Additional Factor" Criteria

Plaintiffs challenge several "Risk Review" and "Additional Factor" criteria in the NOFO, including HUD identifying as a "sufficient and independent basis" to reject projects:

- "Ability to promote self-sufficiency and economic independence,"
- "History of illegal discrimination, including illegal racial discrimination"
- "History of subsidizing or facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO"
- "Public sources like news reports"

ECF No. 33-1 at 638-39 (NOFO Sec. V.C)

And HUD's inclusion of the following factors in application review:

- "The scope of the overall projected impact on the program and administrative goals and priorities in this NOFO,"
- "Likelihood that the proposed project will result in the benefits expected"
- "Broad range of recipients beyond recurrent recipients"

ECF No. 33-1 at 639 (NOFO Sec. V.D)

Plaintiffs argue that these criteria are arbitrary and capricious for several reasons, including because HUD offered no explanation for the provisions in the memo explaining the NOFO. ECF No. 44-2 at 43-44. Defendants respond that the factors are objective and rational, and that "the Risk Review and Additional Factors are explained—either directly in the NOFO or are self-evidently [sic] on their face." ECF No. 46 at 82. Defendants also argue that the Risk Review factors mirror the risk review required by 2 C.F.R. § 200.206, and that any concern about how HUD will apply the factors is an unripe, as-applied challenge. *Id.*

Whatever the potential merits of the challenged provisions, Defendants do not identify—and the Court does not find in the provided portions of the record—any explanation for the challenged provisions. The only place in the record that Defendants identify as explaining the provisions, ECF 33-1 at 638-39, are the pages of the NOFO listing the challenged provisions. No other explanation has been provided and thus this alone makes the provisions arbitrary and capricious. *See Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 888 (W.D. Wash. 2025) (holding that provisions that "have not been explained at all" do not withstand arbitrary-and-capricious review). Defendants argue that the provisions are self-evident, but "agency action is rarely so self-evident that no other explanation is required," and this action is no exception. *Sorenson Comm'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). Nor do the challenged factors mirror 2 C.F.R. § 200.206, which directs agencies to assess matters such as an applicant's financial stability,

management systems, and history of performance; indeed, the challenged factors go well beyond those. And Plaintiffs' challenge is not premature: whether HUD explained these criteria turns on the record, not on how HUD later applies them. The challenged provisions are vague as to their scope and applicability, and do not by their own terms indicate why or how HUD may apply them to applicants in implementing the CoC program.

For these reasons, the Court holds that the provisions listed by Plaintiffs under "Risk Review" and "Additional Factors" Criteria header of the Appendix of Challenged Provisions are arbitrary and capricious, with one exception. HUD's reason for considering an applicant's "[h]istory of illegal discrimination" in deciding whether to entrust it with federal funds "may reasonably be discerned." *See State Farm*, 463 U.S. at 43 (citation omitted). That HUD will decide in the first instance whether past conduct was illegal, *see* ECF No. 44-2 at 42, does not make the factor unreasoned. A misapplication can be challenged if it occurs. The factor concerning an applicant's "[h]istory of subsidizing or facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO" is different. It turns on "the purposes of this NOFO," which include the anti-harm-reduction policy the Court has held to be arbitrary and capricious, above. HUD has not explained what past conduct the factor is intended to reach or why it bears on an applicant's fitness to receive CoC funds. It is therefore arbitrary and capricious along with the other unexplained factors.

As the Court holds these provisions unlawful based on Defendants' failure to explain them, the Court does not reach Plaintiffs' other arguments concerning unlawfulness of the "Risk Review" and "Additional Factor" Criteria. The "Risk Review" and Additional Factor Criteria identified in the Appendix of Challenged Provisions, ECF No. 44-1 at 9, other than the illegal-discrimination factor, are vacated, severed, and declared unlawful. Defendants HUD and Secretary Scott Turner, their agents, and all persons acting in concert or participation with them are enjoined from applying these criteria, or any grant funding priority rule or policy having materially the same effect in implementing the 2026 NOFO. Such an injunction is necessary to accord Plaintiffs complete relief.

**6. Threshold Review Criteria**

The 2026 NOFO includes requirements as part of "threshold" review for all new projects that Plaintiffs argue exceed HUD's statutory authority as to new projects that CoCs list in Tier 1 of their applications. As a reminder, while only Tier 2 projects go through "merit" review, all projects must go through "threshold" review prior to being funded, whether they fall in CoC's Tier 1 or Tier 2 applications.

The Challenged Threshold Review Criteria require that all new projects, compared with project renewals, whether included in Tier 1 or Tier 2 of CoCs' applications meet certain standards that reflect HUD's current policy preferences (including meeting specified benchmarks; ensuring that "all" program participants will participate in supportive services; demonstrating that programs will cooperate

with law enforcement in enforcing policies that Plaintiffs argue criminalize homelessness). *See* ECF No. 33-1 at 615-17, 619-20 (NOFO Sec. V.A.4.c(4)(a), (c), (e)).

Plaintiffs argue that these criteria violate the 2026 Appropriation Act as applied to Tier 1 projects (and accordingly exceed HUD's authority), because in the Act Congress required that HUD select projects totaling not less than 60 percent of each collaborative applicant's annual renewal demand "based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" ECF No. 44-2 at 48 (quoting Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399). Plaintiffs argue that, for Tier 1 funding, the statutory language means that CoCs get to decide which projects receive awards, so long as they are "consistent with" statutory requirements. *Id.* If the challenged Threshold Review criteria are permitted, then HUD could disqualify or selectively fund new Tier 1 applications based on HUD's policy priorities and not based on the CoCs' rankings—in contravention of Congress's mandate that CoCs be permitted to set the funding priority for the projects they rank in Tier 1. *Id.*

Defendants respond that the 2026 Appropriations Act allows HUD to choose which new projects to fund among CoCs' Tier 1 projects because HUD may apply the selection criteria from 42 U.S.C. § 11386a (including new criteria created by the Secretary under § 11386a(b)(1)(G)) when funding Tier 1 projects. ECF No. 46 at 59 ("[the 2026 Appropriations Act] does not say that awards must be made solely on the basis of [CoCs' Tier 1] rankings or that local placement in Tier 1 overrides otherwise applicable selection criteria"). Defendants also emphasize that the non-statutory

threshold criteria "only apply to new project applications," and not to renewal projects that CoCs place in Tier 1. *Id.* Defendants, acknowledged, however, that the Act "requires HUD to respect each CoC's ordering of projects." *Id.*

The Act does not permit HUD to override the CoCs' Tier 1 rankings with criteria of its own. It directs that HUD "shall select" projects up to the Tier 1 amount "based on rankings determined by the local continuum of care." 140 Stat. at 399. That specific direction controls the general authority to add selection criteria in §11386a(b)(1)(G). *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). The Act's further requirement that selections be "consistent with 42 U.S.C. 11381 et seq." ensures that Tier 1 projects meet the requirements of the McKinney-Vento Act itself and the program-integrity requirements that already govern CoC awards. It does not incorporate new, discretionary criteria that would let HUD fund some ranked projects and not others according to its own priorities. Reading it that way would leave the CoCs' rankings, which Defendants concede HUD must respect, ECF No. 46 at 59, with little effect. Defendants' point that the challenged threshold requirements only apply to *new* projects does not change the Court's conclusion. The 2026 Appropriations Act requires HUD to "select projects" "based on" the local CoCs' rankings, not to select *renewal* projects based on those rankings. *See* Pub. L. No. 119-75, 140 Stat. at 399. Congress demonstrates in *the immediately preceding provision* that it knows how to single out renewal projects, so Congress's failure to do so here must be respected. *See id.* ("*Provided further*, That the Secretary shall make reasonable adjustments to renewal amounts to enable

renewal projects to operate at substantially the same levels, including cost- of-living adjustments for supportive services from the prior grant.")

The challenged Non-Statutory Threshold Criteria identified in the Appendix of Challenged NOFO provisions, ECF No. 44-1 at 10-11, are therefore vacated, severed, and declared unlawful only as applied to projects listed by CoCs in Tier 1. Defendants HUD and Secretary Scott Turner, their agents, and all persons acting in concert or participation with them are enjoined from applying these criteria, or any grant funding priority rule or policy having materially the same effect in awarding Tier 1 grant funding in the 2026 NOFO. Such an injunction is necessary to accord Plaintiffs complete relief.

**7. Disability Priority Criteria**

Plaintiffs challenge a 2026 NOFO provision providing that "[i]ndividuals who are likely to never be able to return to the workforce—over 62 years old, physically disabled, developmentally disabled—should be prioritized for Permanent Supportive Housing." ECF No. 33-1 at 582 (NOFO Sec. III.B.3). Plaintiffs argue that the disability priority policy is contrary to federal disability law because it discriminates against individuals with some kinds of disabilities (such as mental disabilities including substance use disorders) over others in violation of the Rehabilitation Act and the Americans with Disabilities Act. ECF No. 44-2 at 45-47.

Defendants argue that Plaintiffs lack standing to challenge this provision because the challenged disability priority "does not require applicants or CoCs to take

any action," does not award points based on whether CoC applicants act on the statement, and therefore does not impose a preference. ECF No. 46 at 55.

Plaintiffs base their standing argument on the claim that HUD gives practical effect to the challenged disability priority through an Additional Factor criterion under which HUD may reject projects based on their "projected impact on the … priorities in this NOFO." ECF No. 44-2 at 45 (citing NOFO Sec. V.D). Plaintiffs have separately challenged the legality of certain Additional Factor Criteria including this one that Plaintiffs argue confer standing as to this claim, and the Court found those criteria to be unlawful. These vacated criteria cannot presently give practical effect to the challenged disability policy because they are no longer in force. Defendants represent that the statement does not award points and "does not require applicants or CoCs to take any action." ECF No. 46 at 55. With the Additional Factor criterion vacated, Plaintiffs identify no other way HUD will apply the statement in selecting projects. A statement of HUD's goals that no criterion implements does not, on this record, cause Plaintiffs an injury that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (holding that a threatened injury must be "certainly impending").

Plaintiffs' challenge to the disability priority statement, NOFO Sec. III.B.3, is therefore dismissed without prejudice for lack of standing. If HUD applies the statement in selecting projects under the 2026 NOFO, Plaintiffs may renew their challenge.

8. **Bonus Limits**

The 2026 NOFO imposes the following limitations on the CoC Bonus:

1. The CoC Bonus amount for a Split CoC that is not a New Tribal CoC will be no less than $250,000 and no more than $3,000,000;

2. The CoC Bonus for a Merged CoC will be no less than $750,000 and no more than $10,000,000;

3. The CoC Bonus for a CoC that is neither a Split CoC nor a Merged CoC will be no less than $500,000 and no more than $5,000,000.

4. The CoC Bonus for a New Tribal CoC will be no less than $500,000 and no more than $5,000,000.

ECF No. 33-1 at 563-64 (NOFO Sec. II.B.3.c(1)-(4)).

Plaintiffs argue that these bonus minimums and maximums are arbitrary and capricious for two reasons: first, because they limit the ability of large CoCs with high demonstrated need to receive Bonus funds while skewing Bonus awards in favor of smaller CoCs with lower relative need, independent of the substantive merits of their applications. ECF No. 44-2 at 48-49. Second, Plaintiffs argue that HUD failed to consider the important factor that the Bonus Limits systematically disadvantage CoCs with higher relative need in competing for all Tier 2 funding, not just in competing for Bonus funding. *Id.* This is so, Plaintiffs argue, because "if a small CoC and large CoC scored the same on the NOFO's merit criteria and put forward identical projects that they comparably ranked, the small CoC's project would get a higher final score—and be much more likely to receive funding—despite the projects' equivalence." *Id.*

Defendants raise three arguments in response. First, that the Bonus Limits are committed to HUD's unreviewable discretion under 42 U.S.C. § 11386a(b)(1)(G). ECF No. 46 at 88. Second, that HUD acted reasonably in setting bonus floors and caps. *Id.* at 88-89. Defendants specifically argue that HUD found that the previous Bonus amounts "stifled competition" because Bonus amounts were granted "based on a percentage of the CoC's FPRN" (Final Pro Rata Need), and because "larger CoCs would receive larger bonuses." *Id.* (citing HUD's Policy Rationale For NOFO Reforma memo, AR 73, which says that Bonuses were previously awarded "not on merit but rather on the existing resources of the CoC"). According to Defendants this formula would increase Bonuses to larger CoCs "not tied in any direct way to CoC performance, merit, or outcome," and decrease the share of Bonuses available to smaller CoCs over time. *Id.* Defendants state that HUD determined that "applying caps would achieve Congressional intent for the CoC program to be competitive." *Id.*

Third, regarding Plaintiffs' argument that HUD failed to consider that the Bonus formula would hurt large CoCs competing for Tier 2 funding, HUD responds that HUD recognized that the changed Bonus structure would decrease the Bonuses received by certain CoCs, but that "these resources are above and beyond the CoCs' existing renewal demands," and that HUD determined that the loss of these "extra" resources was outweighed by the creation of a "more level playing field" for Bonus funds among CoCs of all sizes. *Id.* at 89.

Defendants' argument that it has unreviewable discretion to award Bonus funds is wrong, as agency action is committed to unreviewable agency discretion only

in those "rare instances" in which there is "no law to apply." *Webster v. Doe*, 486 U.S. 592, 599 (1988). The CoC statute, including 42 U.S.C. § 11386a(b)(1)(G) specifically, provides that the Secretary shall create additional criteria that "the Secretary determines to be appropriate to carry out this part in an effective and efficient manner." This provision is subject to the rationality requirement of APA decision-making. *See State Farm*, 463 U.S. at 43.

The Court need not decide whether HUD's premise about the prior bonus structure holds, because HUD failed to consider the effect Plaintiffs identify. HUD acknowledged that the Bonus Limits would reduce the bonus funds available to some CoCs, and it concluded that the loss was acceptable because those funds are "above and beyond the CoCs' existing renewal demands," ECF No. 33-1 at 56; ECF No. 46 at 89. But Plaintiffs' argument is different. Because of how the Bonus Limits interact with the NOFO's formula for scoring Tier 2 applications, a smaller CoC's project will outscore an otherwise identical project from a larger CoC in the competition for all Tier 2 funds, not just bonus funds. ECF No. 44-2 at 49; ECF No. 33-1 at 642. Neither the record pages Defendants cite nor their brief addresses that effect. *See* ECF No. 33-1 at 56; ECF No. 46 at 89. HUD thus "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

The challenged Bonus Limits language identified in the Appendix of Challenged Provisions, ECF No. 44-1 at 11, is vacated, severed, and declared unlawful. Defendants HUD and Secretary Scott Turner, their agents, and all persons acting in concert or participation with them are enjoined from applying these bonus

limits, or materially similar limits, in implementing the 2026 NOFO. Without the limits, CoCs may apply for CoC Bonus funding of up to 15% of their Final Pro Rata Need, as the NOFO otherwise provides. ECF No. 33-1 at 588 Such an injunction is necessary to accord Plaintiffs complete relief.

**9. Executive Order Conditions**

The 2026 NOFO also creates post-award conditions requiring successful grant applicants to "follow ... Presidential Executive Actions affecting federal financial assistance programs,"[5] ECF No. 33-1 at 658 (NOFO Sec. VII.A. Administrative 9), and Executive Order 14218 (*Ending Taxpayer Subsidization of Open Borders*). ECF No. 33-1 at 659 (NOFO Sec. VII.A. Civil Rights and Other Protections 13).

Plaintiffs challenge these post-award requirements as unlawful for several reasons, including because they are beyond HUD's authority, are arbitrary and capricious, and arguing that certain EOs impose unconstitutional limitations on grant applicants' First Amendment rights. ECF No. 44-2 at 50-53. In particular, Plaintiffs argue that the EO conditions are arbitrary and capricious because HUD

[5] This list includes: Executive Order (EO) 14332 (Improving Oversight of Federal Grantmaking); EO 14303 (Restoring Gold Standard Science); EO 14219 (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative); EO 14218 (Ending Taxpayer Subsidization of Open Borders); EO 14202 (Eradicating Anti-Christian Bias) • EO 14205 (Establishment of the White House Faith Office); EO 14182 (Enforcing the Hyde Amendment); EO 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity); EO 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government); EO 14151 (Ending Radical and Wasteful Government DEI Programs and Preferencing); and EO 14148 (Initial Rescissions of Harmful Executive Orders and Actions).

provided no reasoned explanation for their inclusion of the conditions in the NOFO. *Id.* at 51.

Defendants respond that the provisions are reasonable because they simply consist of HUD's informing CoC applicants that the referenced Executive Orders "may apply" to their grants and that since the "Executive Orders do not apply to the CoC grantees," HUD "did not 'act' on Plaintiffs through this provision." ECF No. 46 at 84-85. And because the only obligations under this provision attach to HUD itself, not to any recipient of funding under the NOFO, they have not imposed any condition on Plaintiffs related to the EOs, much less one that burdens recipients' First Amendment rights. *Id.* at 96-97.

The Court finds that the NOFO does have an effect on grantees because it states that grantees "must follow the applicable provisions," including the EOs that Plaintiffs object to here. The only reason to include a provision in the NOFO telling grantees they "must follow" certain Executive Orders is if HUD either believes that the provision imposes a duty on grantees or intends for grantees to believe they are so bound. Accordingly, the Court rejects Defendants' claim that HUD did not "act" on Plaintiffs through the provision. The requirements that NOFO incorporates say as much: "[r]ecipients of Federal awards must comply with applicable Executive Orders, as advised by the Department." ECF No. 46 at 84 (quoting Gen. Admin. Requirements at 4).

The Court further finds that neither the NOFO, nor the memorandum explaining the basis for the NOFO, explains the inclusion of the EO conditions at all.

*See generally* 2026 NOFO; ECF No. 33-1 at 21-56. For this reason, the conditions are arbitrary and capricious. *Martin Luther King, Jr. Cnty.*, 785 F. Supp. 3d at 888–89 (holding that rote incorporation of executive orders into funding conditions, absent any explanation for their inclusion, does not constitute reasoned decisionmaking). Because the conditions fall on this ground, the Court does not reach Plaintiffs' remaining arguments, including their statutory and First Amendment challenges to the conditions requiring compliance with the "gender ideology" Executive Orders. ECF No. 44-2 at 51-53.

The challenged Executive Order Conditions identified in the Appendix of Challenged Provisions are vacated, severed, and declared unlawful.

**C. The OMB Apportionment Footnotes**

OMB has authority to apportion appropriated funds—that is, make them available—before an agency can obligate them. *See* 31 U.S.C. §§ 1512, 1513(b), 1517(a); Notice; Delegation of Apportionment Authority, 90 Fed. Reg. 9737 (Feb. 18, 2025). This is an administrative power that is meant to ensure that agencies do not spend funds in excess of what Congress appropriated. *See* 31 U.S.C. § 1512(a).

Plaintiffs challenge the legality of two "Apportionment Footnotes," A2 and A3, that Defendant OMB appended to the apportionment of funding for Homeless Assistance Grants.[6] They require that "[t]o the extent permitted by law" amounts

[6] The originally challenged Apportionment Footnotes A1 and A2 expired on September 30, 2026, but OMB has since reapportioned the funds and imposed substantively similar identical footnotes A2 and A3. *See* OMB, *Approved Apportionments*, https://apportionment-public.max.gov/ (FY 2027 HUD

apportioned for competitive grants be obligated only "on award agreements that include terms and conditions" consistent with the directives in Executive Order 14332, Footnote A2, and that amounts not yet obligated be consistent with the directives in Executive Order 14321. Footnote A3. Because OMB has designated these footnotes as legally binding, HUD would violate the Antideficiency Act—and the relevant officials could face administrative and criminal penalties—if they do not follow the footnotes. *See* OMB Circular No. A-11 § 120.34 (Aug. 2025), https://perma.cc/897F-UUQK; 31 U.S.C. §§ 1517–1519.

Plaintiffs argue that the challenged Footnotes are invalid because they exceed OMB's authority and are arbitrary and capricious. *See* ECF No. 44-2 at 54-56. Defendants respond that this Court cannot review Plaintiffs' claim regarding the footnotes, that Plaintiffs lack standing to bring the claim, and that Plaintiffs' arguments fail on the merits. *See* ECF No. 46 at 89-95. The Court first addresses the Plaintiffs' standing and the Court's power to adjudicate this claim before reaching the merits.

**1. Standing**

Defendants challenge Plaintiffs' standing because the footnotes only impose obligations on HUD, and "impose no requirements, determine no legal rights, or cause any effects on Plaintiffs." ECF No. 46 at 101; *see also id.* at 92. But the footnotes will significantly affect Plaintiffs' interests because, if applied, they would prevent HUD

---

apportionment for Account 086-0192, *available at* https://perma.cc/V9UH-8V27). This Order applies to the newly reimposed footnotes A2 and A3.

from making awards to any applicants that do not follow the policy preferences contained in the relevant Executive Orders.

Defendants essentially ask the Court to hold that actions that would be found arbitrary and capricious under the APA if taken directly by HUD become insulated from private challenge when framed as binding instructions from OMB to HUD. The Court is not prepared to create this loophole. Whether ordered by OMB in a legally binding footnote or included by HUD directly as a provision in the 2026 NOFO the substantive restrictions in the challenged footnotes restrict CoC's eligibility for funding under the CoC program.

Plaintiffs have therefore shown injury, traceability, and redressability. The footnotes bind HUD to condition and allocate CoC awards according to the executive orders' directives and Plaintiffs are applicants for and recipients of those awards. *See* OMB Circular No. A-11 § 120.34. That HUD, and not OMB, will make the awards does not defeat traceability, because the footnotes have a "determinative or coercive effect" on HUD's action. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). And vacating the footnotes would remove that constraint. Plaintiffs therefore have standing to challenge the footnotes.

**2. Reviewability**

Defendants also argue that this Court does not have the power to review Plaintiffs' claim regarding OMB apportionment footnotes on the grounds that the APA does not apply because the Antideficiency Act (specifically 31 U.S.C. §§ 1512-1513) precludes judicial review. *See* ECF No. 46 at 89 (citing 5 U.S.C. § 701(a)(1)).

Other courts have now considered and rejected this argument. *See, e.g.*, *Nat'l Ctr. for Learning Disabilities v. OMB*, No. 26-cv-13019, 2026 WL 2754447, at *10 (D. Mass. Sept. 17, 2026); *Neguse v. U.S. Immigr. and Customs Enf't*, 813 F. Supp. 3d 45, 88 (D.D.C. 2025). This Court reaches the same conclusion for the reasons below.

Defendants argue that §§ 1512 and 1513 lack "rights-creating language," which, together with the statute's remedial scheme, shows that Congress meant to preclude review. ECF No. 46 at 90. But whether a statute contains rights-creating language bears on whether it implies a private right of action, not on whether it displaces a cause of action the APA itself provides. *See Alexander v. Sandoval*, 532 U.S. 275, 288-89 (2001). Plaintiffs sue under the APA, not under the Antideficiency Act. *See Nat'l Ctr. For Learning Disabilities*, 2026 WL 2754447, at *10.

The APA confers a general cause of action upon persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702; *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702). Section 701(a) of the APA, however, only disallows judicial review where "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). But whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved. *Block*, 467 U.S. at 345. Courts apply a "strong presumption favoring judicial review of administrative action" that is only overcome by a "show[ing] that Congress prohibited all judicial review" of the relevant agency actions. *Mach Mining, LLC v. EEOC*, 575

U.S. 480, 489 (2015) (citation modified). Accordingly, the burden is not on Plaintiffs to demonstrate that the Antideficiency Act creates a right of action, but on Defendants to show that a statutory scheme clearly establishes Congress's intent to preclude judicial review.

Defendants attempt to do so by pointing out that if an Executive Branch employee violates §§ 1512 or 1513 of the Antideficiency Act, the head of the employee's agency must report the violation to the President, Congress, and the Comptroller General, and that the Antideficiency Act's remedial provisions include after-the-fact reporting but not a specifically listed method for private parties to enforce appropriations. ECF No. 46 at 90-91 (citing 31 U.S.C. §§ 1351, 1517(b)). This argument is not convincing. The penalties and remedial actions in the Antideficiency Act highlighted by Defendants are consequences that the statute sets out for Executive Branch employees who obligate funds *in excess* of congressional appropriations, not those who fail to fully obligate appropriated funds. Plaintiffs' APA claims do not interact with those specific statutory remedies because they seek to ensure that Executive Branch employees fully obligate funds based only on lawful considerations.

Defendants also point to the D.C. Circuit and the Supreme Court's holdings in *Global Health Council v. Trump*, 153 F.4th 1, 7, 19 (D.C. Cir. 2025) and *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 146 S. Ct. 19 (2025) ("*AVAC*") to suggest that the Antideficiency Act precludes all APA review. ECF No. 46 at 89. But both cases concerned the Impoundment Control Act, which sets out its own scheme for

addressing executive impoundment of funds, including enforcement by the Comptroller General. *See Global Health Council*, 153 F.4th at 17; *AVAC*, 146 S. Ct. at 19. Neither addresses the Antideficiency Act's apportionment provisions, and *AVAC* was a preliminary determination in a stay order. *See* ECF No. 47 at 35 n.8.

For these reasons the Court does not find that the Antideficiency Act's remedial scheme for the type of violation Plaintiffs allege is so comprehensive as to preclude judicial review under the APA.

The footnotes are also final agency action. They mark the consummation of OMB's apportionment decision, and legal consequences flow from them; that is, HUD officials who obligate funds inconsistently with them would violate the Antideficiency Act. *See* 31 U.S.C. §§ 1517-1519; *Bennett*, 520 U.S. at 177-79.

**3. Merits**

Plaintiffs also argue that the Footnotes are arbitrary and capricious because OMB failed to consider any information other than the contents of the executive order in compelling HUD to abide by them, including the impact of the footnotes' funding restrictions on providers, CoCs, and program participants. ECF No. 44-2 at 55. Defendants respond that because the Executive Orders referenced in the challenged footnotes "directly implicate[]" grantmaking and the CoC program, it was reasonable for OMB to order HUD to comply with those Executive Orders in footnotes A2 and A3. ECF No. 46 at 93-94.

Defendants' response misses the point. OMB's administrative record consists only of the two executive orders, substantiating Plaintiffs' argument that OMB did

not consider the effect of the Executive Orders on the CoC program in promulgating the footnotes. ECF No. 33-1 at 683-91. This record demonstrates that OMB failed to consider "important aspect[s] of the problem" rendering their inclusion arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Defendants argue that OMB did not need to provide any additional reasoning for requiring HUD to comply with the cited Executive Orders because "[i]t cannot be arbitrary and capricious for OMB to comply with the Executive Orders in such a manner." ECF No. 46 at 95. But OMB cannot avoid the APA's requirement that it consider important aspects of the problem simply by "having the President direct the agency to take an action." *Nat'l Ctr. for Learning Disabilities*, 2026 WL 2754447, at *15. Defendants' reliance on *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), fares no better. ECF No. 46 at 95. The President is not an agency under the APA, but OMB is, and it is OMB's footnotes that Plaintiffs challenge. Nor does the footnotes' qualifier, "[t]o the extent permitted by law," cure the defect. The problem is that OMB considered nothing beyond the executive orders, and a saving clause does not supply the reasoning the APA requires.

Because the Court accepts Plaintiffs' argument that footnotes A2 and A3 are arbitrary and capricious, the Court does not reach the parties' arguments regarding whether the footnotes exceed Defendants' statutory authority.

Footnotes A2 and A3, as reissued in OMB's fiscal year 2027 apportionment, are declared unlawful and are vacated insofar as they apply to Continuum of Care programs.

**D. Further Relief**

Due to the major changes this Court is ordering HUD to implement when carrying out the 2026 NOFO, and the difficulty this Court would face in ordering Defendants to change course after announcing grant awards, the Court finds that compliance reporting is necessary to accord Plaintiffs the relief to which they are entitled.

Defendants HUD and Secretary Scott Turner are ordered to file in each of the above-captioned cases, no later than November 25, 2026, a Compliance Report that (a) describes Defendants' plans for making Tier 1 awards without applying the vacated provisions, including steps Defendants will undertake to ensure that the agency does not consider or otherwise apply the vacated provisions when making Tier 1 awards and (b) describes Defendants' plans for making Tier 2 awards, including how HUD will reopen the Tier 2 application window and score resubmitted applications, without applying the Set-Aside or other vacated provisions, and the steps Defendants will undertake to ensure that the agency does not consider or otherwise apply the vacated provisions when making Tier 2 awards. The report shall also confirm that HUD will not apply Apportionment Footnotes A2 and A3 in obligating Continuum of Care funds.

Defendants are also required to submit a final Compliance Report no later than January 8, 2027, detailing the steps Defendants took to comply with this Court's Order, and signed under penalty of perjury by the HUD official most directly responsible for the implementation of the award program. The Court concludes that

given the discretion with which HUD administers the CoC program, this reporting is necessary to ensure that Plaintiffs obtain the relief to which they are lawfully entitled. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiffs prevailed on the merits of most of their challenge to the NOFO, will be irreparably harmed if HUD obligates funds inconsistent with this Court's Order, and will have no legal remedy that will remedy the injury once awards are made. The public interest also weighs in favor of ensuring that the CoC program is lawfully administered, which this Court can only verify through the minimal reporting presently ordered. Any burden on Defendants should be comparatively light, as the Court's Order essentially requires that HUD share with the Court the policy and directives that HUD will undoubtedly be promulgating internally as it administers the CoC program consistent with this Court's Order. Nor does this reporting amount to the ongoing "superintend[ence]" of agency operations that Defendants caution against. ECF No. 46 at 99 (quoting *Salazar ex rel. Salazar v. District of Columbia*, 896 F.3d 489, 497 (D.C. Cir. 2018)). It consists of two reports, ends shortly after Tier 2 awards are made, and directs no particular exercise of HUD's discretion.

## IV. CONCLUSION

For the foregoing reasons, in No. 26-cv-436, the Court GRANTS IN PART and DENIES IN PART the NAEH Plaintiffs' Motion for Summary Judgment, ECF No. 44, and the Defendants' Cross-Motion for Summary Judgment, ECF No. 46, as set forth above. The NAEH Plaintiffs' challenge to the disability priority statement, NOFO Sec. III.B.3, is DISMISSED WITHOUT PREJUDICE for lack of standing. In

No. 26-cv-439, the Court GRANTS IN PART and DENIES IN PART the Plaintiff States' Renewed Motion for Summary Judgment, States ECF No. 51, and Defendants' Cross-Motion for Summary Judgment, States ECF No. 52, as set forth in Parts III.A and III.B.1. The compliance reporting ordered in Part III.D applies in both cases.

IT IS SO ORDERED.

MARY S. MCELROY
United States District Judge

November 20, 2026